UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

**AVIVA STAHL**,

                              Plaintiff,

         v.

**FEDERAL BUREAU OF PRISONS**, and
**DEPARTMENT OF JUSTICE**,

                              Defendants.

---

No. 19-cv-4142

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Journalist Aviva Stahl ("Ms. Stahl") brings this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, to compel the Federal Bureau of Prisons ("BOP") and Department of Justice ("DOJ") (collectively "Defendants") to disclose records of the medical treatment of Mohammad Salameh ("Mr. Salameh") from January 1, 2002, to December 31, 2015, including videos of the BOP force-feeding Mr. Salameh while he was engaged in peaceful hunger strikes. Ms. Stahl brings this action because she believes the public has a right to have a full picture of the BOP's practice of force-feeding people who are on hunger strike.

2.      The conditions inside of America's prisons has become a pressing national concern. This is evidenced by the immense number of news articles, books, and even feature-length documentaries on the issue. Nevertheless, the conditions faced by the more than 2.3 million people confined in jails and prisons across the United States remains largely hidden from the general public. A March 2019 report by the *New York Times* described prisons as "the black boxes of our

1

society."[1] That report offered a "rare look" into the "violence of incarceration" and suggested that Americans would fix our prisons if we could only see what happens inside of them.[2] As that *New York Times*' report explained, "when prisoners go on hunger strikes or work strikes . . . the public rarely understands exactly why."[3]

3.       Investigating prison hunger strikes, and the BOP's response to them, is exactly why Ms. Stahl filed the FOIA request at issue in this case.

4.       Prior to filing this request, Ms. Stahl had heard reports that prisoners in the Administrative Maximum Security unit of the United States Penitentiary in Florence, Colorado ("USP Florence ADMAX") had been engaged in hunger strikes. She also learned that, in response to these protests, the BOP had been force-feeding those prisoners. Indeed, Ms. Stahl learned that the BOP has a policy for force-feedings people on hunger strike, and that policy requires the agency to videotape all such force-feedings.[4]

5.       Ms. Stahl understood that force-feeding is a practice that has been condemned by such organizations as the American Medical Association, the World Medical Association, and the United Nations.

6.       When Ms. Stahl learned that the BOP was allegedly force-feeding people in United States prisons, she wanted to inform the public about the practice, and she knew that the most effective way to do so would be to obtain videos of the BOP administering the procedure.

7.       Since Ms. Stahl had heard that the BOP had been force-feeding hunger-striking prisoners at USP Florence ADMAX, she sought to obtain the videos of the force-feedings that had

---

[1] Shaila Dewan, *Inside America's Black Box: A Rare Look at the Violence of Incarceration*, N.Y. Times (Mar. 30, 2019), https://www.nytimes.com/2019/03/30/us/inside-americas-black-box.html.
[2] *Id.*
[3] *Id.*
[4] Federal Bureau of Prisons, Policy Statement 5562.05, Hunger Strikes 7 (2005), https://www.bop.gov/policy/progstat/5562_005.pdf.

occurred there. To do so, Ms. Stahl contacted Mr. Salameh because she had heard that he was one of the prisoners that had been force-fed while hunger striking at that facility.

8.     Mr. Salameh confirmed that the BOP had force-fed him while he was hunger striking and authorized the BOP to release to Ms. Stahl his medical records, including all videos of the BOP force-feeding him. With these express written authorizations attached, Ms. Stahl submitted the FOIA request at issue in this case.

9.     In response, the BOP released some of Mr. Salameh's medical records, including records indicating that the BOP force-fed Mr. Salameh numerous times between January 1, 2002, and December 31, 2015, and that the BOP had videos of some of these force-feedings. But the BOP specifically refused to release other records of Mr. Salameh's medical treatment—including any videos of the BOP force-feeding him.

10.     Although the BOP claims—in a generalized and conclusory fashion—that several exemptions apply to the withheld records, the BOP has no proper reason for withholding them.

11.     Ms. Stahl has already published one article on the information contained in the written medical records that the BOP has released in response to her FOIA request thus far, but she knows that videos of the force-feedings will give the public a clearer picture of this government practice than any written record ever could.

12.     Ms. Stahl brings this suit to compel the Defendants to disclose the remainder of Mr. Salameh's medical records from January 1, 2002, to December 31, 2015, including all videos of the BOP force-feeding him during that time.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

14.     Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) because Ms. Stahl resides in this district.

## PARTIES

15.     Plaintiff Aviva Stahl is an independent investigative journalist. She has written for prominent national outlets including the *Guardian*, the *Nation*, *Harper's Magazine*, *Rolling Stone*, *VICE*, and many others. She is a member of the news media and intends to publish the information at issue in this lawsuit to enrich the public's understanding of government operations and activities, specifically the BOP's force-feeding of people on hunger strike.

16.     Defendant Department of Justice is a department within the executive branch of the United States government and is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

17.     Defendant Federal Bureau of Prisons is a sub-agency of the DOJ and is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

## FACTS

### Purpose for Seeking Records

18.     Ms. Stahl is a freelance journalist whose investigative reporting focuses on the criminal justice system, specifically within prisons.

19.     Ms. Stahl became interested in the records at issue in this case when she heard that prisoners at USP Florence ADMAX had been engaged in peaceful hunger strikes for years, that the BOP had been force-feeding these hunger strikers, and that the BOP had a policy of videotaping force-feedings.

20.     Ms. Stahl had several reasons to believe that this was a matter of public interest.

### Prison Protests and Hunger Strikes

21.     The same year that Ms. Stahl submitted the FOIA request at issue in this case, protests led by prisoners in the United States grabbed national headlines.

