**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____

Aviva STAHL,

                  *Plaintiff,*

*v.*

**FEDERAL BUREAU OF PRISONS and**
**U.S. DEPARTMENT OF JUSTICE,**

                  *Defendants.*
_____

No. 19-CV-4142 (BMC)

(Cogan, J.)


# MEMORANDUM OF LAW IN SUPPORT OF
# THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT


RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

F. FRANKLIN AMANAT
Senior Counsel
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201-2776
(718) 254-6024

*Attorneys for Defendants*


**Dated: December 20, 2019**

## TABLE OF CONTENTS

*(Ctrl+Click on headings or page numbers to hyperlink to section)*

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.   BOP's Hunger Strike Policy ...................................................................... 3

    B.   BOP's Use of Force Policy ........................................................................ 5

    C.   The Salameh Videos .................................................................................. 6

    D.   Stahl's FOIA Request ................................................................................ 8

APPLICABLE LEGAL STANDARD ...................................................................................... 9

ARGUMENT ........................................................................................................................ 11

    I.     ALL OF THE CONTESTED VIDEOTAPES WERE "COMPILED FOR LAW ENFORCEMENT PURPOSES" WITHIN THE MEANING OF 5 U.S.C. § 552(b)(7). .................................................................................. 11

    II.    THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE PERSONAL PRIVACY OF THE BOP STAFF DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(6) AND (b)(7)(C). ............................................ 13

    III.   THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE SAFETY OF THE BOP STAFF DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(7)(F). .............................................................................. 17

    IV.   THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE LAW ENFORCEMENT TECHNIQUES AND PROCEDURES DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(7)(E). ...................................... 20

CONCLUSION ...................................................................................................................... 23

## **TABLE OF AUTHORITIES**
*(Ctrl-Click on citations anywhere in brief to hyperlink to westlaw.com)*

### **Cases**

*Ahmed v. USCIS,* 2013 WL 27697 (E.D.N.Y. Jan. 2, 2013)...................................................20

*Allard K. Lowenstein Int'l Human Rts. Proj. v. DHS,* 626 F.3d 678 (2d Cir. 2010) ...........20

*Aspin v. Dep't of Defense,* 491 F.2d 24 (D.C. Cir. 1973) ...................................................11

*Associated Press v. Dep't of Defense,* 554 F.3d 274 (2d Cir. 2009)...............................14, 15

*Associated Press v. DOJ,* 549 F.3d 62 (2d Cir. 2008) ...........................................................9

*Billington v. DOJ,* 245 F. Supp. 2d 79 (D.D.C. 2003) .........................................................17

*Blackwell v. FBI,* 646 F.3d 37 (D.C. Cir. 2011) .................................................................20

*Blanton v. DOJ,* 182 F. Supp. 2d 81 (D.D.C. 2002) ...........................................................17

*Carney v. DOJ,* 19 F.3d 807 (2d Cir. 1994)...............................................................9, 10, 19, 22

*CIA v. Sims,* 471 U.S. 159 (1985) ........................................................................................9

*Cook v. Nat'l Archives,* 758 F.3d 168 (2d Cir. 2014) .....................................................13, 14

*Dep't of Defense v. FLRA,* 510 U.S. 487 (1994) ................................................................17

*Delviscovo v. FBI,* 903 F. Supp. 1 (D.D.C. 1995) ..............................................................23

*Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1 (2001) ...................9

*Dep't of State v. Washington Post Co.,* 456 U.S. 595 (1982) ..............................................13

*DOJ v. Reporters' Comm. for Freedom of the Press,* 489 U.S. 749 (1989) ...............14, 15, 17

*DOJ v. Tax Analysts,* 492 U.S. 136 (1989) ..........................................................................9

*Elec. Privacy Info. Ctr. v. DHS,* 777 F.3d 518 (D.C. Cir. 2015) .........................................17

*Elkins v. FAA,* 134 F. Supp. 3d 1 (D.D.C. 2015) ................................................................20

*FBI v. Abramson,* 456 U.S. 615 (1982) ..............................................................................10

*Fisher v. DOJ,* 772 F. Supp. 7 (D.D.C. 1991) ....................................................................23

*FLRA v. DVA,* 958 F.2d 503 (2d Cir. 1992).......................................................................14

*Garcia v. DOJ,* 181 F. Supp. 2d 356 (S.D.N.Y. 2002) .................................................15, 16

*Gardels v. CIA,* 689 F.2d 1100 (D.C. Cir. 1982) .......................................................10, 17, 19, 22

*Grand Central Partnership v. Cuomo,* 166 F.3d 473 (2d Cir. 1999)........................9, 17, 19

*Halpern v. FBI,* 181 F.3d 279 (2d Cir. 1999) ...........................9, 10, 14, 15, 17, 19, 22

*Hayden v. NSA,* 608 F.2d 1381 (D.C. Cir. 1979) .......................................................10, 19, 22

*Holt v. DOJ,* 734 F. Supp. 2d 28 (D.D.C. 2010)...........................................................12, 23

*Jefferson v. DOJ,* 284 F.3d 172 (D.C. Cir. 2002) ...............................................................11

*John Doe Agency v. John Doe Corp.,* 493 U.S. 146 (1989) ..............................................8, 9

*Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136 (1980)....................................9

*Lesar v. DOJ,* 636 F.2d 472 (D.C. Cir. 1980)....................................................................15

*Long v. OPM,* 692 F.3d 185 (2d Cir. 2012) ..............................................................14, 17

*Massey v. FBI,* 3 F.3d 620 (2d Cir. 1993) ...............................................................14, 17

*Mayer Brown LLP v. IRS,* 562 F.3d 1190 (D.C. Cir. 2009)..........................................20

*McRae v. DOJ,* 869 F. Supp. 2d 151 (D.D.C. 2012) ..................................................20

*Mingo v. DOJ,* 793 F. Supp. 2d 447 (D.D.C. 2011) .............................................12, 16

*Nat'l Archives v. Favish,* 541 U.S. 157 (2004) ..........................................................14

*New York Times Co. v. DOJ,* 872 F. Supp. 2d 309 (S.D.N.Y. 2012) .............................8

*O'Keefe v. Dep't of Defense,* 463 F. Supp. 2d 317 (E.D.N.Y. 2006) ...........................15

Parker v. DOJ-EOUSA, 852 F. Supp. 2d 1 (D.D.C. 2012)..........................................14

*Pinson v. DOJ ("Pinson I"),* 202 F. Supp. 3d 86 (D.D.C. 2016) ..................................12

*Pinson v. DOJ ("Pinson II"),* 236 F. Supp. 3d 338 (D.D.C. 2017) ..............................12

*Pinson v. DOJ ("Pinson III"),* 313 F. Supp. 3d 88 (D.D.C. 2018) .....................12, 14, 17, 19, 22, 23

*Pratt v. Webster,* 673 F.2d 408 (D.C. Cir. 1982) .................................................10, 12

