UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

AVIVA STAHL,

     Plaintiff,

     v.                            No. 19-CV-4142 (BMC)

FEDERAL BUREAU OF PRISONS, and     DECLARATION OF JAMES PHELPS
DEPARTMENT OF JUSTICE,

     Defendants.

## DECLARATION OF JAMES PHELPS

I, James Phelps, do hereby declare and state as follows:

1.     I am employed by the United States Department of Justice ["DOJ"], Federal Bureau of Prisons ["BOP"], as the Correctional Services Administrator for the North Central Regional Office, located in Kansas City, Kansas. I have been employed in this capacity since July 22, 2018.  Prior to that time, I was employed as Captain at the United States Penitentiary-Lee, located in Jonesville, Virginia, and I have been employed with the BOP since September 2001.

2.     I make the statements herein based on my review of the official files and records of the BOP to which I have authorized access, and on my personal knowledge and experience acquired through the performance of my official duties. Due to the nature of my career progression in various correctional services divisions within BOP, I am intimately familiar with BOP's procedures and protocols related to inmate hunger strikes and calculated uses of force incident thereto.

3.     I am aware that the above-captioned litigation is currently pending under the Freedom of Information Act ["FOIA"], pertaining to BOP's decision to withhold from disclosure

1

thirteen (13) videotapes that depict two calculated uses of force in November 2015 involving inmate Mohammad Salameh, Reg. No. 34338-054, while he was incarcerated at the Administrative Maximum facility in Florence, Colorado ("Florence ADX").

4.     Specifically, I understand that in response to a FOIA request from the Plaintiff, BOP withheld six (6) videotapes depicting the involuntary medical administration of hydration to inmate Salameh on November 4, 2015, and another seven (7) videotapes depicting the involuntary medical administration of nutrition to inmate Salameh on November 11, 2015.

5.     The purpose of this declaration is to explain BOP's procedures and protocols related to hunger strikes and calculated uses of force and to explain and justify BOP's withholding of the videos at issue in this case, including the techniques and procedures for law enforcement investigations depicted therein.

## BOP HUNGER STRIKE POLICY

6.     Pursuant to 18 U.S.C. § 4042, BOP has a statutory obligation to provide for the safekeeping, care, and subsistence of all persons in its custody. This obligation, of course, includes the responsibility to monitor the health, welfare, and nutrition of inmates in its custody, and to ensure that appropriate steps are taken to preserve and protect inmates' lives. This is a responsibility that BOP takes extremely seriously.

7.     Inmates sometimes take actions while in custody that put their own health and lives in serious jeopardy. One such action is the hunger strike – a conscious decision by an inmate, for whatever reason, to refuse for an extended period of time to consume the nutrition and/or hydration provided to him at his facility. Although hunger strikes are relatively rare within the BOP system, they are not unheard of. Some inmates have been known to engage in hunger strikes repeatedly over the course of their incarceration, including inmate

Salameh, who apparently undertook dozens of such strikes during the years he was in custody at Florence ADX.

8. The failure to consume proper nutrition and/or hydration for an extended period of time can place an individual's life and health in extreme jeopardy, leading to organ failure and even death. To prevent this outcome, BOP has developed a specific policy and protocol for responding to inmate hunger strikes, aimed at preserving and protecting inmates' lives in a humane and appropriate manner in accordance with BOP's statutory obligation of safekeeping. A copy of this publicly-available policy, Program Statement PS 5562.05, *Hunger Strikes*, is attached as Exhibit A.

9. According to the policy, "[i]t is the responsibility of the Bureau of Prisons to monitor the health and welfare of individual inmates, and to ensure that procedures are pursued to preserve life." The procedures can be summarized as follows: 1) review, document, and report every incident of an inmate on hunger strike; 2) regularly monitor the inmate's health and welfare; 3) offer food and beverages on a regular basis to any inmate on hunger strike; and 4) as a last resort, administer involuntary medical treatment when an inmate's life or health is seriously threatened. Exh. A at 1-2.

