UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVIVA STAHL,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL BUREAU OF PRISONS, and<br>DEPARTMENT OF JUSTICE,<br><br>    Defendants. | No. 19-CV-4142 (BMC)<br><br>DECLARATION OF ERIKA<br>FENSTERMAKER |

DECLARATION OF ERIKA FENSTERMAKER

I, Erika Fenstermaker, do hereby declare and state as follows:

1.   I am employed by the United States Department of Justice ["DOJ"], Federal Bureau of
     Prisons ["BOP"], as a Government Information Specialist ["GIS"] for the North Central
     Regional Office ["NCRO"], located in Kansas City, Kansas. I have been assigned to the
     NCRO since September 2014. Prior to that time, I served as a Legal Assistant at USP
     Canaan since January 2011.

2.   I make the statements herein based on my personal knowledge, on my review of the official
     files and records of BOP to which I have authorized access, and on information acquired
     by me through the performance of my official duties. Given the nature of my duties as a
     GIS for the NCRO, I am familiar with the procedures followed by BOP's Central Office
     and by the NCRO in responding to requests made pursuant to the Freedom of Information
     Act ["FOIA"].

3.   I have reviewed the Complaint filed on July 17, 2019, by Plaintiff Aviva Stahl, seeking
     disclosure of certain records she sought through FOIA requests submitted to BOP,
     concerning inmate Mohammad Salameh, Reg. No. 34338-054. In her Complaint, Plaintiff

1

alleges that BOP did not conduct an adequate search in response to her FOIA requests, that BOP improperly applied and asserted various FOIA exemptions in response to her FOIA requests, that BOP improperly withheld or redacted certain items responsive to her FOIA requests, and that BOP did not respond timely to her FOIA requests. She also alleges that BOP failed to grant her requests for FOIA fee reductions and expedited processing. In accordance with the agreement which, as I have been advised, the Government reached with the Plaintiff in October, and with the court order endorsing that agreement, this Declaration only addresses Plaintiff's allegations that BOP improperly applied and asserted various FOIA exemptions in response to her FOIA requests and that BOP improperly withheld or redacted certain items responsive to her FOIA requests.

### BOP'S FOIA PROCESS

4.    Requests for BOP records are governed by DOJ's FOIA regulations, *see* 28 C.F.R. Part 16, BOP's FOIA regulations, *see* 28 C.F.R. Part 513, and BOP Program Statement PS 1351.05, *Release of Information*.[1] Under 28 C.F.R. § 513.60, FOIA requests to BOP must be made in writing and addressed to the Director, Federal Bureau of Prisons, 320 First Street N.W., Washington, D.C. 20534. These requests may be submitted via mail or electronically.

5.    All FOIA requests are initially received by the FOIA/Privacy Act Section of the Office of General Counsel in the Central Office of BOP. Once received, a Central Office FOIA Technician will review the request to determine the likely location(s) of the records sought.

6.    If the majority of records sought are reasonably likely to be located in the Central Office, such as policy development or contracting records, the request will be assigned to Central Office FOIA processors. Central Office FOIA staff will then scan the request into PDF

---

[1] All BOP Program Statements referenced in this Declaration are available at the Bureau's public website, www.bop.gov.

format, upload it into BOP's FOIA tracking database (FOIAXpress), assign the request a number, and notify the requester that her request was received.

7.  However, if a majority of the records sought are reasonably likely to be located at an institution or in one of the six BOP regional offices, such as records regarding an individual inmate, then the Central Office FOIA staff will scan the request into PDF format and e-mail it to FOIA staff located in the appropriate regional office, such as NCRO. *See* 28 C.F.R. § 513.64(a). Within the North Central Region, NCRO FOIA staff will upload the FOIA request into FOIAXpress and assign it a number. NCRO FOIA staff will then notify the requester that her request was received. *See* 28 C.F.R. § 513.64(b).

8.  Once NCRO FOIA staff determine where the records sought are reasonably likely to be located, a thorough search for responsive records is initiated at the appropriate location(s). If the records sought are reasonably likely to be located in the Regional Office itself, NCRO FOIA staff will coordinate the search with appropriate program or legal staff assigned to the NCRO. However, if the records sought are reasonably likely to be located at one of the twenty institutions in the North Central Region, NCRO FOIA staff will forward the request to the institution's FOIA point of contact, often either a legal assistant or legal liaison, who will then coordinate the search for responsive records at that site.