22.     In the summer of 2018, prisoners across the country went on a general strike, which was covered by numerous national outlets including the *New York Times*,[5] the *Washington Post*,[6] the *Atlantic*,[7] and the *New Yorker*.[8]

23.     The nationwide 2018 prison strike specifically included hunger strikes, which was also widely reported.[9]

24.     Prison hunger strikes, among all prison protests, have long captured the public interest.

25.     Prison hunger strikes gained notoriety in the United States as early as 1917, when suffragists—imprisoned for supporting a woman's right to vote—went on hunger strike.

26.     In 2013, nearly 30,000 people imprisoned in California went on a hunger strike to protest long-term isolated confinement, and after two months of extensive media coverage, the prisoners secured substantive policy changes.

27.     The force-feeding of hunger striking prisoners and detainees has also recently

---

[5] Mitch Smith, *Prison Strike Organizers Aim to Improve Conditions and Pay*, N.Y. Times (Aug. 26, 2018), https://www.nytimes.com/2018/08/26/us/national-prison-strike-2018.html.
[6] Lindsey Bever & Cleve R. Wootson Jr., *Inmates Across the U.S. Are Staging a Prison Strike Over 'Modern-Day Slavery,'* Wash. Post (Aug. 21, 2018), https://www.washingtonpost.com/nation/2018/08/21/inmates-across-us-are-staging-prison-strike-over-modern-day-slavery.
[7] Vauhini Vara, *The Viral Success of a Strike No One Can See*, Atlantic (Aug. 30, 2018), https://www.theatlantic.com/business/archive/2018/08/prison-strike/568948.
[8] Daniel A. Gross, *An Inside Account of the National Prisoners' Strike*, New Yorker (Sept. 6, 2018), https://www.newyorker.com/news/as-told-to/an-inside-account-of-the-national-prisoners-strike.
[9] *See, e.g.*, Smith, *supra* note 5 ("[A]ctivists circulated video that appeared to show an inmate turning down a burrito and saying he was on a hunger strike."); Ed Pilkington, *Major Prison Strike Spreads Across US and Canada as Inmates Refuse Food*, Guardian (Aug. 23, 2018), https://www.theguardian.com/us-news/2018/aug/23/prison-strike-us-canada-forced-labor-protest-activism; Laignee Barron, *Here's Why Inmates in the U.S. Prison System Have Launched a Nationwide Strike*, Time (Aug. 22, 2018), http://time.com/5374133/prison-strike-labor-conditions ("Through labor strikes, hunger strikes and sit-ins staged from Aug. 21 to Sept. 9, protest organizers are demanding an end to what they see as exploitation and racism in the world's largest incarceration complex.").

gained widespread public attention.

28.     Just this year, the force-feeding of hunger-striking asylum-seekers by Immigration and Customs Enforcement ("ICE") made national headlines. The *Washington Post* reported that the news of ICE force-feeding hunger-striking asylum-seekers "triggered outrage from lawmakers and human rights groups."[10] The *Associated Press* reported that the story "had garnered international headlines and angry responses from policymakers and human rights advocates."[11] And eventually, after "public pressure was a mounting," ICE halted the practice.[12]

29.     Indeed, force-feeding hunger strikers has frequently been a topic of public debate in the international, human rights, and medical communities. The United Nations has noted that force-feeding is considered "tantamount to torture," is "a violation of internationally-protected human rights," and does not comply with human rights standards "under any circumstances."[13] The World Medical Association has declared that "[f]orced-feeding is never ethically acceptable."[14] And the American Medical Association has said that "the force-feeding of detainees violates core ethical values of the medical profession" because every patient has the right to refuse treatment.[15]

30.     Mr. Salameh notes that when the BOP force-fed him, guards secured him to a chair with straps around his shins, thighs, knees, and diagonally across his torso to form an X, and also

---

[10] Amy B. Wang, *ICE Confirms It Is Force-Feeding Detainees on Hunger Strike*, Washington Post (Feb. 2, 2019), https://www.washingtonpost.com/dc-md-va/2019/02/02/ice-admits-force-feeding-detainees-hunger-strike.

[11] Garance Burke & Martha Mendoza, *Detainee on Hunger Strike Details Force-Feeding*, AP (Feb 3, 2019), https://apnews.com/e2ff21606c72407db3197ddf866bd738.

[12] Martha Mendoza et al., *Ice Stops Force-Feeding Detainees*, AP (Feb. 15, 2019), https://www.apnews.com/15d84da5810748f7a14b346419381cfb.

[13] Press Release, U.N. Joint Statement on New Israeli Law on Force-Feeding of Detainees (Aug. 8, 2015), http://www.emro.who.int/pse/palestine-news/un-joint-statement-on-new-israeli-law-on-force-feeding-of-detainees.html..

[14] *WMA Declaration of Malta on Hunger Strikers*, World Med. Ass'n (Oct. 15, 2017), https://www.wma.net/policies-post/wma-declaration-of-malta-on-hunger-strikers (adopted in 1991).

[15] Letter from Jeremy A. Lazarus, MD, Pres., Am. Med. Ass'n, to Chuck Hagel, Sec'y of Def. (Apr. 25, 2013), https://www.jhsph.edu/research/centers-and-institutes/center-for-public-health-and-human-rights/_pdf/AMA%20Hunger%20Strikes%20Letter.pdf.

handcuffed his wrists behind his back for the duration of the force-feeding, which sometimes lasted for hours. Staff then forced a tube down his nostril, which sometimes came out of his mouth, causing him to choke, and other times entered his windpipe, causing him to cough uncontrollably. After the tube was properly inserted into his stomach, staff would pump Novasource (a nutritional supplement) into his body. And after the force-feeding was over, staff would violently yank the tube from his nostril.