*Prison Legal News v. Samuels,* 787 F.3d 1142 (D.C. Cir. 2015)..................................14

*Pub. Emp. for Env'tl Resp. v. Intl. Boundary and Water Comm.,* 740 F.3d 195 (D.C. Cir. 2014)......17

*Quinto v. DOJ,* 711 F. Supp. 2d 1 (D.D.C. 2010)........................................................12

*Raulerson v. Ashcroft,* 271 F. Supp. 2d 17 (D.D.C. 2002) .........................................17

*Vazquez v. DOJ,* 887 F. Supp. 2d 114 (D.D.C. 2012) ................................................20

Wilner v. NSA, 592 F.3d 60 (2d Cir. 2009) ..................................................9, 10, 19, 22

*Wolf v. CIA,* 473 F.3d 370 (D.C. Cir. 2007) ........................................................10, 19, 22

*Wood v. FBI,* 432 F.3d 78 (2d Cir. 2005) ...........................................................13, 14, 16

*Zander v. DOJ,* 885 F. Supp. 2d 1 (D.D.C. 2012) ...............................................12, 13, 19

*Zhao v. Dep't of State,* 320 F. Supp. 3d 505 (E.D.N.Y. 2018) ...............................10, 19, 22

## Statutes

5 U.S.C. § 552...............................................................................................................*passim*

5 U.S.C. § 8401.....................................................................................................................11

18 U.S.C. § 3050...................................................................................................................11

18 U.S.C. § 4012...................................................................................................................11

18 U.S.C. § 4042.................................................................................................................3, 11

**Regulations**

28 C.F.R. §§ 511.10-511.12 ...............................................................................11

28 C.F.R. §§ 552.10-552.14 ...............................................................................11

**Legislative History**

H.R. REP. 89-1497, 89th Cong., 2d Sess. 6 (1966) ............................................8

## PRELIMINARY STATEMENT

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Plaintiff Aviva Stahl seeks certain documents from the federal Bureau of Prisons ("BOP"), an agency within the Department of Justice ("DOJ"), relating to an inmate in custody named Mohammad Salameh, Reg. No. 34338-054. Salameh, a convicted terrorist serving a sentence of 240 years for his role in al Qaeda's 1993 bombing of the World Trade Center, was for many years incarcerated at BOP's most secure facility – the Administrative Maximum facility in Florence, Colorado ("Florence ADX"). During his years at Florence ADX, Salameh initiated a number of hunger strikes. Although such strikes are relatively rare within the federal prison system, BOP has a protocol for responding to them, aimed at preserving and protecting inmates' lives in a humane and appropriate manner in accordance with BOP's statutory obligation of inmate safekeeping. As part of this protocol, hunger striking inmates can, as a last resort, be involuntarily subjected to medical treatment necessary to prevent death or permanent injury, such as by intravenous ("IV") hydration or by administration of liquid nutrition through a nasogastric tube. On multiple occasions during his time at Florence ADX, Salameh received such last-resort involuntary medical treatment.

Stahl, who according to her complaint is a freelance journalist investigating what she calls "force-feeding" of inmates at Florence ADX, requested from BOP through FOIA two types of information about BOP's responses to Salameh's hunger strikes. First, with Salameh's written consent, she asked for all of Salameh's prison medical records from 2002 to 2015. In response, BOP released to her, with minimal redactions, more than 2,600 pages of Salameh's medical records from Florence ADX. These records document each of Salameh's multiple hunger strikes during this period, including each strike's deleterious impact on the inmate's health, BOP's repeated efforts on each occasion to persuade Salameh to end his strike, the medical findings supporting each decision to administer involuntary treatment as a last resort, the precise nature of such treatment, and the salutary effect of such treatment on the inmate's health and well-being.

Second, Stahl's FOIA request also sought any extant videotapes depicting involuntary treatment BOP administered to Salameh between 2002 and 2015 in response to his hunger strikes. (Pursuant to BOP policy, such interventions are considered calculated uses of force and are routinely videotaped.) BOP located two sets of responsive tapes: a set of six videos collectively depicting the involuntary administration to Salameh on November 4, 2015, of IV hydration, and a separate set of seven videos collectively documenting the involuntary administration to Salameh on November 11, 2015, of liquid nutrition through a nasogastric tube. These 13 videos were not released to Stahl, but were instead withheld based on FOIA Exemptions (b)(6) and (b)(7)(C), (E), and (F).

Stahl commenced this action under FOIA, 5 U.S.C. § 552. By Stipulation and Order entered October 25, 2019, the parties resolved any objections Stahl originally raised to the adequacy of BOP's search and to the minimal redactions BOP made to Salameh's medical records. The sole issue remaining is whether BOP appropriately withheld the 13 videos documenting the calculated uses of force to administer involuntary medical treatment to Salameh on two occasions in November 2015.

As elaborated below and in the annexed declarations and exhibits, BOP appropriately relied on the FOIA exemptions in 5 U.S.C. § 552(b)(6), (b)(7)(C), (E), and (F), to protect three fundamental interests implicated by the videos: the personal privacy of the BOP staff who participated in calculated uses of force and are depicted in the videos; the safety and security of the prison's premises and of the people who work there; and the techniques and procedures BOP personnel undertake to fulfill their law enforcement objectives. Because these interests indisputably outweigh any interest Stahl or the public may have in the disclosure of the videos, the Government is entitled to summary judgment.

## BACKGROUND

For a complete recitation of the undisputed facts supporting the motion for summary judgment, the Government respectfully refers the Court to the annexed Declarations of James Phelps and Erika Fenstermaker, along with their respective exhibits.[1] Mr. Phelps is a Correctional Services Administrator at BOP's North Central Regional Office ("NCRO"), which oversees Florence ADX and 19 other BOP institutions. His Declaration attaches and summarizes BOP's policy statements with respect to hunger strikes and calculated uses of force; it meticulously describes the contents of each set of withheld videos; and it explains in great detail why withholding the videos is justified, highlighting the multiple critical interests that would be compromised if the videos were to be released. Ms. Fenstermaker is the Government Information Specialist at BOP's NCRO responsible for reviewing and responding to Stahl's FOIA request. Her Declaration and its exhibits describe BOP's process for receiving and responding to FOIA requests and recite the procedural history of Stahl's specific request, including the categories of information sought, the responsive records located, the documents released, and the materials withheld. The Declaration then briefly describes the contents of the two sets of videos before articulating why each of the statutory FOIA exemptions cited for withholding supports BOP's decision not to release the 13 videos.