10. Pursuant to PS 5562.05, an inmate is determined to be on hunger strike (1) when he communicates that fact to staff and is observed by staff to be refraining from eating for a period of time, ordinarily in excess of 72 hours, or (2) when staff observe the inmate to be refraining from eating for a period in excess of 72 hours. Exh. A at 2. Once a hunger strike is confirmed, the inmate is referred to medical or mental health staff for evaluation and treatment, as appropriate. Ordinarily, the hunger striking inmate is placed in a medically appropriate locked room for close monitoring and tracking of nutritional intake and output. Cells designated for hunger striking inmates are typically single-cell observation rooms

with water shut-off capabilities and where contact with other inmates is restricted, to prevent passing of food or liquid items to a hunger striking inmate. This permits staff to closely monitor a hunger striking inmate's nutritional intake and need for treatment. *See* Exh. A at 3.

11. When an inmate is initially referred for a medical evaluation under the hunger strike policy, medical staff ordinarily perform the following procedures: 1) height and weight measured and recorded; 2) vital signs taken; 3) urinalysis testing; 4) referral for psychological and/or psychiatric evaluation; 5) general medical evaluation; 6) radiographs if clinically indicated; and 7) laboratory studies if clinically indicated. Additional evaluations and/or tests may also be performed if determined to be clinically necessary and appropriate by medical staff. Exh. A. at 4.

12. Following the initial medical evaluation, the inmate's weight and vital signs are taken and recorded at least once every 24 hours for the duration of the hunger strike, and the other procedures and evaluations set forth above are repeated as medically indicated. *See* Exh. A at 4. Inmates on hunger strike are provided three (3) nutritious meals per day and an adequate supply of drinking water or other beverages, which are delivered to the inmate's cell. In addition, all commissary food is removed from the cell, and the inmate is not permitted to purchase any commissary food while under hunger strike management, in order to allow staff to adequately monitor food and water intake and output. Exh. A at 5.

13. Inmates are regularly and repeatedly encouraged by BOP medical and correctional staff to end their strikes and to consume the food and beverage provided to their cells. As a last resort, involuntary treatment of an inmate on hunger strike is considered when a physician determines that, as a result of inadequate intake or abnormal output, the inmate's life or health will be threatened if nutrition or hydration is not taken immediately. Exh. A at 6.

4

14.     Prior to the administration of involuntary treatment, BOP staff are required to make reasonable efforts to convince the inmate to voluntarily accept treatment, and to explain to him the medical risks of not accepting treatment. Exh. A at 6. If the facility physician determines, after reasonable but unsuccessful efforts to convince the inmate to accept treatment voluntarily, that a medical necessity for immediate treatment of a life or permanent-health threatening situation exists, then the physician, and only the physician, may order that treatment be administered to the inmate without his consent. Exh. A at 6. Ordinarily, involuntary treatment consists of nasogastric tube for feeding and/or the intravenous (IV) administration of fluids. Exh. A at 7.

15.     After the decision is made to administer involuntary medical treatment, clinical and laboratory monitoring is continued as necessary until the inmate's life or permanent health is no longer threatened. Involuntary treatment will normally continue until adequate oral intake of food and liquid is achieved, but medical monitoring may continue at the physician's discretion beyond that point. Exh. A at 8. Only a physician may release an inmate from hunger strike evaluation and involuntary treatment. Exh. A at 8.

16.     According to the hunger strike policy, physicians responsible for medical care of inmates on hunger strike are free to exercise their own sound medical judgment. Each hunger strike case is to be evaluated on its own merits and individual circumstances, and treatment must be provided within the bounds of sound medical practice. Exh. A at 8.

17.     PS 5562.05 provides that when a physician orders the involuntary administration of medical treatment in response to a hunger strike, it is considered a calculated use-of-force. As such, the administration of treatment must be videotaped, and all staff involved must follow the procedures outlined in BOP's use of force policy. *See* Exh. A at 7.