9.  Responsive records found during these comprehensive searches are provided to a GIS or FOIA Paralegal Specialist at the NCRO, who reviews the records to determine whether any portion is exempt from disclosure under FOIA. If any responsive records contain exempt information, then any reasonably segregable portions of such records will be disclosed after redaction of the exempt information. The requester is advised in writing of any withholding of responsive information, whether in part or in whole, and of the reasons

for the withholding. The requester is also advised that she may appeal the denial of information to DOJ's Office of Information Policy.

FOIA REQUEST NO. 2018-02917[2]

10.    According to BOP records, inmate Mohammad Salameh, Reg. No. 34338-054, was sentenced to 240 years' imprisonment following 1994 convictions in the Southern District of New York arising out of his role in the 1993 bombing of the World Trade Center Complex. Attached as Exhibit A is a true and correct copy of inmate Salameh's Public Information Data. His current release date is January 22, 2095.

11.    On February 16, 2018, the NCRO received from the BOP Central Office a FOIA request from Plaintiff Aviva Stahl seeking all records pertaining to the medical treatment and evaluation of inmate Salameh from January 1, 2002, through December 31, 2015, as well as any videotapes of involuntary medical treatment administered to him during that time. A true and correct copy of the FOIA Request, date-stamped as received by the BOP Central Office on February 15, 2018, is attached as Exhibit B.

12.    The NCRO FOIA technician receiving the FOIA Request assigned it No. 2018-02917, and sent an acknowledgment letter to Plaintiff on February 16, 2018, a true and correct copy of which is attached as Exhibit C.

13.    After responsibility for the FOIA request was assigned to me, I directed staff at the Administrative Maximum Unit in Florence, Colorado ["Florence ADX"], where inmate Salameh was incarcerated during the period covered by the request, to conduct a thorough and comprehensive search for records responsive to Plaintiff's FOIA Request No. 2018-02917.

---

[2] Plaintiff's Second FOIA request, designated as request No. 2018-06868, was treated as duplicative to Request No. 2018-02917.

4

14.    The first portion of Plaintiff's FOIA request sought records pertaining to the medical treatment and evaluation of inmate Salameh from January 1, 2002, through December 31, 2015, and attaches the waiver forms necessary to authorize the release of such medical records to a third party. *See* Exhibit B. In response to this portion of the request, 2,669 pages of medical records ostensibly pertaining to inmate Salameh were located.

15.    The second portion of Request No. 2018-02917 sought videotapes of any involuntary treatment BOP may have administered to inmate Salameh between January 1, 2002, and December 31, 2015, in response to his hunger strikes.[3] *See* Exhibit B. In response to this portion of the request, six (6) videotapes were located at Florence ADX that pertained to the provision of involuntary hydration to inmate Salameh on November 4, 2015, and another seven (7) videotapes were located at Florence ADX that pertained to the provision of involuntary nutrition to inmate Salameh on November 11, 2015.

16.    Upon receiving the medical records and videos described above, I carefully reviewed them for applicable FOIA exemptions and processed them so as to achieve maximum disclosure to Plaintiff, consistent with the access provisions of FOIA and its statutory exemptions. Every effort was made to provide Plaintiff with all reasonably segregable nonexempt information contained in the responsive records. Exempt information was excised from the medical record pages disclosed in part, and the appropriate exemptions were cited. Altogether, 2,622 pages of inmate Salameh's medical records were released to Plaintiff in

---

[3] Pursuant to Program Statement PS 5562.05, *Hunger Strikes*, at 7, involuntary treatment of a hunger-striking inmate is considered a calculated use of force, and such incidents should be videotaped. Pursuant to Program Statement PS 5566.06, *Use of Force and Application of Restraints*, at 19, the original videotapes of a calculated use of force are maintained and secured as evidence in the appropriate Special Investigative Services ["SIS"] office. Pursuant to BOP's established retention policies, videos documenting calculated uses of force, including involuntary treatment in response to a hunger strike, are maintained at and by appropriate SIS offices for two and a half (2 1/2) years, or longer if necessary for legal, evidentiary, or operational purposes.  After two and a half (2 1/2) years, if such videos are not needed for legal, evidentiary, or operational purposes, they are destroyed or recycled.

full, 42 pages were produced with redactions, and five pages were withheld in full. It is my

understanding that as a result of the stipulation reached in October between Plaintiff and

the Government, Plaintiff is no longer contesting the withholding or redaction of material

from inmate Salameh's medical records.