31.     During one force-feeding, Mr. Salameh recalls that he tightened his stomach muscles to resist the force-feeding and continue his hunger strike, causing him to vomit, but the staff continued to pour Novasource down his throat and he vomited uncontrollably throughout the rest of the procedure. (According to records released to Ms. Stahl, this force-feeding is one of those that was videotaped by the BOP.)

32.     Mr. Salameh insists that the BOP did not conduct these force-feedings out of concern for his health, but to punish him with excessive pain for hunger striking in the first place, in the hopes of forcing him to give up his peaceful protests.

33.     Ms. Stahl believes that the public should be allowed to see the videos of these force-feedings and judge the merits of the BOP's policy—and application of that policy—for itself.

34.     Ms. Stahl filed the FOIA requests at issue in this lawsuit to expand the public's understanding of several issues of interest, including prison protests, hunger strikes, and force-feedings. Her article on the records that she has received from the BOP thus far has started to do just that. Indeed, there have been several follow-up reports on Ms. Stahl's article, demonstrating that there is public interest in this specific story.

**The Request**[16]

35.     Ms. Stahl had heard that the BOP was force-feeding hunger-striking prisoners at USP Florence ADMAX. Specifically, she had heard that Mr. Salameh was one of those prisoners, but that he was no longer housed at that facility. To obtain records of the BOP force-feeding people on hunger strike, Ms. Stahl thus made contact with Mr. Salameh and, with his express authorization, sought the records at issue in this lawsuit.

*First Inquiry*

36.     Ms. Stahl submitted a valid FOIA request to the BOP on February 12, 2018 (the "First Inquiry").

37.     In Ms. Stahl's First Inquiry, she requested all records of Mr. Salameh's medical evaluations and treatment from January 1, 2002, to December 31, 2015, including "any . . . videotapes of any involuntary medical treatment."

38.     Along with this request, Ms. Stahl included a DOJ-361 Certification of Identity form[17] completed by Mr. Salameh. She also included an Authorization for Release of Medical Information completed and signed by Mr. Salameh and witnessed by staff at USP Florence. This Authorization specifically authorized and requested the BOP to release to Ms. Stahl a complete record of Mr. Salameh's medical file pertaining to his evaluation and treatment from January 1, 2002, to December 31, 2015, including all "videotapes of involuntary medical treatment, including insertion of nasogastric tubes, IVs, . . . etc." (ellipses in original). The Authorization also stated

---

[16] For the reasons explained below—primarily because the BOP considered Ms. Stahl's two FOIA requests duplicative and, on that basis, administratively closed the second—the two requests discussed in this section should be considered one request for purposes of this lawsuit, and are discussed as such in this Complaint.

[17] The purpose of a DOJ-361 Certification of Identity form is to ensure that the DOJ does not wrongfully disclose records of individuals who are the subject of the DOJ's systems of records. The DOJ-361 Certification of Identity form completed by Mr. Salameh and submitted by Ms. Stahl with her First Inquiry specifically authorized the Defendants to release information on Mr. Salameh to Ms. Stahl.

that Mr. Salameh understood that this information would be used for "journalism/reporting."

39. The BOP subsequently assigned Ms. Stahl's First Inquiry "Request No. 2018.02917."

*Second Inquiry*

40. Ms. Stahl submitted a second valid FOIA request to the BOP on March 23, 2018 (the "Second Inquiry").

41. In Ms. Stahl's Second Inquiry, she requested, "videos in which Salameh has undergone force-feeding or what the BOP refers to as 'involuntary treatment with naso-gastric tube feeding and/or intravenous administration of essential nutrients . . . .'"

42. In Ms. Stahl's Second Inquiry, she also pointed out that BOP policies require the BOP to videotape (1) the process of removing hunger strikers from their cells and (2) force-feeding them. She thus sought "any existing videos . . . that depict the cell extraction as well as the force-feeding of Mr. Salameh."

43. Along with Ms. Stahl's Second Inquiry, she included another DOJ-361 Certification of Identity form completed and signed by Mr. Salameh, a BP-A0301 Authorization to Release Confidential Information form completed and signed by Mr. Salameh, and a signed letter from Mr. Salameh authorizing the DOJ to release to Ms. Stahl all medical records, including "all videotapes of my medical exams and force-feedings and naso-gastric tube feedings, and all intravenous rehydrations . . . ."

44. Ms. Stahl also attached to her Second Inquiry a BOP Incident Report numbered 2782525. This Incident Report stated that:

> On November 11, 2015, at approximately 11:30 a.m.; Health Services determined inmate Salameh, Mohammad, Reg. No. 34338-054, has a significant hazard to his health due to numerous consecutive missed meals. Salameh was given a final order to rehydrate himself and he refused. A Calculated Use of Force team was utilized

9

and Salameh was placed in the pro restraint chair and the nasal gastral involuntary Hydration procedure took place.

45.     Ms. Stahl further attached to her Second Inquiry a Naso-Gastric Tube Feeding record that states that on May 1, 2005, at 10:21 a.m., the BOP involuntarily fed Mr. Salameh over 700 milliliters of Novasource, 200 milliliters of water, and 300 milliliters of electrolyte solution through his left nostril. She also attached two "Injury Assessment and Followup" forms from May 1, 2005, indicating that Mr. Salameh complained of vomiting and neck pain after the force-feeding.

46.     The BOP subsequently assigned Ms. Stahl's Second Inquiry "Request No. 2018-03868."

### News Media Fee Reduction

47.     In both Ms. Stahl's First Inquiry and Second Inquiry she clearly identified herself as a member of the news media.

48.     She noted that she had written for prominent national outlets including the *Guardian*, the *Nation*, *Harper's Magazine*, *Rolling Stone*, *VICE*, and many others.