### A.     BOP's Hunger Strike Policy

BOP has a statutory obligation to provide for the safekeeping, care, and subsistence of all persons in its custody. *See* 18 U.S.C. § 4042. As Mr. Phelps explains, this obligation includes the responsibility to monitor the health, welfare, and nutrition of inmates in its custody, and to ensure that appropriate steps are taken to preserve and protect inmates' lives. Phelps Decl. ¶ 6. While BOP takes this responsibility very seriously, inmates sometimes choose to put their own health and lives in

---

[1] In the Stipulation and Order the parties submitted and the Court endorsed on October 25, 2019, the parties and the Court agreed that "a statement pursuant to Local Civil Rule 56.1 shall not be required in this FOIA action." ECF No. 16, at ¶ 4.

jeopardy, such as by engaging in hunger strikes: conscious decisions, for whatever reason, to refuse for an extended period of time to consume the nutrition and/or hydration provided by the facility. *Id.* ¶ 7. Hunger strikes are relatively rare within the federal prison system, but some inmates have been known to engage in them repeatedly, including Salameh, who apparently undertook dozens of such strikes during the years he was in custody at Florence ADX. *Id.*

The failure to consume adequate levels of food and/or water for an extended period of time can place an individual's life and health in extreme jeopardy, leading to organ failure and even death. *Id.* ¶ 8. To prevent this outcome, BOP has developed a specific protocol for responding to inmate hunger strikes, aimed at protecting inmates' lives in a humane and appropriate manner in accordance with BOP's statutory obligation of inmate safekeeping. *Id.*; *see* BOP Program Statement PS 5562.05, *Hunger Strikes*, attached as Exhibit A to the Phelps Declaration.

Pursuant to PS 5562.05, an inmate is determined to be on hunger strike (1) when he communicates that fact to staff and is observed to be refraining from eating for a period of time, ordinarily in excess of 72 hours, or (2) when staff observe the inmate to be refraining from eating for a period in excess of 72 hours. Phelps Decl. ¶ 10 & Exh. A at 2. Once a hunger strike is confirmed, the inmate is referred to medical or mental health staff for evaluation, monitoring, and treatment, as appropriate. Phelps Decl. ¶¶ 10-12 & Exh. A at 4-5. Inmates are repeatedly encouraged to end their strikes and to consume the three nutritious meals and adequate supply of drinking water which are delivered to their cell each day. Phelps Decl. ¶¶ 12-13 & Exh. A at 5-6. As a last resort, involuntary treatment of an inmate on hunger strike is considered when a physician determines that, as a result of inadequate intake or abnormal output, the inmate's life or permanent health will be threatened if nutrition or hydration is not immediately consumed. Phelps Decl. ¶ 13 & Exh. A at 6.

Prior to the administration of involuntary medical treatment, BOP staff are required to make reasonable efforts to convince the inmate to voluntarily accept treatment, and to explain to him the

medical risks of not accepting treatment. Phelps Decl. ¶ 14 & Exh. A at 6. If the facility physician determines, after reasonable efforts to convince the inmate to accept treatment voluntarily prove unsuccessful, that a medical necessity exists for immediate treatment of a life or permanent-health threatening situation, then the physician may order that treatment be administered to the inmate without his consent. *Id.* Ordinarily, involuntary treatment consists of nasogastric tube for feeding and/or the intravenous (IV) administration of fluids, and it will normally continue until adequate oral intake of food and water is achieved. Phelps Decl. ¶¶ 14-15 & Exh. A at 7-8.

### B.   BOP's Use of Force Policy

PS 5562.05 provides that when a physician orders the involuntary administration of medical treatment in response to a hunger strike, it is considered a calculated use-of-force; as such, all staff involved must follow the procedures outlined in BOP's use of force policy, which is published in PS 5566.06, *Use of Force and Application of Restraints*. Phelps Decl. ¶ 17-18 & Exh. A at 7, Exh. B. Participating staff are required to wear protective equipment and clothing, must be personally willing to participate in the calculated use of force, and must affirm such willingness verbally on camera prior to the commencement of the use of force. Phelps Decl. ¶ 19 & Exh. B at 9.

Under the policy, the entire calculated use of force, from the introduction of participating staff to the post-incident debriefing, must be documented and videotaped, and this documentation must be forwarded for review by the Regional Director. Phelps Decl. ¶ 20 & Exh. B at 5. The original videotapes documenting a calculated use of force are maintained and secured as evidence in the appropriate Special Investigative Services ("SIS") office. Phelps Decl. ¶ 21 & Exh. B at 19. SIS is a component of BOP's Correctional Services Department responsible, among other duties, for assisting in the investigation of criminal acts, for tracking the activities of certain inmates, and for training staff on intelligence-gathering methods and issues. Phelps Decl. ¶ 21.

### C.   <u>The Salameh Videos</u>

According to BOP records, Salameh was sentenced to 240 years' imprisonment following 1994 convictions in the Southern District of New York arising out of his role in al Qaeda's 1993 bombing of the World Trade Center; between 2002 and 2015 inclusive, he was in BOP custody at Florence ADX. Fenstermaker Decl. ¶ 10 & Exh. A.[2] While there, Salameh participated in dozens of hunger strikes. Phelps Decl. ¶ 7. On two such occasions in November 2015, the medical and security staff at Florence ADX responded by undertaking calculated uses of force as a last resort to provide Salameh with involuntary medical treatment ordered by the facility physician in accordance with PS 5562.05. On both occasions, BOP staff videotaped the events in accordance with PS 5562.05 and PS 5566.06.

The first occasion took place on November 4, 2015, when BOP administered IV hydration to Salameh without his consent in response to his deteriorating medical condition and significant hazard to his health resulting from a hunger strike. Fenstermaker Decl. ¶ 20; Phelps Decl. ¶ 22. The incident was filmed from two slightly different angles using two different video cameras, each of which divided the incident into three parts, of roughly 30, 30, and 12 minutes in length, respectively; hence, the six videos collectively document an incident of about 72 minutes in duration, shot from two different perspectives. Fenstermaker Decl. ¶ 20; Phelps Decl. ¶ 23. The videotapes record the entire calculated use of force, including the initial introduction of the staff members involved, the verbal descriptions of each staff member's role and responsibility, the extraction and transfer of Salameh from his observation cell to a medical treatment area at Florence ADX, the preparation for and administration of the medical procedure to provide IV hydration to Salameh, the transfer of Salameh back to his observation cell, and the post-incident debriefing in which each staff member described his or her role and responsibility, among other information. Fenstermaker Decl. ¶ 20; Phelps Decl. ¶¶ 24-35.

---

[2] Salameh is still in BOP custody, but he is no longer housed at Florence ADX. His expected release date is January 22, 2095. Fenstermaker Decl. ¶ 10 & Exh. A.

The second occasion took place a week later, on November 11, 2015, when in response to Salameh's deteriorating medical condition and significant hazard to his health resulting from a hunger strike, BOP medical personnel inserted a nasogastric tube into Salameh without his consent, and through it provided him with an appropriate quantity of liquid nutritional supplement. Fenstermaker Decl. ¶ 21; Phelps Decl. ¶ 36. Again, the incident was filmed from two slightly different angles using two different video cameras. The first camera divided the incident into four parts, of roughly 30, 13, 30, and 2 minutes in length, respectively; the second camera divided the incident into three parts, of roughly 30, 30, and 15 minutes in length, respectively. Hence, the seven videos collectively document an incident of about 75 minutes in duration, shot from two different perspectives. Fenstermaker Decl. ¶ 21; Phelps Decl. ¶ 37.