<u>BOP USE OF FORCE POLICY</u>

18.     BOP's policy concerning use of force is set forth in PS 5566.06, *Use of Force and Application of Restraints*, which is publicly available and is attached hereto as Exhibit B. BOP puts use of force incidents into two categories: 1) immediate; and 2) calculated. Exh. B. at 3-4. Involuntary administration of medical treatment in response to a hunger strike is considered a calculated use of force, because there is generally time to plan and implement protocols in advance, such as by coordinating staff to attempt confrontation avoidance, and by preparing a team of staff to implement the use of force procedures.

19.     During a calculated use of force incident, participating staff are required to wear protective equipment and clothing. See Exh. B at 9. In addition, staff must be personally willing to participate in calculated uses of force, and must affirm such willingness explicitly on camera prior to the commencement of the use of force. See Exh. B. at 9. Regardless of the reason for initiating a use of force, the identities of the staff members participating in calculated uses of force are never released to the inmate or to other third parties.

20.     Pursuant to the use of force policy, the entire execution of a calculated use of force, from the introduction of all staff participating, and the post-incident debriefing, must be documented and videotaped, and this documentation must be forwarded for review by the Regional Director. Exh. B at 5. Thus, all involuntary administrations of medical treatment involving an inmate on hunger strike are reviewed by the Regional Office to ensure compliance with BOP policy.

21.     The original videotapes documenting a calculated use of force are maintained and secured as evidence in the appropriate Special Investigative Services ["SIS"] office. Exh. B at 19. SIS is a component of BOP's Correctional Services Department and is responsible, among other duties, for assisting in the investigation of criminal acts, for tracking the activities of

certain inmates, and for training staff on intelligence-gathering methods and issues. The videotapes are saved at the SIS office for two and a half (2 1/2) years, unless specifically needed after that time for evidence or other legal purposes. Exh. B at 20.

CONTENT OF THE NOVEMBER 4, 2015, VIDEOS

22. The first 6 videos at issue depict a calculated use of force at Florence ADX on November 4, 2015, in which inmate Salameh was provided involuntary medical treatment, specifically, IV hydration, due to his deteriorating medical condition and significant hazard to his health resulting from an intentional hunger strike.

23. The incident was filmed from two slightly different angles using two different video cameras, each of which divided the incident into three parts, of roughly 30, 30, and 12 minutes in length, respectively; hence, the six videos collectively document an incident of about 72 minutes in duration, shot from two different perspectives. The substance of what is depicted in each camera's view is identical, so my description below encompasses all six videos.

24. As is the case in any video-recording of a calculated use of force in the BOP system, the videos begin with a correctional services supervisor, specifically a Lieutenant, introducing himself to the cameras. The two BOP staff members operating the handheld video cameras then introduce themselves by name and title; during this introduction, the camera operators' faces cannot be seen, but they are occasionally visible on each other's cameras as the videos continue. The Lieutenant then describes the situation and the need for the calculated use of force. The Lieutenant's face is clearly shown, with his name also depicted on his uniform, and he describes the specific procedures that will be taking place during the calculated use of force, including the order in which specific security measures will be conducted. In the background, the location and nature of medical equipment can be seen.

25.     The video cameras then focus one by one on each of the staff members involved in the calculated use of force, including both security and medical personnel. Each staff member identifies himself, his job title, and the specific duties and/or responsibilities he has been assigned to carry out during the calculated use of force (for example, what part of the inmate's body he has been given responsibility to restrain), and he verbally states that he is a willing participant in the calculated use of force. The medical personnel discuss the inmate's medical condition, explain the need for involuntary treatment, and describe the procedures they intend to use. The videos clearly show the staff members' faces, along with the protective gear and security equipment each staff member dons and carries during the calculated use of force.

26.     The Lieutenant then performs a visual inspection of the security equipment and protective gear each staff member is wearing or carrying. During the inspection, specific security equipment can be seen, and through the Lieutenant's inspection, the videos reveal how some of the security equipment works. The videos also reveal the specific security equipment and protective gear that each individual staff member is carrying.

27.     The videos then depict the staff members navigating through the institution, traveling as a group to the observation cell in which inmate Salameh is housed. Security doors and other institutional equipment can be seen during this travel. The videos show staff arriving together at inmate Salameh's cell, and a staff member trained in conflict avoidance attempting to gain Salameh's compliance to voluntarily come to the cell door for a medical evaluation.