17.   As will be explained in detail herein, the thirteen (13) videotapes that were located at

Florence ADX in response to Plaintiff's FOIA request were withheld from production in

whole, as supported by the applicable statutory exemptions. Attached to this declaration as

Exhibit D is a true and correct copy of the letters to Plaintiff informing her that the videos

were being withheld in full, and indicating the applicable statutory exemptions applied to

withhold them. As set forth there, the following exemptions were applied to each of the

thirteen (13) videotapes:

a.     5 U.S.C. § 552(b)(6)

b.     5 U.S.C. § 552(b)(7)(C)

c.     5 U.S.C. § 552(b)(7)(E)

d.     5 U.S.C. § 552(b)(7)(F)

18.   In response to this litigation, I also prepared a *Vaughn* Index describing with specificity

the documents and information withheld in response to FOIA Request No. 2018-0217.  In

the Index, I identify the total number of pages in each document, followed by the number

of pages redacted or withheld.  I also describe with specificity what pages of the document

were affected by the withholdings, in order to provide context for the withholdings.  A true

and correct copy of the *Vaughn* Index for FOIA Request No. 2018-02917 is attached as

Exhibit E to this declaration.

## THE WITHHELD VIDEOTAPES

19.     The 13 videotapes at issue depict two separate incidents involving inmate Salameh.

20.     The first 6 videos depict a calculated use of force on November 4, 2015, in which inmate

Salameh was provided involuntary medical treatment, specifically, intravenous hydration,

due to his deteriorating medical condition and significant hazard to his health resulting

from a voluntary hunger strike. The incident was filmed from two different angles using

two different video cameras, each of which divided the incident into three parts, of roughly

30, 30, and 12 minutes in length, respectively; hence, the six videos collectively document

an incident of about 72 minutes in duration, shot from two different perspectives. As further

elaborated in the Declaration of James Phelps, the videotapes record the entire calculated

use of force, including the initial introduction of the staff members involved, the verbal

descriptions of each staff members' roles and responsibilities during the use of force, the

extraction and transfer of inmate Salameh from his observation cell to a medical treatment

area at Florence ADX, the preparation for and administration of the medical procedure to

provide intravenous hydration to inmate Salameh, the transfer of inmate Salameh back to

his observation cell, and the post-incident debriefing in which each staff member described

his or her role and responsibility, among other information.

21.     The next 7 videos depict a calculated use of force on November 11, 2015, in which inmate

Salameh was administered involuntary medical treatment, specifically, liquid nutrition

provided through a nasogastric tube, due to his deteriorating medical condition and

significant hazard to his health resulting from a voluntary hunger strike. The incident was

filmed from two different angles using two different video cameras. The first camera

divided the incident into four parts, of roughly 30, 13, 30, and 2 minutes in length,

7

respectively; the second camera divided the incident into three parts, of roughly 30, 30, and 15 minutes in length, respectively. Hence, the seven videos collectively document an incident of about 75 minutes in duration, shot from two different perspectives. As further elaborated in the Declaration of James Phelps, the videotapes record the entire calculated use of force, including the initial introduction of the staff members involved, the verbal descriptions of each staff members' roles and responsibilities during the use of force, the extraction and transfer of inmate Salameh from his observation cell to a medical treatment area at Florence ADX, the preparation for and administration of the medical procedure to provide nutrition to inmate Salameh through a nasogastric tube, the transfer of inmate Salameh back to his observation cell, and the post-incident debriefing in which each staff member described his or her role and responsibility, among other information.

22.   As further elaborated in the Declaration of James Phelps, in each set of videos, the following can be seen and/or heard, among other things: the personal image and identifying information of each staff member involved in the calculated use of force (including, in some cases, the names of the staff members visible on their uniforms); the equipment that each staff member dons and utilizes for a calculated use of force; the specific location and method in which such equipment is used and secured; and the specific layout of the medical area at Florence ADX, including the location, type, and amount of medical and correctional supplies.

### Non-Disclosure under FOIA Exemption 5 U.S.C. § 552(b)(6)

23.   Exemption (b)(6) authorizes the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption (b)(6) was applied to withhold the personal

image and identifying information of each staff member involved in the two calculated uses of force (including, where applicable, the names of the staff members visible on their uniforms).