49.     She incorporated by reference many of these articles by directing the BOP to her website, stahlidarity.com, where links to her articles can be found.

50.     She noted that she had no personal or commercial interest in these records.

51.     This qualified and still qualifies Ms. Stahl's request for the news media fee reduction under FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and the BOP's regulations.

### Public Interest Fee Reduction

52.     Furthermore, Ms. Stahl noted in both her First Inquiry and Second Inquiry that disclosure of the requested records was in the public interest because her primary and sole purpose for seeking them was to enrich the public's understanding of government operations and activities, specifically the BOP's force-feeding of people on hunger strike.

53.     She also noted that she had no personal or commercial interest in these records.

54.     All of this qualified and still qualifies Ms. Stahl's request for additional fee reductions under the public interest fee reduction or waiver under FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and the BOP's regulations.

**Request for Expedited Processing**

55.     As a member of the news media, Ms. Stahl also requested expedited processing.

56.     She argued that expedited processing was warranted by the immense amount of press coverage that prisoner healthcare issues had garnered, demonstrating that it was a pressing national concern.

57.     She also noted that force-feeding hunger strikers had received extensive press attention over the years.

58.     Finally, she noted that the BOP's force-feeding of hunger strikers may be ongoing.

59.     All of this qualified and still qualifies Ms. Stahl's request for expedited processing under FOIA, 5 U.S.C. § 552(a)(6)(D)(E), and the BOP's regulations.

<u>**Agency Responses**</u>

**Initial Responses to First Inquiry**

60.     In a February 16, 2018 letter, the BOP acknowledged receipt of Ms. Stahl's First Inquiry and assigned it Request No. 2018-02917.

61.     In that acknowledgment, the BOP denied Ms. Stahl's request for expedited processing.

62.     The BOP also extended the time it had to respond to Ms. Stahl's request by the ten additional days provided by 5 U.S.C. § 552(a)(6)(B)(i).

63.     Finally, the BOP stated that if Ms. Stahl had requested a fee waiver (which she

clearly had), the BOP would make a decision on whether to grant Ms. Stahl's request after it determined whether fees would be assessed for the request.

64.    In a March 19, 2018 email, Ms. Stahl objected to the BOP's denial of expedited processing, citing the various reasons her request qualified for expedited processing under 28 C.F.R. § 16.5(e)(ii) and (iv).

65.    In a March 20, 2018 email (before Ms. Stahl sent her Second Inquiry), a representative from the BOP wrote that "I have reviewed your request and I am changing the request from complex to expedite."

66.    However, it was still nearly eight months until Ms. Stahl received a final response from the BOP.

**Response to Second Inquiry**

67.    In an April 3, 2018 email, the BOP acknowledged receipt of Ms. Stahl's Second Inquiry, assigned it Request No. 2018-03868, stated that it considered this request duplicative of Ms. Stahl's First Inquiry, and thus closed Request No. 2018-03868.

68.    In an April 5, 2018 email, Ms. Stahl noted that in her Second Inquiry, she specifically requested copies of the force team extraction videos, which she did not specifically mention in her First Inquiry.

69.    In that email, Ms. Stahl also pointed out that, with her Second Inquiry, she submitted additional releases from Mr. Salameh to ensure that the BOP understood that she sought—and that Mr. Salameh had authorized the BOP to give her—videos of the BOP force-feeding him.

70.    In an April 5, 2018 reply, the BOP stated that it considered the records requested in the Second Inquiry to be entirely included in the records requested in the First Inquiry.

71.     It was therefore understood by both Ms. Stahl and the BOP that Ms. Stahl's First Inquiry entitled her to all of the records that her Second Inquiry would have entitled her to, and that the filing of her First Inquiry triggered all of the statutory requirement under FOIA.

### Follow-Up Emails

72.     Between April 5, 2018, and July 9, 2018, Ms. Stahl sent the BOP at least three follow-up emails asking for updates on her request.

73.     During this three-month period, the BOP failed to provide any substantive response.

74.     On July 9, 2018, the BOP sent an email to Ms. Stahl stating that it had "received the records for this request," that the request had "started to be processed," and that the request "should be completed and approved for release in the next couple weeks."

75.     However, Ms. Stahl did not receive any records from the BOP for over a month, and even that release was only a partial release.

### Partial Release

76.     The BOP partially responded to Ms. Stahl's request in a letter dated August 10, 2018.

77.     With that response, the BOP produced 1055 unredacted pages of medical records and four additional pages of medical records that were partially redacted.

78.     The BOP claimed that the redacted materials were exempt from disclosure under 5 U.S.C. § 552(b)(6) ("personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy") and (b)(7)(C) ("records . . . compiled for law enforcement purposes but only to the extent that the production…could reasonably be expected to constitute an unwarranted invasion of personal

privacy.").

79.     The BOP did not detail which exemption allegedly applied to which redactions.

**Follow-Up Emails**

80.     In an August 17, 2018 email, Ms. Stahl acknowledged receipt of the partial release, but questioned why it did not contain videos of the involuntary feedings, which she had specifically requested, or any notation or explanation about why these videos were not included.

81.     In an August 17, 2018 response, the BOP stated that more records were being retrieved "from the institution" and that these records would be sent to Ms. Stahl along with a final determination letter.

82.     In an August 17, 2018 reply, Ms. Stahl attempted to clarify if the BOP would be reviewing and releasing more records in addition to those listed in the partial response, or if the BOP would only be re-reviewing and potentially releasing the four partially redacted pages.

83.     In response, in an August 17, 2018 email, the BOP explained that "we processed the electronic medical records and were waiting on other paper records to be retrieved. Therefore, we release on a rolling basis and you will receive more records once we receive the paper records."