The videotapes again record the entire calculated use of force, including the initial introduction of the staff members involved, the verbal descriptions of each staff member's role and responsibility, the transfer of Salameh from his observation cell to a medical treatment area at Florence ADX, the preparation for and administration of the medical procedure to provide nutrition through a nasogastric tube, the transfer of Salameh back to his observation cell, and the post-incident debriefing in which each staff member described his or her role and responsibility, among other information. Fenstermaker Decl. ¶ 21; Phelps Decl. ¶¶ 38-50.

In each set of videos, the following can be seen and/or heard, among other things: the personal image and identifying information of each staff member involved in the calculated use of force; the equipment that each staff member dons and utilizes for a calculated use of force; the specific location and method in which such equipment is used and secured; and the specific layout of the medical area at Florence ADX, including the location, type, and amount of medical and correctional supplies. Fenstermaker Decl. ¶ 22; Phelps Decl. *passim*.

D.     **Stahl's FOIA Request**

On February 15, 2018, BOP's Central Office received a FOIA request from Stahl seeking all records pertaining to the medical treatment and evaluation of Salameh from January 1, 2002, through December 31, 2015, as well as any videotapes of involuntary medical treatment administered to him during that time. Fenstermaker Decl. ¶ 11 & Exh. B. The request attached a written waiver signed by Salameh authorizing the release of his medical records to a third party. Fenstermaker Decl. ¶ 14 & Exh. B. BOP forwarded this FOIA request to NCRO for processing and assigned it No. 2018-02917. Fenstermaker Decl. ¶¶ 7, 11-12.

BOP then undertook a thorough and comprehensive search for documents responsive to the FOIA request. *Id.* ¶¶ 8, 13. It found 2,669 pages of Salameh's medical records from the period covered by the request. *Id.* ¶ 14. It reviewed these records for applicable FOIA exemptions and processed them so as to achieve maximum disclosure; every effort was made to provide Stahl with all reasonably segregable nonexempt information contained in the responsive records. *Id.* ¶ 16. In all, 2,622 pages of Salameh's medical records were released to Stahl in full, 42 pages were produced with minor redactions, and five pages were withheld in full. *Id.* ¶ 16; *see also id.* Exh. E (*Vaughn* index). Among other things, these medical records document the instances during the period in question in which BOP responded to Salameh's hunger strikes through involuntary hydration or nutrition, the medical findings germane to such instances, and the details of what treatment was provided and how. Fenstermaker Decl. ¶ 26; Phelps Decl. ¶ 56.

In addition to the extensive medical records located and released to Stahl, BOP also located, in response to Stahl's FOIA request, the 13 videotapes described above. Fenstermaker Decl. ¶ 15. These were withheld from production in whole, based on FOIA Exemptions (b)(6) and (b)(7)(C),(E), and (F). *Id.* ¶¶ 17-18 & Exhs. D, E. By Stipulation and Order entered on October 25, 2019 (ECF No. 16), the sole issue left for the Court to decide is whether withholding the videos was justified under BOP's

cited exemptions; the parties resolved any objections Stahl originally raised to the adequacy of BOP's search and to the minimal redactions BOP made to Salameh's medical records. *See* ECF No. 16.

## APPLICABLE LEGAL STANDARD

FOIA represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. REP. 89-1497, 89th Cong., 2d Sess. 6 (1966)); *see New York Times Co. v. DOJ*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012). While FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). FOIA section 552(b) thus lists nine categories of records exempted from release, and mandates that records need not be disclosed if "the documents fall within [any of the] enumerated exemptions," *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see also Associated Press v. DOJ*, 549 F.3d 62, 64 (2d Cir. 2008) (FOIA "calls for broad disclosure of Government records, while maintaining a balance between the public's right to know and the government's legitimate interest in keeping certain information confidential"); *Halpern v. FBI*, 181 F.3d 279, 287 (2d Cir. 1999); *see also John Doe*, 493 U.S. at 151-52 (FOIA exemptions are "intended to have meaningful reach and application").

A court cannot provide relief under FOIA unless the agency has (1) improperly (2) withheld (3) agency records (4) that are not exempt. *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980). "Only when each of these criteria is met may a district court 'force an agency to comply with the FOIA's disclosure requirements.'" *Grand Central Partnership v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Reporters Committee*, 445 U.S. at 150); *see also DOJ v. Tax Analysts*, 492 U.S. 136, 142 (1989).

Summary judgment is the preferred procedural vehicle for resolving FOIA actions. *See, e.g., Grand Central,* 166 F.3d at 478; *Carney v. DOJ*, 19 F.3d 807, 812 (2d Cir. 1994). To obtain summary

judgment in a FOIA action, the defendant agency must show that it conducted an adequate search for responsive records (which, by stipulation, is not at issue here) and that any withheld documents fall under a FOIA exemption or exclusion. *See Carney*, 19 F.3d at 812; *Grand Central,* 166 F.3d at 478.

An agency may meet its burden under FOIA by submitting declarations describing with reasonable specificity the nature of the withheld documents and the justification for the nondisclosure. *See Wilner v. NSA*, 592 F.3d 60, 69 (2d Cir. 2009); *Grand Central,* 166 F.3d at 478 ("A district court in a FOIA case may grant summary judgment in favor of an agency on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith."); *Carney*, 19 F.3d at 812 ("Affidavits or declarations … giving reasonable explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."); *Zhao v. Dep't of State*, 320 F. Supp. 3d 505, 509 (E.D.N.Y. 2018), *aff'd*, 776 Fed. Appx. 733 (2d Cir. 2019).

Moreover, such "affidavits submitted by an agency are accorded a presumption of good faith." *Carney*, 19 F.3d at 812; *see also Wilner,* 592 F.3d at 69; *Halpern,* 181 F.3d at 295; *Zhao*, 320 F. Supp. 3d at 510. Courts generally respect the factual reasoning of agencies, and "[u]ltimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). For this reason, a court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

Once the agency satisfies its burden, the plaintiff must "make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, … or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." *Carney*, 19 F.3d at 812.

## **ARGUMENT**

I.     **ALL OF THE CONTESTED VIDEOTAPES WERE "COMPILED FOR LAW ENFORCEMENT PURPOSES" WITHIN THE MEANING OF 5 U.S.C. § 552(b)(7).**

FOIA Exemption (b)(7) allows agencies to withhold records meeting a threshold requirement of having been "compiled for law enforcement purposes" if release would cause one or more enumerated harms. 5 U.S.C. § 552(b)(7); *see FBI v. Abramson,* 456 U.S. 615, 622 (1982); *Pratt v. Webster,* 673 F.2d 408, 413 (D.C. Cir. 1982). "In assessing whether records are compiled for law enforcement purposes, ... the focus is on how and under what circumstances the requested files were compiled, and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Jefferson v. DOJ*, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (quoting *Aspin v. Dep't of Defense*, 491 F.2d 24, 27 (D.C. Cir. 1973)).