28.     When inmate Salameh refuses to voluntarily be removed from his cell, the Lieutenant provides specific instructions to the staff in order to carry out the cell extraction component of the calculated use of force. A staff member utilizes a set of keys to unlock the cell door,

and he and other staff members enter the cell. Again, the specific security equipment and protective gear donned by each staff member can be seen in the videos. After staff members enter inmate Salameh's cell, the Lieutenant continues to give directions to the team to carry out the cell extraction. The videos reveal the specific steps taken to restrain the inmate, as well as the specific security equipment used to restrain him.

29.     After inmate Salameh is removed from his cell, he is weighed on a nearby scale and placed in a wheelchair. He is then escorted to another area of the institution. During this travel, the layout of this area of Florence ADX, including both secure and unsecured doors, can be seen in the videos. Additionally, as the staff members are escorting him to the other area, their protective equipment, as well as specific security equipment, is clearly and closely shown on the videos.

30.     Once the team and the inmate arrive at the other area of the institution, medical staff evaluate inmate Salameh, take his vital signs and conduct a physical examination. During this process, the staff members' security and protective equipment can be seen on the videos, as well as the specific hand and leg restraints applied to inmate Salameh. In addition, medical supplies, staff computers, and other equipment can be seen in the background.

31.     After the medical examination, inmate Salameh is informed that he needs immediate liquid intake due to signs of severe dehydration, and he is asked whether he will drink on his own. Medical staff make reasonable efforts to convince the inmate to voluntarily accept treatment, and they explain to him the medical risks of not accepting treatment. When the inmate refuses to accept treatment voluntarily, medical staff inform him that a medical necessity for immediate treatment of a life or permanent-health threatening situation exists, and that the physician has ordered that treatment be administered to the inmate without his

consent. Medical staff then prepare to administer IV hydration to inmate Salameh. This process includes drawing blood, and then preparing the IV line. During this process, inmate Salameh is once again offered the opportunity to drink, but he refuses.

32. Just prior to the administration of IV fluids, medical staff request that inmate Salameh's hand restraints be modified to facilitate insertion of the IV line. The videos show staff retrieving keys, depicting both the specific staff member holding the keys as well as the specific location in which the keys were secured. The keys are utilized to adjust and re-apply the hand restraints, and are then returned to the staff member, who secures the keys in the same area from which he retrieved them.

33. The medical staff then administers treatment to inmate Salameh through IV hydration. Once they are satisfied with his liquid intake and its effect on his medical condition, medical staff disconnect the IV and encourage inmate Salameh to resume eating and drinking.

34. The use of force team then escorts Salameh out of the area, back to his observation cell. Again, the layout of this area of Florence ADX, including both secure and unsecured doors, can be seen in the videos, as well as close-up views of security and protective equipment donned and/or carried by staff. After inmate Salameh is returned to his cell, the videos show staff removing his restraints, while the Lieutenant provides directions to the staff. Staff then secure the cell, and the videos again show which staff members carry the keys for this purpose. The videos then show the inside of inmate Salameh's cell, in which he is seen sitting on the bed.

35. After inmate Salameh is secured in his cell, the staff members are seen navigating through the institution again, to a location where they conduct a debrief of the incident. During this debrief, the Lieutenant describes the calculated use of force, including the specific actions

that were taken by the staff to restrain inmate Salameh in preparation for the medical treatment. One by one, each staff member again introduces himself, describing the specific duties he was assigned and how he carried out those duties, and indicating whether he had any injuries following the incident. Medical staff also introduce themselves, describing the treatment they administered and the inmate's medical condition. The camera operators also introduce themselves by name and title again. The videos concerning the calculated use of force involving the involuntary administration of hydration to inmate Salameh on November 4, 2015, then come to an end.