24.     Each staff member depicted in the videos  has a personal privacy interest in the videotapes, including in the use of his or her own image, and in the identification of the individual via audio or video. None of the staff members involved in the two calculated uses of force have provided a written waiver of their personal privacy interests or authorized the release of their images or identities.

25.     Release of this information would constitute a clearly unwarranted invasion of the personal privacy of the individuals involved, insofar as it could subject the staff members to embarrassment, harassment, or threats due to their involvement in calculated uses of force and in involuntary treatment of inmates on hunger strike. Release of the videos could also subject the third-party individuals depicted therein to unanticipated and unwanted injury to their reputations, and possibly to unwanted and/or derogatory publicity and inferences arising from their connection to law enforcement. In addition, release of this information could endanger the life or physical safety of BOP staff involved in calculated uses of force, insofar as inmate Salameh (a convicted terrorist), his confederates, or other inmates, may seek to retaliate against staff involved in calculated uses of force.

26.     As elaborated in the Declaration of James Phelps, BOP has determined that release of the requested information would not shed light on the agency's performance of its statutory duties, or on the operations and activities of the Government; there is thus no public interest in transparency nor any other interest, which would counterbalance the individuals' privacy in the information withheld under Exemption (b)(6). In making this determination, BOP took into account, among other considerations, the fact that it released to Plaintiff, in

9

response to her FOIA request, more than 2,600 pages of medical records corresponding to inmate Salameh. These records document the instances in which BOP responded to inmate Salameh's hunger strikes through involuntary hydration or nutrition, the medical findings germane to such responses, and the details of what treatment was provided and how. Moreover, BOP's Program Statements regarding hunger strikes and use of force are publicly available documents, setting forth in detail when, why, and how BOP engages in use of force as a last resort in response to hunger strikes.

27.   The exempt personal privacy information described above is inextricably intertwined with the rest of the videos and therefore cannot reasonably be segregated. Accordingly, the entire videotape was withheld to protect BOP staff members' personal privacy interests in their images and identifying information.

Non-Disclosure under FOIA Exemption 5 U.S.C. § 552(b)(7)

28.   As a threshold to applying Exemption (b)(7), an agency has to demonstrate that the "records or information [were] compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7).

29.   BOP is a law enforcement agency. The term "law enforcement officer" is expressly defined to include "an employee of the Bureau of Prisons or Federal Prison Industries, Inc." *See, e.g.*, 5 U.S.C. § 8401(17)(D)(i). Furthermore, BOP employees perform law enforcement functions: they possess the authority to make arrests, 18 U.S.C. § 3050; seize evidence, 18 U.S.C. § 4012; and execute searches on inmates and visitors to the institution, 28 C.F.R. §§ 511.10-511.12, 552.10-552.14. Additionally, BOP is tasked with the law enforcement mission of protecting inmates, staff, and the community. *See* 18 U.S.C. § 4042(a)(1)-(3) ("The Bureau of Prisons, under the direction of the Attorney General, shall (1) have charge of the management and regulation of all Federal penal and correctional institutions; (2)

10

provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .").

30. As explained above, pursuant to PS 5562.05, *Hunger Strikes*, at 7, involuntary treatment of a hunger-striking inmate is considered a calculated use of force, and pursuant to PS 5566.06, *Use of Force and Application of Restraints*, at 19, the original videotapes of a calculated use of force are maintained and secured as evidence in the appropriate SIS office. SIS is a component of BOP's Correctional Services Department and is responsible, among other duties, for assisting in the investigation of criminal acts, for tracking the activities of certain inmates, and for training staff on intelligence-gathering methods and issues. When located in response to Plaintiff's FOIA request, the videotapes were found by an SIS Lieutenant among the files of the SIS office at Florence ADX.

31. The videotapes withheld in response to Plaintiff's FOIA request meet the law enforcement threshold of Exemption 7. Specifically, they contain recordings of two (2) calculated uses of force involving inmate Salameh, which were created consistent with BOP policy and its law enforcement mission of protecting inmates, staff, and the community.

<u>Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(C)</u>

32. Exemption (b)(7)(C) protects from mandatory disclosure any records or information compiled for law enforcement purposes as to which disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Exemption (b)(7)(C) was applied to withhold the personal image and

identifying information of each staff member involved in the two calculated uses of force (including, where applicable, the names of the staff members visible on their uniforms).