**Emails About Final Release**

84.     In an August 20, 2018 email, the BOP informed Ms. Stahl that it would send her a CD containing the reminder of the records that it would be disclosing to her in response to her FOIA request and asked her for her current mailing address.

85.     That same day, Ms. Stahl replied by email, providing her current mailing address.

86.     On October 9, 2018—almost two months later—Ms. Stahl still had not received a final response or CD from the BOP.

87.     On that day, Ms. Stahl emailed the BOP and asked why there had been a delay. She

also asked if the BOP could send her the final determination letter so that she could anticipate what would be released.

88.     In an October 9, 2018 reply, the BOP said that the CD had been mailed out the previous week and failed to reply to Ms. Stahl's request for the final determination letter.

89.     On October 17, 2018, Ms. Stahl emailed the BOP to inform them that she still had not received the CD. She asked if they could send her another copy, and asked again if they could send her the final determination letter so that she could think through next steps if the BOP had denied any part of her request.

90.     On October 19, 2018, Ms. Stahl emailed the BOP again, nudging them to reply to her October 17, 2018 email.

91.     On October 22, 2018, the BOP replied to Ms. Stahl by email, stating that, "For some reason mailing of CD's seems to be very slow. We normally like to have a requester wait about 4 weeks before requesting another CD. That seems to be the lag time with other requesters we have mailed CD's to." In that email, the BOP once again failed to respond to Ms. Stahl's request for the final determination letter.

## Final Release

92.     On November 2, 2019, Ms. Stahl received the BOP's final release in this matter.

93.     The BOP's final determination letter was dated September 24, 2018, more than a month before Ms. Stahl received it, and almost a month before the BOP's own October 22, 2018 email claimed that it was sent.

94.     With that response, the BOP produced 1567 unredacted pages of medical records and another thirty-seven pages of medical records that were partially redacted.

95.     The BOP also stated that it was withholding six pages of records and six videos.

15

96.     The BOP stated that "portions of these records are exempt in part or in full from disclosure to you under the following exemptions," and cited the same exemptions claimed in its August 10 letter, as well as 5 U.S.C. § 552(b)(7)(E) and (F).[18]

97.     The BOP did not detail which exemptions allegedly apply to which of the redactions or withheld records.

98.     The BOP did not even differentiate between which exemptions allegedly apply to the redactions versus the withheld records.

### Summary of Agency Responses

#### Failure to Conduct an Adequate Search

99.     The medical records disclosed by the BOP indicate that Mr. Salameh was force-fed numerous times in the period of time covered by Ms. Stahl's request.

100.    The BOP's Program Statement on Hunger Strikes, Program Statement 5562.05, requires that all force-feedings be videotaped.

101.    BOP's Program Statement on Use of Force and Application of Restraints, Program Statement 5566.06, further requires that all such videos be sent to the central office.

102.    Despite this, the BOP stated that it found only six videos responsive to Ms. Stahl's request without describing what search it conducted to locate additional videos.

103.    Failure to produce records because of an inadequate search constitutes an improper withholding of records in violation of FOIA, 5 U.S.C. § 552 (a)(3), and the BOP's regulations.

#### Exemptions Improperly Applied

104.    In the BOP's Final Release to Ms. Stahl, the agency stated that "portions of these

---

[18] 5 U.S.C. § 552(b)(7)(E) allows agencies to redact or withhold records compiled for law enforcement purposes, the release of which "would disclose techniques and procedures for law enforcement investigations and prosecutions."
5 U.S.C. § 552(b)(7)(F) allows agencies to redact or withhold records compiled for law enforcement purposes, the release of which "could reasonably be expected to endanger the life or personal safety of an individual."

records are exempt in part or in full from disclosure to you under the following exemptions" and listed the four exemptions noted above. This apparently indicates that the BOP believes that those exemptions apply to the records that were redacted and withheld.

105.    However, the BOP did not detail with any particularity which exemptions allegedly apply to which redactions or withheld records.

106.    The BOP did not even distinguish between which exemptions allegedly apply to the redactions versus the withheld records.

107.    This type of conclusory and generalized application of numerous exemptions to various records and parts of records, without specifying which exemptions apply to which withheld records and redactions—and how—constitutes an improper withholding of agency records in violation of FOIA, 5 U.S.C. § 552(a)(3)(A) and (6)(A), and the BOP's regulations.

**Cited Exemptions Do Not Apply**

108.    Even if the BOP had not improperly cited exemptions in a conclusory and generalized manner, the cited exemptions clearly do not apply to the redacted and withheld records, and thus those redactions and withholdings violate FOIA.

*5 U.S.C. § 552(b)(6) and (b)(7)(C)*

109.    Two of the exemptions that the BOP improperly cited in a conclusory and generalized manner were 5 U.S.C. § 552(b)(6) and (b)(7)(C).

110.    5 U.S.C. § 552(b)(7)(C) allows agencies to redact or withhold records that would constitute an unwarranted invasion of the personal privacy of third parties.

111.    5 U.S.C. § 552(b)(6) allows agencies to redact or withhold records that would constitute a *clearly* unwarranted invasion of the personal privacy of third parties.

112.    Both 5 U.S.C. § 552(b)(6) and (b)(7)(C) require that the agency and courts balance

17

the privacy interest at stake versus the public interest in the requested records.

113.    Here, any third-party privacy interest is minimal.

114.    Mr. Salameh—the primary subject of all of these records—has expressly granted the BOP permission to disclose all of the records at issue to Ms. Stahl for the purposes of reporting and journalism.

115.    By contrast, the public interest in these records is extraordinary, as described in paragraphs 21 through 34 of this Complaint.