Here, it cannot seriously be disputed that the videotapes were "compiled for law enforcement purposes" within the meaning of section 552(b)(7). To begin, BOP is undoubtedly a law enforcement agency. The statutory term "law enforcement officer" is expressly defined to include "an employee of the Bureau of Prisons or Federal Prison Industries, Inc." *See, e.g.*, 5 U.S.C. § 8401(17)(D)(i). Furthermore, BOP employees perform multiple law enforcement functions: they possess the authority to make arrests, 18 U.S.C. § 3050; seize evidence, 18 U.S.C. § 4012; and execute searches on inmates and visitors to the institution, 28 C.F.R. §§ 511.10-511.12, 552.10-552.14. *See* Fenstermaker Decl. ¶ 29. Additionally, BOP is tasked with the law enforcement mission of protecting inmates, staff, and the community. *See* 18 U.S.C. § 4042(a)(1)-(3) ("The Bureau of Prisons, under the direction of the Attorney General, shall (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .").

Moreover, as Mr. Phelps explains,

> And paramount above all, BOP is a law enforcement and security agency, with a mission of protecting the public by detaining, instructing, and disciplining all persons charged with or convicted of offenses against the United States.…
>
> Although involuntary administration of hydration or nutrition to a hunger striking inmate is a medical procedure, the relationship between calculated uses of force in a hunger strike context and BOP's law enforcement and security mission is clear. As stated above, the original videotapes of a calculated use of force incident are maintained and secured as evidence in the appropriate SIS office. SIS's duties include assisting in the investigation of criminal acts, tracking the activities of certain inmates, and training staff on intelligence-gathering methods and issues.

Phelps Decl. ¶¶ 51-52; *see also* Fenstermaker Decl. ¶ 30.

Agencies classified as law enforcement agencies are entitled to special deference in their claims of law enforcement purpose. *See Pratt*, 673 F.2d at 418 (explaining this deference as based on "the generally accurate assumption that federal agencies act within their legislated purposes"). Such deference has routinely been extended to BOP in connection with its assertion of FOIA exemptions under § 552(b)(7), especially when such assertions are backed by declarations averring that the material "was generated as part of BOP's law enforcement mission of protecting inmates, staff, and the community." *Pinson v. DOJ (*"*Pinson III*"*)*, 313 F. Supp. 3d 88, 114 (D.D.C. 2018). *See also Pinson v. DOJ ("Pinson II")*, 236 F. Supp. 3d 338, 365 (D.D.C. 2017); *Pinson v. DOJ ("Pinson I")*, 202 F. Supp. 3d 86, 101 (D.D.C. 2016); *Holt v. DOJ*, 734 F. Supp. 2d 28, 41 (D.D.C. 2010); *Quinto v. DOJ*, 711 F. Supp. 2d 1, 5-6 (D.D.C. 2010).

Of note, courts have repeatedly held that when, as here, the information in question is compiled and maintained by SIS, the law enforcement purpose of the information is self-evident. *See Pinson III*, 313 F. Supp. 3d at 114 (records "maintained by the SIS office, which compiles investigatory records for potential criminal activity within an institution and investigates potential misconduct by inmates" "pertain to how BOP handles threats to security, how it monitors and maintains the health and safety

of its inmates and staff, and how it investigates criminal activity" and "were created by BOP to fulfill its responsibility of protecting inmates and prison staff"); *Mingo v. DOJ*, 793 F. Supp. 2d 447, 453 (D.D.C. 2011) (videotapes "maintained by the Special Investigative Office" were compiled for law enforcement purposes because they were "created in connection with BOP's responsibility to protect[] inmates, staff, and the community").

Directly on point is *Zander v. DOJ*, 885 F. Supp. 2d 1 (D.D.C. 2012), which, as here, involved a FOIA request for release of a BOP video documenting a calculated use of force. The court there had no difficulty concluding that the video satisfied Exemption (b)(7)'s threshold; even assuming that a rationale behind the BOP requirement that uses of force be videotaped "is to guard against unfounded allegations and eliminate the unwarranted use of force," release of the video would clearly undermine BOP's law enforcement mission, making the subsections of Exemption (b)(7) applicable. *Zander*, 885 F. Supp. 2d at 7-8. The same conclusion is warranted here.

## II.    THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE PERSONAL PRIVACY OF THE BOP STAFF DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(6) AND (b)(7)(C).

Congress has determined that the privacy interests of government employees and other non-parties whose personal information may be included in agency files countervail FOIA's general policy of transparency. FOIA thus contains two separate exemptions designed "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982); *see Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005). The first is (b)(6), which applies to "personnel, medical, or similar files" and protects against disclosure "which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The second is (b)(7)(C), which applies to "records or information compiled for law enforcement purposes" and protects against disclosure which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

In deciding whether an agency properly withheld records under (b)(6), courts first determine whether the records are "personnel, medical, or similar files." *See Cook v. Nat'l Archives,* 758 F.3d 168, 174 (2d Cir. 2014). This is a *de minimis* threshold. *See Cook,* 758 F.3d at 174 ("[A] record is a 'similar file' if it contains personal information identifiable to a particular person."); *Wood,* 432 F.3d at 86. If the record meets this threshold, then the court balances the public need for the information against the privacy interest at stake to determine whether disclosure would constitute a clearly unwarranted invasion of personal privacy. *Cook,* 758 F.3d at 174, 175-76; *Long v. OPM*, 692 F.3d 185, 190, 193 (2d Cir. 2012); *Wood,* 432 F.3d at 87-88.

For documents "compiled for law enforcement purposes," such as the videos at issue here, there are greater protections from disclosure. FOIA Exemption (b)(7)(C) is broader in scope than Exemption (b)(6), and more easily satisfied. *Compare* "could reasonably be expected to constitute" *with* "would constitute," *and* "unwarranted" *with* "clearly unwarranted." *See DOJ v. Reporters' Comm. for Freedom of the Press,* 489 U.S. 749, 756 (1989); *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) ("Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material"); *FLRA v. DVA,* 958 F.2d 503, 510 (2d Cir. 1992).

Under both exemptions, "the privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." *Wood,* 432 F.3d at 88; *see also Associated Press v. Dep't of Defense,* 554 F.3d 274, 284-85 (2d Cir. 2009); *Long,* 692 F.3d at 195-96. "It is [thus] well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under the FOIA." *Associated Press,* 554 F.3d at 285; *see also Halpern*, 181 F.3d at 297 (disclosure of identities of law enforcement personnel unwarranted given that it could subject them to embarrassment and harassment, thereby lending more weight to privacy interest over public's interest in disclosure); *Massey v. FBI,* 3 F.3d 620, 624 (2d Cir. 1993); *Pinson III*, 313 F. Supp. 3d at 110 (exemptions have "been interpreted broadly

to protect 'bits of personal information, such as names and addresses'" (quoting *Prison Legal News,* 787 F.3d at 1147)); *Parker v. DOJ-EOUSA*, 852 F. Supp. 2d 1, 12 (D.D.C. 2012).