<u>CONTENT OF THE NOVEMBER 11, 2015 VIDEOS</u>

36. The next 7 videos at issue depict a calculated use of force at Florence ADX on November 11, 2015, in which inmate Salameh was provided involuntary medical treatment, specifically, liquid nutrition provided through a nasogastric tube, due to his deteriorating medical condition and significant hazard to his health resulting from an intentional hunger strike.

37. The incident was filmed from two slightly different angles using two different video cameras. The first camera divided the incident into four parts, of roughly 30, 13, 30, and 2 minutes in length, respectively; the second camera divided the incident into three parts, of roughly 30, 30, and 15 minutes in length, respectively. Hence, the seven videos collectively document an incident of about 75 minutes in duration, shot from two different perspectives. The substance of what is depicted in each camera's view is identical, so my description below encompasses all seven videos.

38. As is the case in any video-recording of a calculated use of force in the BOP system, and similar to the November 4, 2015, videos, the November 11, 2015, videos begin with a correctional services supervisor, specifically a Lieutenant, introducing himself to the

cameras. The two BOP staff members who operated the handheld video cameras then introduce themselves by name and title; during this introduction, the camera operators' faces cannot be seen, but they are occasionally visible on each other's cameras as the videos continue. The Lieutenant then describes the situation and the need for the calculated use of force. The Lieutenant's face is clearly shown, and he describes the specific procedures that will be taking place during the calculated use of force, including the order in which specific security measures will be conducted. In the background, the location and nature of medical equipment, as well as several secure and unsecure doors and an exit sign, can be seen.

39.     The video cameras then focus one by one on each of the staff members involved in the calculated use of force, including both security and medical personnel. Each staff member identifies himself, his job title, and the specific duties and/or responsibilities he has been assigned to carry out during the calculated use of force (for example, what part of the inmate's body he has been given responsibility to restrain), and he verbally states that he is a willing participant in the calculated use of force. The medical personnel discuss the inmate's medical condition, explain the need for involuntary treatment, and describe the procedures they intend to use. The videos clearly show the staff members' faces.

40.     The Lieutenant then performs a visual inspection of the security equipment and protective gear each staff member is wearing or carrying. During the inspections, the specific security equipment and protective gear that each individual staff member is carrying is visible.

41.     The videos then show the staff members navigating through the institution, traveling as a group to the observation cell in which inmate Salameh is housed. Security doors and other institutional equipment can be seen during this travel. The videos show staff arriving together at inmate Salameh's cell, and a staff member trained in conflict avoidance

attempting to gain Salameh's compliance to voluntarily come to the cell door for a medical evaluation.

42. At this time, the Lieutenant indicates that inmate Salameh has voluntarily agreed to come to his cell door and submit to hand restraints. A staff member then moves to the door and utilizes a set of keys to unlock the food slot of the cell, at which time other staff members apply hand restraints to inmate Salameh through the food slot. Again, the specific security equipment and protective gear donned by each staff member can be seen in the videos. Inmate Salameh's cell is then unlocked by a staff member carrying those specific keys, and additional restraints are applied to inmate Salameh. The Lieutenant is seen and heard giving directives to the staff members to carry out specific duties, and in particular, the security measures involved in restraining an inmate during a calculated use of force. The videos reveal the specific steps taken to restrain the inmate, as well as the specific security equipment used to restrain him.

43. After inmate Salameh is placed in restraints, the team escorts him to another area of the institution. During this travel, the layout of this area of Florence ADX, including both secure and unsecured doors, can be seen in the videos. Additionally, as the staff members are escorting him to the other area, their protective equipment, as well as specific security equipment, is clearly and closely shown on the videos.

44. Once the team and the inmate arrive at the other area of the institution, medical staff evaluate inmate Salameh, weigh him, take his vital signs, and conduct a physical examination. During this process, the staff members' security and protective equipment can be seen on the videos, as well as the specific hand and leg restraints applied to inmate Salameh. In addition, medical supplies and other equipment can be seen in the background.

45. Inmate Salameh was then placed in a specialized chair allowing an inmate to remain restrained while sitting upright. The video shows the specific actions taken by staff to utilize the specialized chair and to restrain inmate Salameh for the involuntary administration of liquid nutrition, and it also depicts the nature and location of the restraints. The Lieutenant and medical staff then conduct an inspection of the restraints, and adjustments are made.