33.    Exemption (b)(7)(C) is similar to Exemption (b)(6), albeit less demanding (*e.g.,* "could reasonably be expected to constitute" *vs.* "would constitute," and "unwarranted" *vs.* "clearly unwarranted"), assuming the law enforcement threshold is satisfied. Thus, the personal privacy rationales set forth above at paragraphs 24-26 for withholding the videos under Exemption (b)(6) also warrant withholding under Exemption (b)(7)(C).

34.    As explained in paragraph 27, the exempt personal privacy information described above is inextricably intertwined with the rest of the videos and therefore cannot reasonably be segregated. Accordingly, the entire videotape was withheld to protect BOP staff members' personal privacy interests in their images and identifying information.

<u>Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(E)</u>

35.    Exemption (b)(7)(E) protects from mandatory disclosure any records or information compiled for law enforcement purposes as to which release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Exemption (b)(7)(E) was applied to withhold in full all thirteen (13) videotapes responsive to this FOIA request.

36.    Again, pursuant to PS 5562.05, *Hunger Strikes*, at 7, involuntary treatment of a hunger-striking inmate is considered a calculated use of force, and pursuant to PS 5566.06, *Use of Force and Application of Restraints*, at p. 19, the original videotapes of a calculated use of force are maintained and secured as evidence in the appropriate SIS office.

12

37.    Release of the videotapes would disclose BOP and SIS techniques and procedures for gathering evidence that is used for investigative and law enforcement purposes; this could enable inmates to circumvent, countermeasure, and/or nullify the effectiveness of BOP's investigative and intelligence processes.

38.    Specifically, disclosure of the videotapes would improperly reveal the methods of preparation for, the location of, and the process for initiating a calculated use of force within a secure BOP institution, which could enable inmates to circumvent or nullify the effectiveness of calculated use of force techniques.

39.    The disclosure of the videotapes would also reveal the specific equipment and techniques used to execute a calculated use of force, which could allow inmates to circumvent this law enforcement technique in the future. Such disclosure would reveal the specific techniques that each staff member involved in the calculated use of force is assigned to accomplish (for example, how different staff members restrain different parts of the inmate's body), which could enable inmates to anticipate and counteract staff actions, thereby mitigating the effectiveness of such efforts.

40.    In addition, disclosure of the videotapes would reveal the specific equipment each staff member uses and/or dons during a calculated use of force, which could enable inmates to identify potential weak areas of protection, and to devise how to remove such equipment or learn how to render it useless or less effective.

41.    The disclosure of the videotapes would also reveal the layout of specific areas within the secure confines of Florence ADX, including the location of secure cells, unsecured areas, and medical and security equipment storage areas. Disclosure of this information could allow inmates to learn how to navigate through these areas undetected by staff, secure

themselves in these areas, and/or gain access to critical medical supplies or security equipment.

42.    The videotapes also show the location where, and method in which, security equipment (i.e., keys) are secured and stored. The disclosure of this information could permit inmates to evade staff, to tamper with security equipment, or to render such equipment useless or less effective.

43.    Disclosure of the videotapes would also reveal the specific type and amount of medical and security equipment utilized by correctional and medical staff in the performance of their duties, and particularly during a calculated use of force. The disclosure of this information could permit inmates to hamper or circumvent staff's ability to respond to an emergency or carry out law enforcement activities, such as conducting a calculated use of force.

44.    Additionally, disclosure of the videotapes would reveal the manner in which correctional restraints are applied and secured in preparation for a calculated use of force, as well as the capabilities and functionality of restraint equipment utilized to carry out a calculated use of force. Disclosure of this information could permit inmates to circumvent staff's efforts to restrain and maintain control of inmates during calculated uses of force by anticipating staff's actions and methods of restraint and strategizing to determine techniques to delay or interfere with restraint protocols.

45.    In addition, disclosure of the videotapes would reveal the specific method(s) utilized for initiating and completing medical procedures, and in particular in this case, a medical procedure to provide involuntary hydration or nutrition to an inmate. Release of this information could allow inmates to learn the specific process, which could allow them to circumvent or countermeasure the effects of the medical procedure. Indeed, during the

14

videos depicting the November 11, 2015, calculated use of force, inmate Salameh is seen attempting to resist efforts to subject him to involuntary nutrition by deliberately regurgitating or vomiting the supplement provided to him. The techniques and measures the security and medical staff used to overcome this resistance are also depicted in the videos. Disclosure of such techniques and measures would allow inmates an opportunity to devise even more effective strategies for resisting involuntary feeding, which would undermine BOP's objective of keeping the inmate alive and ensuring that the inmate is well nourished.