116.    Thus, exemptions 5 U.S.C. § 552(b)(6) and (b)(7)(C) do not apply to the redactions or withheld records in this matter.

*5 U.S.C. § 552(b)(7)(E)*

117.    Another one of the exemptions that the BOP improperly cited in a conclusory and generalized manner was 5 U.S.C. § 552(b)(7)(E).

118.    This exemption allows agencies to redact or withhold records compiled for law enforcement purposes, the release of which would disclose techniques and procedures for law enforcement investigations or prosecutions.

119.    Here, the release of the redacted and withheld records would not disclose techniques or procedures for law enforcement investigations or prosecutions.

120.    The records at issue in this matter relate to the BOP force-feeding a hunger-striking prisoner—Mr. Salameh.

121.    First, records related to force-feeding a person on hunger strike are not, for purposes of 5 U.S.C. § 552(b)(7)(E), "records of techniques or procedures for law enforcement investigations or prosecutions."

122.    Second, to the extent that records related to force-feeding a person on hunger strike

18

are a technique or procedure for law enforcement investigations or prosecutions, this technique or procedure is already public information.

123.    The BOP's policy of force-feeding prisoners who engage in hunger strikes is contained in the BOP's own regulations, which the BOP has made available to the public.[19]

124.    Thus, releasing records related to this technique or procedure would not "disclose" that technique or procedure for purposes of 5 U.S.C. § 552(b)(7)(E).

125.    For both of those reasons, exemption 5 U.S.C. § 552(b)(7)(E) does not apply to the redactions or withheld records in this matter.

*5 U.S.C. § 552(b)(7)(F)*

126.    Another one of the exemptions that the BOP improperly cited in a conclusory and generalized manner was 5 U.S.C. § 552(b)(7)(F).

127.    This exemption allows agencies to redact or withhold records compiled for law enforcement purposes, the release of which could reasonably be expected to endanger the life or personal safety of an individual.

128.    As a preliminary matter, under 5 U.S.C. § 552(b)(7)(F), the agency must identify the specific individual whose personal safety or life would be endangered by disclosure.

129.    The BOP has improperly failed to identify any such individual.

130.    Furthermore, there is no conceivable individual.

131.    Once again, all of these records pertain to Mr. Salameh and he has specifically requested that the BOP release these records to Ms. Stahl for reporting and journalism purposes.

132.    The release of these records could not be expected to endanger the life or personal

---

[19] Federal Bureau of Prisons, *BOP Policies*, https://www.bop.gov/PublicInfo/execute/policysearch?todo=query (last visited July 7, 2019) (listing BOP policies that can be accessed via hyperlinks, including Policy Statement 5562.02, Hunger Strikes); Policy Statement 5562.05, *supra* note 4, available at https://www.bop.gov/policy/progstat/5562_005.pdf (detailing the BOP's policy of force-feeding people on hunger strike).

safety of an individual.

133.   Thus, exemption 5 U.S.C. § 552(b)(7)(F) does not apply to the redactions or withheld records in this matter.

**Untimeliness and Waiver of Fees**

134.   Ms. Stahl filed her request on February 12, 2018.

135.   Under FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and BOP regulations, the BOP had twenty days from receipt of Ms. Stahl's request to respond and inform Ms. Stahl of its determination and reasons for that determination.

136.   In a letter dated February 16, 2019, the BOP acknowledge receipt of this request and extended its time to respond by the ten additional days provided by 5 U.S.C. § 552(a)(6)(B)(i).

137.   This gave the BOP thirty days from February 16, 2018, to make a determination on Ms. Stahl's request.

138.    Thus, the BOP was required by statute to make a determination on Ms. Stahl's request by March 15, 2018.

139.   Despite repeated follow-up emails from Ms. Stahl, as described in paragraphs 72 through 75, the BOP did not make any determination on Ms. Stahl's request until August 10, 2018.

140.   This was nearly four full months after the date by which the BOP was required to make a determination under FOIA, 5 U.S.C. § 552(a)(6)(A)(i) and (B)(i), and BOP regulations.

141.   Furthermore, the BOP's August 10, 2018 determination was only a partial determination.

142.   The BOP did not make a final determination on Ms. Stahl's request until September 24, 2018.

143.   This was more than six full months after the date by which the BOP was required

20

to make a determination under FOIA, 5 U.S.C. § 552(a)(6)(A)(i) and (B)(i), and BOP regulations.

144.    In addition, Ms. Stahl did not receive this final determination until at least November 1, 2018, despite her repeated requests for an explanation for the delay, as described in paragraphs 84 through 91.

145.    Due to this untimeliness, and the lack of any applicable exception, the BOP is precluded from assessing fees in this matter under FOIA, 5 U.S.C. § 552(a)(4)(A)(viii)(I).

### News Media Fee Reduction

146.    In the BOP's February 16, 2018 letter to Ms. Stahl, the BOP stated that if Ms. Stahl had requested a fee waiver (which she clearly had), the BOP would make a decision whether to grant her request after it determined whether fees would be assessed for the request.

147.    It is unclear if this referred to Ms. Stahl's request for a news media fee reduction, a public interest fee reduction, or both.

148.    Either way, throughout all of the BOP's subsequent communications with Ms. Stahl, the BOP failed to address Ms. Stahl's request for a news media fee reduction.

149.    However, the BOP did not assess any fees for the records produced.

150.    This may be because the BOP realized that it was precluded from assessing fees in this matter due to its late response to Ms. Stahl's request.

151.    Regardless, Ms. Stahl's request and subsequent communications with the BOP in this matter made it clear that her request was entitled to a news media fee reduction under FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and the BOP's regulations.