Where the privacy concerns addressed by Exemptions (b)(6) and (b)(7)(C) are present, "the exemption requires the person requesting the information to establish sufficient reason for the disclosure." *Nat'l Archives v. Favish*, 541 U.S. 157, 172 (2004); *see Associated Press*, 554 F.3d at 285. the requester must first establish that the public interest sought to be advanced is a significant one, and then must show the information is likely to advance that interest. *Id.*; *see Garcia v. DOJ*, 181 F. Supp. 2d 356, 372 (S.D.N.Y. 2002) ("In order to overcome the recognized privacy interest of individuals whose name or other personally identifiable information appears in documents created in the course of a law enforcement investigation, the FOIA requestor must demonstrate that the disclosure of such information would further the goals of the FOIA."). Thus, whether disclosure is warranted turns on the nature of the information and its relationship to the basic purpose of FOIA to open agency action to the light of public scrutiny. *See Reporters Comm.,* 489 U.S. at 772.

Here, the videotapes easily meet the requirements of both 5 U.S.C. §§ 552(b)(6) and (b)(7)(C) and were thus appropriately withheld from disclosure. The personal image and identifying information of each staff member involved in the calculated uses of force can be seen in the videos, and the staff members also verbally introduce themselves by name and title at the beginning and end of each set of videos. Fenstermaker Decl. ¶¶ 22-23; Phelps Decl. ¶ 54. As Mr. Phelps explains,

> [E]ach staff member who participated in the calculated uses of force involving inmate Salameh is identified by name and title in the videos, with his face clearly shown. BOP is obligated to respect and protect the privacy of each of its employees, and each staff member depicted in the videos (none of whom has waived privacy rights or authorized disclosure) has a personal privacy interest in withholding his image from public disclosure. Release of these images and the information they contain about the staff members involved could subject those staff members to embarrassment, harassment, or threats due to their willing involvement in calculated uses of force and involuntary treatment of inmates on hunger strike. It could also subject them to unanticipated and unwanted injury to their reputations, and possibly to unwanted and/or derogatory publicity and inferences arising from their connection to law enforcement.

Phelps Decl. ¶ 54; *see also* Fenstermaker Decl. ¶¶ 24-25.

These considerations are sufficient to justify withholding. *See Halpern*, 181 F.3d at 297; *Lesar v. DOJ*, 636 F.2d 472, 487 (D.C. Cir. 1980) (finding legitimate interest in concealing identities of government employees where disclosure "could subject them to annoyance or harassment in either their official or private lives"); *O'Keefe v. Dep't of Defense*, 463 F. Supp. 2d 317, 326 (E.D.N.Y. 2006) ("investigative personnel have significant privacy interests as they may be subject to harassment or embarrassment if their identities are disclosed."); *Garcia*, 181 F. Supp. 2d at 373 (potential threat of reprisals could increase the privacy interests of identities of investigative officers). Indeed, in the most analogous case, a court found BOP videos of an altercation among inmates, in which faces of dozens of individuals could clearly be seen, to be "categorically exempt" under (b)(7)(C) "in the absence of a showing that an overriding public interest warrants disclosure." *Mingo*, 793 F. Supp. 2d at 453-54.

BOP duly considered the relevant public and private interests implicated by the videos and determined that release would result in a clearly unwarranted invasion of the personal privacy of the personnel involved, without serving a discernible public interest. Fenstermaker Decl. ¶¶ 25-26, 33; Phelps Decl. ¶¶ 51, 56. As Mr. Phelps avers,

> Although, as I said, BOP takes its obligation of public transparency very seriously, there is no public interest in the light that release of the requested videos would shed on the agency's performance of its statutory duties; nor is there any other interest which would counterbalance the staff members' personal privacy interest in the images and information withheld. As noted, PS 5562.05 and PS 5566.06 are publicly available documents setting forth the policies governing when, why, and how BOP undertakes involuntary administration of medical treatment as a last resort in response to hunger striking inmates, as well as the protocols governing immediate and calculated uses of force. Moreover, with respect to inmate Salameh specifically, it is my understanding that BOP has already released to Plaintiff, with Salameh's authorization, more than 2,600 pages of medical records, which document all of the instances in which BOP responded to inmate Salameh's hunger strikes through involuntary hydration or nutrition, the medical findings germane to such instances, and the details of what treatment was provided and how. In addition, I am aware from articles Plaintiff has already published, such as one from this past June, that Plaintiff has interviewed multiple inmates who claim to have been subjected to involuntary treatment at Florence ADX, including "about 13 hours on the phone with Salameh," who provided her with a detailed first-person account of what he claims he experienced. These disclosures

fully satisfy any public interest in information about the specific calculated uses of force depicted in the videos, and no such interest warrants vitiating the personal privacy rights of the personnel involved through the additional disclosure of the videos.

Phelps Decl. ¶ 56.

This balancing determination more than adequately justifies withholding the videos, under both Exemption (b)(6) and (b)(7)(C). *See Wood,* 432 F.3d at 88-89 (disclosure of names and identifying information of government investigators and personnel would add little to public's understanding of how the agency performed its duties given that existence and outcome of the investigation had been disclosed); *Halpern,* 181 F.3d at 296-97; *Grand Central,* 166 F.3d at 485; *Massey,* 3 F.3d at 624. *See also Billington v. DOJ,* 245 F. Supp. 2d 79, 86 (D.D.C. 2003) (under the balancing test, "something, even a modest privacy interest, outweighs nothing every time"). *See generally Dep't of Defense v. FLRA,* 510 U.S. 487, 495 (1994); *Reporters Comm.,* 489 U.S. at 775; *Long,* 692 F.3d at 193.

## III.   THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE SAFETY OF THE BOP STAFF DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(7)(F).

FOIA's protections concerning the safety and security of government employees and other third parties implicated in agency documents are even stronger than protections for personal privacy. Exemption (b)(7)(F) broadly protects from disclosure any record created for law enforcement purposes the release of which "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). This exemption confers broad protection for the safety of law enforcement personnel. *See Elec. Privacy Info. Ctr. v. DHS,* 777 F.3d 518, 526 (D.C. Cir. 2015) (describing the reach of Exemption (b)(7)(F) as "expansive"); *Blanton v. DOJ,* 182 F. Supp. 2d 81, 87 (D.D.C. 2002). However, the exemption "does not require that a particular kind of individual be at risk of harm; 'any individual' will do." *Pub. Emp. for Env'tl Resp. v. Intl. Boundary and Water Comm.,* 740 F.3d 195, 205 (D.C. Cir. 2014). Moreover, "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *Id.*

"Unlike Exemption 7(C), which involves a balancing of societal and individual privacy interests, 7(F) is an absolute ban against certain information and, arguably, an even broader protection than 7(C)." *Raulerson v. Ashcroft*, 271 F. Supp. 2d 17, 29 (D.D.C. 2002). And "within limits, courts defer to the agency's assessment of danger." *Pinson III*, 313 F. Supp. 3d at 119, 121; *see also Gardels*, 689 F.2d at 1104 ("Once satisfied that ... the information logically falls into the exemption claimed, the courts need not go further to test the expertise of the agency.").