46. Inmate Salameh is informed that he needs immediate nutrition intake due to signs of severe malnutrition and danger to his health, and he is asked whether he would voluntarily drink Ensure, a liquid nutritional supplement. Medical staff make reasonable efforts to convince the inmate to voluntarily accept treatment, and they explain to him the medical risks of not accepting treatment. When the inmate refuses to accept treatment voluntarily, medical staff inform him that a medical necessity for immediate treatment of a life or permanent-health threatening situation exists, and that the physician has ordered that treatment be administered to the inmate without his consent.

47. The medical staff then inserts a nasogastric tube into inmate Salameh, conducting further evaluations and examinations of inmate Salameh along the way to ensure that the tube is properly and safely inserted into Salameh's body and routed to his stomach. Once the nasogastric tube has been fully inserted, the medical staff can be seen administering to Salameh, through the tube, a quantity of Novasource, a liquid nutritional supplement similar to Ensure. During this time, inmate Salameh is seen attempting to resist or reject efforts to subject him to involuntary nutrition by deliberately regurgitating and vomiting the supplement being provided to him. The videos also show how the medical staff and the security staff responded to these actions, including the measures taken to ensure that inmate Salameh received a nutritionally adequate quantity of supplement through the tube.

14

48.    Following the administration of liquid nutrition, medical staff carefully remove the nasogastric tube and conduct additional examinations. Staff can then be seen removing the specialized chair restraints from inmate Salameh, and he is placed on a medical bed where his vital signs are taken again.

49.    Once the medical staff clears him for discharge, the use of force team escorts Salameh out of the area, back to his observation cell. Again, the layout of this area of Florence ADX, including both secure and unsecured doors, can be seen in the videos, as well as close-up views of security and protective equipment donned and/or carried by staff. After inmate Salameh is returned to his cell, the videos show staff removing his restraints, while the Lieutenant provides directions to the staff. Staff then secure the cell, and the videos again show which staff members carry the keys for this purpose. The videos then show the inside of inmate Salameh's cell.

50.    After inmate Salameh is secured in his cell, the staff members are seen navigating through the institution again, to a location where they conduct a debrief of the incident. During this debrief, each staff member again introduces himself, describing the specific duties he was assigned and how he carried out those duties, and indicating whether he had any injuries following the incident. Medical staff also introduce themselves, describing the treatment they administered and the inmate's medical condition. The camera operators also introduce themselves by name and title again. The Lieutenant then summarizes the calculated use of force, including the specific actions that were taken by the staff to restrain inmate Salameh in preparation for the medical treatment. The videos concerning the calculated use of force involving the involuntary administration of nutrition to inmate Salameh on November 11, 2015 then come to an end.

<u>JUSTIFICATION FOR WITHHOLDING THE VIDEOS</u>

51.    BOP takes seriously its obligation as a federal agency to remain transparent and accountable concerning the manner in which it conducts its affairs. This is one reason BOP has made fully public its Program Statements on hunger strikes and on use of force – so that the public is informed about the policies governing when, why, and how BOP undertakes involuntary medical treatment as a last resort in response to hunger striking inmates. But BOP takes even more seriously its statutory obligation to provide for the safekeeping, care, and subsistence of all persons in its custody, including the responsibility to monitor the health, welfare, and nutrition of inmates in its custody, and to ensure that appropriate steps are taken to preserve and protect inmates' lives. BOP takes just as seriously the need to operate in an environment where the safety, security, and privacy of its staff are fully protected and where the risk of breaches (including violent or evasive conduct by inmates) is minimized. And paramount above all, BOP is a law enforcement and security agency, with a mission of protecting the public by detaining, instructing, and disciplining all persons charged with or convicted of offenses against the United States. Balancing all of these considerations, there is no question that withholding the 13 videos from disclosure under FOIA is fully justified.