46.   Finally, the disclosure of the videotapes would reveal any limitations or challenges BOP security and medical staff encountered during calculated uses of force, including space constraints and vulnerability of security or medical equipment. Disclosure of this information could allow inmates to take advantage of those weaknesses and circumvent the purpose and effectiveness of a calculated use of force.

47.   None of the techniques and procedures depicted in the videotapes and discussed in the preceding paragraphs is in the public domain. To my knowledge, BOP has never, through a FOIA request, disclosed or released to anyone outside of DOJ, any videotapes of calculated use of force incidents occurring at Florence ADX in connection with involuntary medical treatment administered to inmates on hunger strike.

48.   The information exempt under Exemption (b)(7)(E) is inextricably intertwined with the rest of the videos.  Furthermore, BOP does not have the technical capacity to edit or redact exempt information from videos.  Therefore, the non-exempt information in the videos cannot reasonably be segregated.  Accordingly, the entirety of the videotapes was withheld.

Non-Disclosure Under FOIA Exemption 5 U.S.C. § 552(b)(7)(F)

49.   Exemption (b)(7)(F) protects from mandatory disclosure any records or information compiled for law enforcement purposes as to which release could endanger the life or physical safety of any individual. *See* 5 U.S.C. § 552(b)(7)(F). Exemption (b)(7)(F) was applied to withhold in full all thirteen (13) videotapes responsive to this FOIA request.

50.   Release of the thirteen videotapes could endanger the life or physical safety of BOP security and medical staff involved in the calculated uses of force. Disclosure of the videotapes would allow inmate Salameh, his friends, confederates, and criminal associates to identify the specific staff members involved in the calculated uses of force, as well as each staff member's specific duties/actions in carrying out the use of force. Disclosure of this information could subject these individuals to retaliation, threats, harassment, or other actions, both inside and outside the facility, at the direction of inmate Salameh, his friends, confederates, or criminal associates, or indeed anyone else who objects to the tactics depicted in the videos. Such disclosure could result in a threat to their safety and to the safety of those BOP staff committed to their protection pursuant to their law enforcement mandate.

51.   Additionally, disclosure of the videotapes would reveal the specific duties and techniques each staff member is assigned to carry out during a calculated use of force (for example, how different staff members restrain different parts of the inmate's body), as well as the specific protective gear and security equipment donned and/or utilized during a calculated use of force. Disclosure of this information could enable inmates to anticipate and counteract or disrupt staffs' actions, which could result in injury to staff. In addition, disclosure of equipment could enable inmates to identify potential weak areas of protection, and to devise how to remove such equipment or learn how to render it useless or less

16

effective, thereby endangering the life or physical safety of staff involved in calculated use of force incidents.

52.     Additionally, disclosure of the videotapes would reveal the manner in which correctional restraints are applied and secured in preparation for and during a calculated use of force, as well as the capabilities and functionality of restraint equipment utilized to carry out a calculated use of force. Disclosure of this information could permit inmates to circumvent staff's efforts to restrain and maintain control of inmates during calculated uses of force by anticipating staff's actions and methods of restraint and strategizing to determine techniques to delay or interfere with restraint protocols, thereby endangering the life or physical safety of staff involved in calculated uses of force.

53.     Finally, given that part of the calculated use of force depicted on each set of videos includes attempts at conflict avoidance with the inmate before proceeding with the cell extraction, release of the videotapes would reveal strategies and tactics for conflict avoidance that inmates intent on violence could attempt to undermine, putting the staff involved in the use of course at greater risk of injury.

54.     The information exempt under (b)(7)(F) is inextricably intertwined with the rest of the videos and therefore cannot reasonably be segregated. Accordingly, the entirety of the videotapes was withheld.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

        Executed this 19 day of December 2019.

                                        *Erika Fenstermaker*
                                        Erika Fenstermaker
                                        FOIA/PA Technician
                                        North Central Regional Office
                                        Kansas City, Kansas

17