### Public Interest Fee Reduction

152.    In the BOP's February 16, 2018 letter to Ms. Stahl, the BOP stated that if Ms. Stahl had requested a fee waiver (which she clearly had), the BOP would make a decision whether to

grant her request after it determined whether fees would be assessed for the request.

153.     It is unclear if this referred to Ms. Stahl's request for a news media fee reduction, a public interest fee reduction, or both.

154.     Either way, throughout all of the BOP's subsequent communications with Ms. Stahl, the BOP failed to address Ms. Stahl's request for a public interest fee reduction under FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and the BOP's regulations.

155.     However, the BOP did not assess any fees for the records produced.

156.     This may be because the BOP realized that it was precluded from assessing fees in this matter due to its late response to Ms. Stahl's request.

157.     Regardless, Ms. Stahl's request and subsequent communications with the BOP in this matter made it clear that her request was entitled to a public interest fee reduction under FOIA, 5 U.S.C. § 552(a)(4)(A)(iii), and the BOP's regulations.

### Request for Expedited Processing

158.     In the BOP's February 16, 2018 letter to Ms. Stahl, the BOP stated that it did not appear that Ms. Stahl's request qualified for expedited processing.

159.     This determination was clearly erroneous.

160.     Ms. Stahl's request made it clear that she was primarily engaged in disseminating information and that there was an urgency to inform the public about an actual or alleged federal government activity (the force-feeding of people on hunger strike), entitling her request to expedited processing under 28 C.F.R. § 16.5(e)(ii).

161.     In addition, Ms. Stahl's request made it clear that her request concerned a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity that affects public confidence, as described in paragraphs 21 through 34 of

this Complaint, entitling her request to expedited processing under 28 C.F.R § 16.5(e)(iv).

162.    In her March 19, 2018 email to the BOP, Ms. Stahl made both of these arguments, asked how to challenge the BOP's denial of her request for expedited processing, and offered to put the BOP in contact with her editor if this would assist the BOP in making its determination.

163.    In the BOP's March 20, 2019 email to Ms. Stahl (before Ms. Stahl sent her Second Inquiry), the agency stated that it changed the classification Ms. Stahl's request from complex to expedited. However, the BOP failed to process Ms. Stahl's request as soon as practicable, as required by FOIA, 5 U.S.C. § 552(a)(6)(E), and Defendants' regulations.

### Administrative Appeal

164.    On December 21, 2018, Ms. Stahl submitted an administrative appeal in this matter through the United Postal Service ("UPS").

165.    Ms. Stahl submitted this appeal through her counsel in this matter, Professor Betsy Ginsberg, Director of the Cardozo Civil Rights Clinic.

166.    BOP and DOJ regulations require that administrative appeals of BOP FOIA rejections be directed to the DOJ.

167.    Ms. Stahl, through her counsel, submitted her administrative appeal to the DOJ.

168.    In her appeal, Ms. Stahl argued that the BOP improperly withheld the records at issue in this lawsuit by failing to conduct an adequate search, applying exemptions in a generalized and conclusory manner, and citing exemptions that did not apply to the records at issue, and also objected to the BOP's failure to expedite processing of her request and failure to address her requests for a news media fee reduction and a public interest fee reduction.

169.    This appeal was sent in a sealed package.

170.    The sealed package was returned to Professor Ginsberg after UPS attempted to

deliver it to DOJ on approximately seven occasions.

171.    Upon information and belief, the package was returned because the United States government was shut down from December 22, 2018, through January 25, 2019.

172.    On January 28, 2019, the first business day after the government shutdown at issue ended, Professor Ginsberg sent by overnight mail another package to the DOJ that contained (1) the sealed package that was returned to her, (2) the UPS tracking materials demonstrating that the appeal had been timely filed, and (3) a cover letter.

## Denial of Administrative Appeal

173.    According to the DOJ's online FOIA appeals tracking system, the DOJ received Ms. Stahl's January 25, 2019 package on January 25, 2019, and assigned it Appeal Tracking Number DOJ-AP-2019-002130.

174.    In a letter to Professor Ginsberg dated March 20, 2019, the DOJ stated that it was "affirming BOP's action on your client's request."

175.    The letter referenced Request No. 2018-01917 and Appeal No. DOJ-AP-2019-002130.

176.    These request and appeals numbers clearly refer to Ms. Stahl's request for Mr. Salameh's medical records.

177.    However, the DOJ's letter describes the request as a request by Mr. Salameh for his own records, and refers to Mr. Salameh—rather than Ms. Stahl—as Professor Ginsberg's client.

178.    Despite this error about basic information about the request and appeal, the DOJ's letter insists that the agency affirmed the BOP's decision only after it "thoroughly reviewed and analyzed your appeal, your client's underlying request, and the action of BOP in response to your client's request."

## Failure to Conduct an Adequate Search

179.     In response to Ms. Stahl's argument in her appeal that the BOP had failed to conduct an adequate search, the DOJ stated that the BOP had "conducted an adequate, reasonable search . . . ."

180.     However, the DOJ did not address the fact that the medical records released to Ms. Stahl indicate that the BOP force-fed Mr. Salameh numerous times during the period of time covered by Ms. Stahl's request, yet in the BOP's denial of Ms. Stahl's request, the BOP referenced only six videos without describing what search it conducted to locate additional videos.

181.     The DOJ thus failed adequately assess whether the BOP conducted an adequate search for the requested records.

## Exemptions Improperly Applied

182.     In affirming the BOP's denial, the DOJ stated that "BOP properly withheld certain information because it is protected from disclosure" under the same exemptions cited by the BOP, and explained that "for each of these exemptions, it is reasonably foreseeable that disclosure of the information withheld would harm the interests protected by these exemptions."