Here, BOP has described in detail the many ways in which disclosure could reasonably be expected to endanger the life or safety of BOP staff, as well as the inmates under their charge. As Mr. Phelps explains, "disclosure of staff members' identities and of their involvement in calculated uses of force could endanger their lives or physical safety. Given the nature of the interaction, inmates may harbor animosity towards staff who willingly participate in a calculated use of force against them. By having their identity disclosed, including through close up views of their faces and features, those individuals could be targeted for retaliation by the affected inmates, who could also potentially enlist the assistance of other inmates or of friends, family, or criminal confederates to carry out such retribution on their behalf." Phelps Decl. ¶ 55; *see also* Fenstermaker Decl. ¶ 50.

Mr. Phelps and Ms. Fenstermaker also point out the significant risk to the life and physical safety of BOP staff and inmates that would emerge from revealing

- the specific duties and techniques each staff member is assigned to carry out during a calculated use of force (for example, how different staff members restrain different parts of the inmate's body), as well as the specific protective gear and security equipment donned and/or utilized during a calculated use of force;

- the manner in which correctional restraints are applied and secured in preparation for and during a calculated use of force, as well as the capabilities and functionality of restraint equipment utilized to carry out a calculated use of force;

- limitations or challenges BOP may have in carrying out calculated uses of force and in responding to emergencies or other institutional situations, including space constraints and vulnerabilities of security or medical equipment;

- areas within the secure confines of Florence ADX, including the layout of those areas, the location of secure cells, unsecured areas, and medical and security equipment storage areas;

- specific locations where equipment (including keys) is stored or secured by staff; and

- BOP's strategies and tactics for conflict avoidance.

Fenstermaker Decl. ¶¶ 50-53; Phelps Decl. ¶¶ 57-64. As Mr. Phelps explains, "[w]hile these protection concerns are vital to BOP throughout its system, they are especially important at the Florence ADX, which is the institution where BOP houses its most dangerous convicts, often with histories of assaulting staff or other inmates, or criminal convictions resulting from terrorist acts against the United States, as is the case for inmate Salameh." Phelps Decl. ¶ 65.

These attestations from an agency official with specific expertise in managing, and maintaining the security of, prison facilities, are entitled to considerable deference. *See, e.g., Wolf,* 473 F.3d at 374-75; *Grand Central,* 166 F.3d at 478; *Carney,* 19 F.3d at 812; *Wilner,* 592 F.3d at 69; *Halpern,* 181 F.3d at 295; *Gardels,* 689 F.2d at 1104; *Hayden,* 608 F.2d at 1388; *Zhao,* 320 F. Supp. 3d at 510.

Stahl has not offered "any reason to doubt BOP's assessment of the endangerment to individual safety that would be caused by disclosure." *Pinson III,* 313 F. Supp. 3d at 120. Indeed, *Pinson III* found no basis to question BOP's expertise in holding that "photographs of locks on cell door and hand restraints" and the "steps used to resolve major crises in a Bureau facility" were protected under (b)(7)(F). *Id.* at 121 ("BOP has sufficiently explained that disclosure of such information would enable inmates to use the staff's resources against them, allow capable inmates to pick cell locks and hand restraints, and enable individuals to circumvent the staff's techniques in crises situations—such as a hostage negotiation—thus endangering the life or physical safety of inmates, staff, and the public.").

Similarly, *Zander* upheld BOP's withholding under (b)(7)(F) of a video of a calculated use of force, concluding "that the agency's assessment of the possible danger to law enforcement officials from disclosing the video is abundantly reasonable. Removing prisoners from their cells presents clear dangers to the law enforcement officers who are charged with the task. Disclosure of a recording of a

'cell extraction' presents the possibility that other prisoners will learn the methods and procedures utilized by BOP officials, and that this information might be used to thwart the safe application of these techniques in the future." *Zander*, 885 F. Supp. 2d at 7.

These authorities, as applied to the facts of this case, uniformly warrant sustaining BOP's invocation of Exemption (b)(7)(F) to withhold the videos.

## IV.   THE VIDEOTAPES WERE PROPERLY WITHHELD TO PROTECT THE LAW ENFORCEMENT TECHNIQUES AND PROCEDURES DEPICTED IN THEM, UNDER 5 U.S.C. § 552(b)(7)(E).

FOIA's exemptions protect not only the personal privacy and safety interests of third-parties whose information is contained in agency documents; they also protect the ability of law enforcement agencies such as BOP to fulfill their critical missions of public safety. Exemption (b)(7)(E) protects against disclosure of information compiled for law enforcement purposes, where release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Under this exemption, no showing of "risk of circumvention" is necessary when protection is sought for "techniques and procedures," as opposed to "guidelines." *See Allard K. Lowenstein Int'l Human Rts. Proj. v. DHS*, 626 F.3d 678, 681-82 (2d Cir. 2010); *Ahmed v. USCIS*, No. 11-6230 (CBA), 2013 WL 27697, at *4 (E.D.N.Y. Jan. 2, 2013).[3] Rather, when "techniques and procedures used in law enforcement investigations or prosecutions" are at play, the protection is "categorical." *McRae v. DOJ*, 869 F. Supp. 2d 151, 168 (D.D.C. 2012). Moreover, while "the government must show that the records

---

[3] Even where a showing of "risk of circumvention" is required because the withheld document pertains to "guidelines" rather than "techniques and procedures," the bar is "relatively low," and, if applicable, is easily met here. *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). *See also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("The exemption allows for withholding information not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.").

contain law-enforcement techniques and procedures that are generally unknown to the public," *Elkins v. FAA*, 134 F. Supp. 3d 1, 4 (D.D.C. 2015), even commonly known procedures may be protected from disclosure if their disclosure could reduce or nullify their effectiveness. *See Vazquez v. DOJ*, 887 F. Supp. 2d 114, 116-17 (D.D.C. 2012).

Here, BOP cited Exemption (b)(7)(E) for two basic, overlapping reasons: (1) release of the techniques and procedures depicted in the videos could undermine the security of the institution (BOP's most secure facility); and (2) release of the techniques and procedures depicted therein could impede BOP's ability to fulfill its mission as a law enforcement agency. As Mr. Phelps attests,

> In addition to the personal privacy of the staff members involved, disclosure of the videos would also inappropriately compromise the security of the facility and undermine BOP's law enforcement and security mission by revealing techniques and procedures for gathering evidence for investigative and law enforcement purposes. Release of the videos would reveal BOP and SIS enforcement and security techniques that are not in the public domain and that BOP relies on to accomplish its mission of protecting inmates, staff, and the public. This includes the techniques and procedures used to prepare for and execute a calculated use of force within a secure BOP institution. Such disclosure could enable inmates to circumvent, countermeasure, and/or nullify the effectiveness of BOP's investigative, intelligence, and law enforcement functions.