52.    Although involuntary administration of hydration or nutrition to a hunger striking inmate is a medical procedure, the relationship between calculated uses of force in a hunger strike context and BOP's law enforcement and security mission is clear. As stated above, the original videotapes of a calculated use of force are maintained and secured as evidence in the appropriate SIS office. SIS's duties include assisting in the investigation of criminal acts, tracking the activities of certain inmates, and training staff on intelligence-gathering methods and issues.

53.   As described above, the videotapes reveal the identities, appearance, and duties of BOP staff involved, as well as several locations within Florence ADX and numerous sensitive law enforcement techniques and procedures, the disclosure of any of which could be harmful to the staff members and to BOP's law enforcement and security missions.

54.   First, each staff member who participated in the calculated uses of force involving inmate Salameh is identified by name and title in the videos, with his face clearly shown. BOP is obligated to respect and protect the privacy of each of its employees, and each staff member depicted in the videos (none of whom has waived privacy rights or authorized disclosure) has a personal privacy interest in withholding his image from public disclosure. Release of these images and the information they contain about the staff members involved could subject those staff members to embarrassment, harassment, or threats due to their willing involvement in calculated uses of force and involuntary treatment of inmates on hunger strike. It could also subject them to unanticipated and unwanted injury to their reputations, and possibly to unwanted and/or derogatory publicity and inferences arising from their connection to law enforcement.

55.   Second, disclosure of staff members' identities and of their involvement in calculated uses of force could endanger their lives or physical safety. Given the nature of the interaction, inmates may harbor animosity towards staff who willingly participate in a calculated use of force against them. By having their identity disclosed, including through close up views of their faces and features, those individuals could be targeted for retaliation by the affected inmates, who could also potentially enlist the assistance of other inmates or of friends, family, or criminal confederates to carry out such retribution on their behalf.

56.   Although, as I said, BOP takes its obligation of public transparency very seriously, there is no public interest in the light that release of the requested videos would shed on the

agency's performance of its statutory duties; nor is there any other interest which would counterbalance the staff members' personal privacy interest in the images and information withheld. As noted, PS 5562.05 and PS 5566.06 are publicly available documents setting forth the policies governing when, why, and how BOP undertakes involuntary administration of medical treatment as a last resort in response to hunger striking inmates, as well as the protocols governing immediate and calculated uses of force. Moreover, with respect to inmate Salameh specifically, it is my understanding that BOP has already released to Plaintiff, with Salameh's authorization, more than 2,600 pages of medical records, which document all of the instances in which BOP responded to inmate Salameh's hunger strikes through involuntary hydration or nutrition, the medical findings germane to such instances, and the details of what treatment was provided and how. In addition, I am aware from articles Plaintiff has already published, such as one from this past June, that Plaintiff has interviewed multiple inmates who claim to have been subjected to involuntary treatment at Florence ADX, including "about 13 hours on the phone with Salameh," who provided her with a detailed first-person account of what he claims he experienced. These disclosures fully satisfy any public interest in information about the specific calculated uses of force depicted in the videos, and no such interest warrants vitiating the personal privacy rights of the personnel involved through the additional disclosure of the videos.

57.    In addition to the personal privacy of the staff members involved, disclosure of the videos would also inappropriately compromise the security of the facility and undermine BOP's law enforcement and security mission by revealing techniques and procedures for gathering evidence for investigative and law enforcement purposes. Release of the videos would reveal BOP and SIS enforcement and security techniques that are not in the public domain and that BOP relies on to accomplish its mission of protecting inmates, staff, and the public.

This includes the techniques and procedures used to prepare for and execute a calculated use of force within a secure BOP institution. Such disclosure could enable inmates to circumvent, countermeasure, and/or nullify the effectiveness of BOP's investigative, intelligence, and law enforcement functions.

58. For one example, the protective gear and security equipment donned and/or carried by staff can be clearly seen on the videos at issue in this case. Disclosure of these images could provide inmates with valuable information about the potential weaknesses or shortcomings of such equipment. Inmates could study these videos and learn where each staff member is potentially vulnerable, thereby leaving staff open to an attack in those areas. Inmates could also study these videos to devise methods to try to remove the equipment or render it useless or less effective.