183.     The DOJ did not—as the BOP did not in its underlying denial—detail with any particularity which exemptions allegedly apply to which redactions or withheld records, as required under FOIA.

184.     The DOJ did not even—as the BOP did not in its underlying denial—distinguish between which exemptions allegedly apply to the redactions versus the withheld records.

185.     This type of conclusory and generalized application of numerous exemptions to various records and parts of records, without specifying which exemptions apply to which withheld records and redactions—and how—constitutes an improper withholding of records in violation of

FOIA, 5 U.S.C. § 552(a)(3)(A) and (6)(A), and the BOP's regulations.

## Cited Exemptions Do Not Apply

186.    Furthermore, as discussed above in paragraphs 108 through 133, none of the exemptions cited by the Defendants apply to the requested records, and the BOP's true reason for denying this request is that it does not want these records to be public even though they are presumptively public under the law.

187.    In affirming the BOP's denial of Ms. Stahl's request, the DOJ thus failed to adequately assess whether the exemptions cited by the BOP actually applied to the redactions and withheld records.

## Untimeliness and Waiver of Fees

188.    According to the DOJ's online FOIA appeals tracking webpage for Ms. Stahl's appeal, the DOJ received Ms. Stahl's appeal on January 25, 2019, after the government shutdown had ended.

189.    Under 5 U.S.C. 552(a)(6)(A)(ii), the DOJ has twenty business days to respond to an appeal.

190.    Twenty business days from January 25, 2019, was February 22, 2019.

191.    The DOJ did not respond to Ms. Stahl's appeal until May 20, 2019.

192.    Under 5 U.S.C. § 552(a)(4)(A)(viii)(I), failure to timely respond to an administrative appeal under FOIA precludes assessing fees.

193.    The Defendants are thus precluded from assessing fees.

## Fee Reductions and Expedited Processing

194.    Despite Ms. Stahl's justified requests for fee reductions and expedited processing, and the BOP's failure to grant either, the DOJ wholly failed to address these issues in its letter

affirming the BOP's final determination on Ms. Stahl's request.

## CLAIMS

### First: Violation of FOIA for Failing to Timely Respond to Plaintiff's Request and Appeal

195.    Ms. Stahl repeats, realleges, and incorporates all of the allegations in all of the above paragraphs as if they are fully restated here.

196.    The BOP's failure to timely respond to Ms. Stahl's request violates FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendants' regulations.

197.    Similarly, the DOJ's failure to timely respond to Ms. Stahl's appeal violates FOIA, 5 U.S.C. § 552(a)(6)(A), and Defendants' regulations.

198.    Each of these violations independently precludes assessing fees under 5 U.S.C. § 552(a)(4)(A)(viii)(I).

199.    The Defendants are thus precluded from assessing fees.

### Second: Violation of FOIA for Improperly Withholding Agency Records

200.    Ms. Stahl repeats, realleges, and incorporates all of the allegations in all of the above paragraphs as if they are fully restated here.

201.    The Defendants' failure to produce records because they conducted an inadequate search constitutes an improper withholding of agency records in violation of FOIA, 5 U.S.C. § 552 (a)(3), and Defendants' regulations.

202.    Furthermore, the Defendants' conclusory and generalized application of numerous exemptions to various records and parts of records, without specifying which exemptions apply to which withheld records or redactions—and how—constitutes an improper withholding of agency records in violation of FOIA, 5 U.S.C. § 552(a)(3)(A) and (6)(A), and the BOP's regulations.

203.    Finally, the Defendants' withholding and redaction of records and parts of records

based on exemptions that do not apply to those records or parts of records constitutes an improper withholding of agency records in violation FOIA, 5 U.S.C. 552(a)(3)(A) and (6)(A), and Defendants' regulations.

### Third: Violation of FOIA for Failing to Grant Fee Reductions

204.    Ms. Stahl repeats, realleges, and incorporates all of the allegations in all of the above paragraphs as if they are fully restated here.

205.    The Defendants' failure to grant Ms. Stahl's requests for fee reductions violates FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II) and (iii), and Defendants' regulations.

### Fourth: Violation of FOIA for Failing to Expedite Plaintiff's Request

206.    Ms. Stahl repeats, realleges, and incorporates all of the allegations in all of the above paragraphs as if they are fully restated here.

207.    The Defendants' failure to expedite Ms. Stahl's request violates FOIA, 5 U.S.C. § 552(a)(6)(E), and Defendants' regulations.

208.    The Court is not precluded from reviewing the Defendants failure to expedite Ms. Stahl's request under 5 U.S.C. § 552(a)(6)(E)(iv) because the Defendants have not provided a complete response to Ms. Stahl's request.

### PRAYER FOR RELIEF

1.    Declare that the records requested by Ms. Stahl are public under 5 U.S.C. § 552 and must be disclosed;

2.    Order Defendants to conduct a thorough search for all records responsive to Ms. Stahl's request;

3.    Order Defendants to immediately process and release all records responsive to Ms. Stahl's request;

4.    Order Defendants to disclose all improperly withheld and redacted records and parts of records;

5.    Enjoin Defendants from charging Ms. Stahl for the search, review, and duplication

fees for processing her request;

6.     Award Ms. Stahl the costs and reasonable attorneys' fees incurred in this action; and

7.     Grant such other relief as this Court deems just and proper.

Dated:  New York, NY
        July 17, 2019

 

                            _____/s_____
                            BETSY GINSBERG,
                            CARDOZO CIVIL RIGHTS CLINIC
                            Benjamin N. Cardozo School of Law
                            Attorney for Plaintiff
                            55 5th Avenue, 11th Floor
                            New York, NY 10003
                            (212) 790-0871

                            KEEGAN STEPHAN
                            *Legal Intern*