Phelps Decl. ¶ 57; *see also id.* ¶¶ 53, 65; Fenstermaker Decl. ¶¶ 35-37.

As examples, Mr. Phelps and Ms. Fenstermaker cite the following techniques and procedures depicted in the videos, among others, and explain the risks associated with their disclosures:

- the protective gear and security equipment donned and/or carried by staff, disclosure of which could provide inmates with valuable information about the potential weaknesses or shortcomings of such equipment;

- specific locations where equipment (including keys) is stored or secured by staff, disclosure of which could potentially allow inmates to target those areas to remove keys or other security devices, allowing inmates to evade or injure staff, tamper with security equipment, or threaten the security of the institution;

- the manner in which inmates are restrained prior to and during a calculated use of force, including the specific equipment used for such restraints and the capabilities and functionality of such equipment, disclosure of which could allow inmates to devise ways to avoid being fully restrained, or to learn how to render the security equipment useless or less effective;

- the specific duties/responsibilities of each staff member participating in a calculated use of force, such as which staff member is responsible for restraining which part of an inmate's body and how, disclosure of which could allow inmates to learn how to anticipate and counteract staffs' actions, thereby circumventing staffs' efforts to secure, restrain, and/or maintain control of inmates during such incidents;

- strategies and tactics for conflict avoidance with inmates, disclosure of which would allow inmates intent on violence to attempt to undermine the strategies, putting the staff involved in the use of force at greater risk of injury; and

- specific areas within the secure confines of Florence ADX, including the layout of those areas and the location of secure cells, unsecured areas, and medical and security equipment storage areas, disclosure of which could allow inmates to learn how to navigate through these areas undetected by staff, secure themselves in these areas, and/or gain access to critical medical supplies or security equipment.

Phelps Decl. ¶¶ 58-64; Fenstermaker Decl. ¶¶ 38-46. For each of these examples, the declarants explain logically and in detail how disclosure of the videos would limit the effectiveness of the techniques and procedures used to conduct calculated uses of force in response to hunger strikes, thereby compromising BOP's ability "to carry out its mission of protecting the public, its staff, and inmates from harm." Phelps Decl. ¶ 65.

Moreover, both declarants attest that the techniques and procedures shown in the videos are not in the public domain. *See* Phelps Decl. ¶¶ 19, 66; Fenstermaker Decl. ¶ 47. As Mr. Phelps attests,

> a key part of maintaining the security of BOP facilities and protecting inmates and staff is to keep detailed aspects of correctional management such as these out of public view. To my knowledge, BOP has never, through a FOIA request, disclosed or released, to anyone outside of DOJ, any videotapes of calculated use of force incidents occurring at Florence ADX in connection with involuntary medical treatment administered to inmates on hunger strike.

Phelps Decl. ¶ 66; *see also* Fenstermaker Decl. ¶ 47.

Declarations such as these have routinely been found sufficient to sustain agency decisions to withhold law enforcement techniques and procedures under Exemption (b)(7)(E). *See generally Wolf,* 473 F.3d at 374-75; *Carney,* 19 F.3d at 812; *Wilner,* 592 F.3d at 69; *Halpern,* 181 F.3d at 295; *Gardels,* 689 F.2d at 1104; *Hayden,* 608 F.2d at 1388; *Zhao,* 320 F. Supp. 3d at 510. In *Pinson III,* the court granted summary judgment with respect to BOP's withholding of, *inter alia,* the "description of the

Bureau's calculated use of force technique and a photo of the technique being used," as well as documents mentioning "equipment to be used during the use of force technique, which staff members were to perform what role during the use of force, and steps to be taken if the inmate remained noncompliant." *Pinson III*, 313 F. Supp. 3d at 117. As here, BOP defended that withholding with declarations attesting that "disclosing such information would allow inmates to 'target certain staff or equipment during a use of force or anticipate what steps staff would be taking based on their noncompliance,' thus allowing circumvention and rendering the procedures ineffective." *Id.* The district court credited these averrals and, finding that the techniques and procedures in question were not in the public domain, agreed "that disclosing this information could reasonably be expected to create a risk of circumvention by revealing the techniques involved in the use of force and the effectiveness of such techniques, rendering them ineffective in future uses." *Id.*

Other decisions have reached the same conclusions under similar circumstances. *See, e.g., Holt,* 734 F. Supp. 2d at 48; *Delviscovo v. FBI,* 903 F. Supp. 1, 3 (D.D.C. 1995) (upholding assertion of Exemption (b)(7)(E) to protect information that would reveal effectiveness of investigative techniques); *Fisher v. DOJ,* 772 F. Supp. 7, 12 (D.D.C. 1991), *aff'd,* 968 F.2d 92 (D.C. Cir. 1992).

As Mr. Phelps summarizes, "[m]aintaining security and ensuring institutional order at Florence ADX is of paramount importance, and revealing BOP's techniques and procedures for doing so could have detrimental effects for BOP staff, the inmates, and the general public." Phelps Decl. ¶ 65. For this reason, and based on the foregoing points and authorities, withholding the videos under Exemption (b)(7)(E) was appropriate and justified.

## CONCLUSION

BOP takes very seriously its obligation as a federal agency to remain transparent and accountable concerning the manner in which it conducts its affairs. *See* Phelps Decl. ¶¶ 51, 56. In this case, however, the access and transparency aims underpinning FOIA must give way to the

countervailing factors protected in FOIA's exemptions. Disclosure of the videos at issue would not shed meaningful light on the agency's performance of its statutory duties, especially given that the BOP policy statements on hunger strikes and calculated use of force are publicly available, and that Stahl has Salameh's medical records and has extensively interviewed him to obtain his first-hand account of his experience. On the other hand, disclosure would severely compromise the personal privacy interests of the persons depicted in the videos, as well as put their security and lives at risk, and it would also impede BOP's fulfillment of its critical mission by inappropriately disclosing techniques and procedures for law enforcement.

Under these circumstances, BOP properly withheld the videos under FOIA Exemptions (b)(6) and (b)(7)(C), (E), and (F), and the Court should grant summary judgment to the Government.

Dated:  Brooklyn, New York  
       December 20, 2019

RICHARD P. DONOGHUE  
United States Attorney  
Eastern District of New York

By:    /s/ {SERVED ELECTRONICALLY}  
       F. FRANKLIN AMANAT  
       Senior Counsel  
       Eastern District of New York  
       271A Cadman Plaza East, 7th Floor  
       Brooklyn, NY 11201-2776  
       (718) 254-6024  
       franklin.amanat@usdoj.gov