59. The videos also reveal specific locations where equipment (including keys) is stored or secured by staff. By obtaining access to these videos, inmates could potentially target those areas to remove keys or other security devices, allowing inmates to evade or injure staff, tamper with security equipment, or threaten the security of the institution.

60. For another example, by seeing how inmates are restrained prior to and during a calculated use of force, including the specific equipment used for such restraints and the capabilities and functionality of such equipment, inmates could devise ways to avoid being fully restrained, or could learn how to render the security equipment useless or less effective. Similarly, by observing the specific duties/responsibilities of each staff member participating in a calculated use of force, such as which staff member is responsible for restraining which part of an inmate's body and how, inmates could learn to anticipate and counteract staffs' actions, thereby circumventing staffs' efforts to secure, restrain, and/or maintain control of inmate during such incidents. Given that part of the calculated use of

force depicted on each set of videos includes attempts at conflict avoidance with the inmate before proceeding with the cell extraction, release of the videotapes would reveal strategies and tactics for conflict avoidance that inmates intent on violence could attempt to undermine, putting the staff involved in the use of course at greater risk of injury.

61. Release of the videos could also reveal any limitations or challenges BOP may have in carrying out calculated uses of force and in responding to emergencies or other institutional situations, including space constraints and vulnerabilities of security or medical equipment. Specific types and quantities of medical and correctional supplies and equipment utilized in the performance of staff duties can be seen in the videos. Inmates could potentially use this information to take advantage of any weaknesses and plan affirmative attacks on or countermeasures to the BOP's response in specific situations.

62. In addition, the videos show specific areas within the secure confines of Florence ADX, including the layout of those areas, the location of secure cells, unsecured areas, and medical and security equipment storage areas. Disclosure of this information could allow inmates to learn how to navigate through these areas undetected by staff, secure themselves in these areas, and/or gain access to critical medical supplies or security equipment.

63. Specifically related to calculated uses of force involving the involuntary administration of medical treatment, the videos reveal the method(s) utilized for initiating and completing medical procedures, including specific methods to restrain inmates, the adjustment of restraints to allow for the provision of medical treatment, and the actual medical procedures utilized. Release of this information could allow inmates to circumvent the BOP's ability to restrain them, as well to countermeasure the effects of such medical procedures.

64. Indeed, in the November 11 videos, inmate Salameh is seen attempting to resist or reject efforts to subject him to involuntary nutrition by deliberately regurgitating or vomiting the

20

supplement provided to him. The techniques and measures the security and medical staff used to overcome this resistance are also depicted in the videos. Disclosure of such techniques and measures would allow inmates an opportunity to devise even more effective strategies for resisting involuntary feeding, which would undermine BOP's objective of keeping the inmate alive and ensuring that the inmate is well nourished.

65.  All of the above-described justifications for withholding the videos are necessary for BOP to carry out its mission of protecting the public, its staff, and inmates from harm. While these protection concerns are vital to BOP throughout its system, they are especially important at the Florence ADX, which is the institution where BOP houses its most dangerous convicts, often with histories of assaulting staff or other inmates, or criminal convictions resulting from terrorist acts against the United States, as is the case for inmate Salameh. Maintaining security and ensuring institutional order at Florence ADX is of paramount importance, and revealing BOP's techniques and procedures for doing so could have detrimental effects for BOP staff, the inmates, and the general public.

66.  None of the techniques and procedures depicted in the videotapes and discussed in the preceding paragraphs is in the public domain. Indeed, a key part of maintaining the security of BOP facilities and protecting inmates and staff is to keep detailed aspects of correctional management such as these out of public view. To my knowledge, BOP has never, through a FOIA request, disclosed or released, to anyone outside of DOJ, any videotapes of calculated use of force incidents occurring at Florence ADX in connection with involuntary medical treatment administered to inmates on hunger strike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _18_ day of _December_ 2019.

James Phelps
Correctional Services Administrator
North Central Regional Office
Kansas City, Kansas

22