UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVIVA STAHL, | |
| Plaintiff, | |
| v. | No. 19-CV-4142 (BMC) |
| FEDERAL BUREAU OF PRISONS, and DEPARTMENT OF JUSTICE, | |
| Defendants. | |

SUPPLEMENTAL DECLARATION OF JAMES PHELPS

I, James Phelps, do hereby declare and state as follows:

1.      On December 18, 2019, I executed a declaration in the above-captioned case concerning Bureau of Prisons ["BOP"] procedures and protocols related to hunger strikes and calculated uses of force, and explaining and justifying BOP's withholding of the videos at issue in this case, including the techniques and procedures for law enforcement investigations depicted therein.

2.      Since the time of my previous declaration, I was promoted to Associate Warden for the BOP at the United States Penitentiary II, in Coleman, Florida, where I am currently employed. The statements made herein are based on my review of the official files and records of the BOP to which I have authorized access, and on my personal knowledge and experience acquired through the performance of my official duties over the course of several years with the BOP.

3.      I supplement my previous declaration of December 18, 2019, to respond to a number of incorrect statements and arguments the Plaintiff made in responding to the Government's motion for summary judgment.

1

The Security and Law Enforcement Implications of Inmate Hunger Strikes

4.      To begin, Plaintiff repeatedly characterizes the actions of inmate Salameh during his time at Florence ADX as "peaceful hunger strikes." In a correctional setting, however, there is no such thing as a "peaceful" hunger strike. While engaging in a hunger strike does not necessarily involve a physical altercation, hunger strikes in a correctional setting pose as much, if not more, of a security risk as do other types of inmate resistance.

5.      Setting aside situations where the inmate is mentally ill (which I do not understand is the case for inmate Salameh), engaging in an intentional hunger strike is a form of insubordination – a deliberate attempt by an inmate to upend the system of authority and rules within the institution, and a purposeful effort to undermine the institution's ability to safely and effectively manage inmates in a correctional environment. Inmates engaging in intentional hunger strikes in federal correctional facilities are essentially attempting to exploit BOP's statutory obligation to provide for their safekeeping, care, and subsistence to achieve their own ends. For example, they may use such strikes to try to manipulate BOP into loosening conditions of confinement that were imposed for legitimate reasons entirely consistent with BOP's paramount law enforcement mission: to protect the public from persons charged with or convicted of offenses against the United States.

6.      Additionally, inmate hunger strikes – especially prolonged ones – have an inherently adverse impact on the normal operations of a correctional institution, as they consume a considerable amount of staff time and resources, are physically and mentally taxing on correctional and medical staff, take staff away from other vital security needs within the prison, and may influence other inmates to act or react in a negative or disruptive manner. This is especially true if multiple inmates in the same institution engage in simultaneous

hunger strikes, whether as a result of deliberate coordination or due to copycat measures among inmates.

7.      The significant security and law enforcement considerations implicated by inmate hunger strikes are especially evident in the case of inmate Salameh. By way of background, inmate Salameh, a convicted international terrorist, is a high-risk, high-profile inmate, serving a sentence of 116 years, 11 months' imprisonment for his involvement in the 1993 World Trade Center bombings, which killed six people and injured over 1,000.[1] Since the time inmate Salameh entered BOP custody, he has amassed more than thirty (30) incident reports for violations of BOP rules, including insolence, destroying property, assault, interfering with security devices, threatening bodily harm, and multiple violations for refusing to obey staff orders. *See* Inmate Discipline Data, attached hereto as Exhibit C.

8.      Moreover, during his time at Florence ADX, inmate Salameh continued to engage in or encourage criminal and terroristic behavior that threatened the public or compromised national security. As stated in media reports from March 2005 and subsequently confirmed in a September 2006 report of the Department of Justice ["DOJ"] Office of the Inspector General ["OIG"]:

> [T]hree convicted terrorists, Mohammed Salameh, Mahmud Abouhalima, and Nidal Ayyad, incarcerated at the Federal Bureau of Prisons' (BOP) Administrative Maximum facility (ADX) in Florence, Colorado, for the 1993 bombing of the World Trade Center, wrote over 90 letters to Islamic extremists outside the prison between 2002 and 2004. These extremists included inmates who are members of a Spanish terror cell with links to other terrorists suspected in the March 11, 2004, terrorist attacks on Madrid commuter trains. One of the letters from Salameh was found in the possession of Mohamed Achraf, described as the leader of a radical Muslim cell, who was charged in October 2004 in Spain for plotting to blow up the National Justice Building in Madrid, which is Spain's "nerve center" for investigating Islamic terror. Salameh also praised Osama bin Laden as a

---

[1] Pursuant to BOP policy, several groups of inmates have been identified as needing heightened or special security monitoring, including inmates belonging to or leading gangs, as well as international or domestic terrorists.

hero in a letter sent to Arabic newspapers. According to the March 2005 news reports, at least 14 letters were exchanged between the three terrorists in ADX Florence and the Spanish terror cell. In addition, 1 of the 17 people arrested in Spain for recruiting suicide operatives used these letters in his recruitment efforts.

*See* "The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates," Evaluation and Inspections Report I-2006-009 (DOJ OIG Sep. 2006), available at https://oig.justice.gov/reports/BOP/e0609/index.htm, citing Lisa Myers, "Imprisoned Terrorists Still Advocating Terror," www.msnbc.msn.com/id/7046691 (March 1, 2005); Lisa Myers, "Jihad Letters From Prison Went Far, Wide," www.msnbc.msn.com/id/7140883 (March 9, 2005); and Associated Press, "Spain Says Terrorist Plotted 'Biggest Blow,'" October 20, 2004, www.msnbc.msn.com/id/6282532 (March 6, 2006).

9.     As further explained in the DOJ OIG report, when inmate Salameh and two other World Trade Center bombers incarcerated at Florence ADX were discovered in March 2005 to be corresponding with other Islamic extremists domestically and abroad, the Counterterrorism Section of DOJ's Criminal Division drafted Special Administrative Measures ("SAMs") for these three inmates, after receiving documentary justification from the FBI's Counterterrorism Division. SAMs, approved by the Attorney General, may be applied to inmates whose communications require more restrictive conditions to prevent acts of violence and terrorism. *See* 28 C.F.R. § 501.3.[2] Under that regulation, the Attorney General

---

[2] SAMs may be recommended on a case-by-case basis by the FBI and the prosecuting component within DOJ, be it a U.S. Attorney's Office or the Criminal or National Security Division, independently or jointly. These recommendations are submitted to DOJ's Office of Enforcement Operations ["OEO"], which after obtaining the necessary supporting documentation prepares a memorandum to the Attorney General presenting the request and the measures to be implemented. SAMs can be ordered for a year at a time and renewed at one-year intervals indefinitely. The Attorney General approves all original impositions of SAMs, and the Assistant Attorney General for the Criminal Division can approve extensions or modifications, with input from OEO, which determines the continued need for special monitoring measures. *See* DOJ OIG Report; Department of Justice Manual §§ 9-24.100, 9-24.200.

may authorize BOP to implement SAMs with respect to a specific inmate when "there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." The regulation further states that "these SAMs ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." 28 C.F.R. § 501.3. Inmates who are under SAMs are restricted to communications and visits with only immediate family members, and all such social communications are monitored by the FBI.[3]

10.     Inmate Salameh was first informed that he had been placed on SAMs on March 18, 2005. *See* Exhibit D (attached). As stated in that notification, BOP adopted the SAMs "based on information of your proclivity for violence. There is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." Exh. D. Shortly before the implementation of these SAMs, Salameh was notified on March 8, 2005, that he was being placed on restricted general correspondence pursuant to 28 C.F.R. § 540.15 because his "past pattern of utilizing general correspondence to attempt to correspond with other incarcerated persons poses a

---

[3] The BOP forwards all mail to and from SAMs inmates to the FBI for analysis and approval. The FBI is required to return the approved mail to the BOP for delivery to the inmate or addressee within 14 days. A period of 60 days is permitted if foreign language translation is required or if there is reasonable suspicion that a code was used and decoding is required. Telephone calls must be monitored contemporaneously by the FBI and recorded. All calls must be in English unless a fluent FBI translator is available to contemporaneously monitor the call. The FBI listens later to the recordings to analyze whether the communication includes messages that solicit or encourage acts of violence or other crimes or attempts to circumvent the SAMs. *See* DOJ OIG Report.

special threat to security and good order of the institution, protection of the public, and national security insofar as [his] unlimited general written correspondence might facilitate further criminal or terrorist activity." *See* Exhibit E (attached).

11.     The initial SAMs imposed on inmate Salameh in March 2005 were renewed each year thereafter until March 2016. On at least one occasion, inmate Salameh was disciplined for circumventing the SAMs, when he inappropriately provided information to his brother about the family of another inmate subject to SAMs. SAM inmates are explicitly prohibited from corresponding with other inmates within the institution and from relaying messages through their authorized contacts to unauthorized third parties. *See* Exhibit F (attached).

12.     The notification sent to inmate Salameh on March 30, 2011, informed him that the SAMs were being extended for another year, citing "your conduct since you have been placed under the SAM, in which you demonstrated a disregard for the SAM restrictions that have been imposed on you." *See* Exhibit G. In addition to the communication with his brother described in the preceding paragraph, "the FBI reports that within approximately the last two years, you unsuccessfully sought to add twenty-six individuals to your contact list…. Among these twenty-six individuals, five of the names and one of the telephone numbers appeared to be associated with terrorists or terrorist supporters." Exh. G. The notification went on: "Most recently, during an annual SAM review meeting with you, the BOP, and the FBI in January 2011, you made several comments that indicate you continue to hold extremist and anti-American views…. You further stated that being imprisoned has not changed your 'ideas as it does some inmates.'" Exh. G.

13.     The last SAM notification sent to inmate Salameh, dated March 23, 2015, mentions that "those who played a role in the 1993 attack [on the World Trade Center] are viewed as heroes by other Islamic extremists in their war against the United States. Your involvement

in that attack demonstrates that you are a violent jihadist, committed to waging war on the United States, and that you are well-positioned to inspire others who share your views." Exhibit H (attached). The notification cites Salameh's "conduct while subject to SAM, including your repeated requests in recent years to have contact with individuals who raise, or appear to be associated with individuals who raise, national security concerns; your attempts to send a number of prohibited publications to your cousin; your two hunger strikes; your comments to BOP staff during a January 2011 meeting, in which you stated that being imprisoned had not changed your 'ideals as it does some inmates'...." Exh. H. Also mentioned is a December 5, 2014, telephone call Salameh had with his brother, whom Salameh inappropriately instructed to convey a message to a lawyer in Jordan who was not an approved contact. Exh. H. As Salameh was told, these incidents "reinforce the need for continued imposition of your SAM" insofar as they "demonstrate that you continue to hold extremist and violent views." Exh. H.

14.    Salameh's dozens of hunger strikes during his time at Florence ADX must be understood in the context of this background. These repeated, extended acts of defiance are of a piece with his long history of correctional discipline for acts of insolence, destruction of property, assault, interfering with security devices, threatening bodily harm, and refusing to obey staff orders.

15.    More importantly, as the Plaintiff has herself reported based on her conversations with inmate Salameh, the sole purpose of Salameh's hunger strikes was to try to manipulate BOP into lifting the SAMs. As the Plaintiff's article states:

> On Salameh's telling, it was the communication restrictions, not his three years under the extreme isolation, that drove him to stop eating. In March 2005, without explanation, a group of guards took him to H Unit and handed him the gags he would live under for 11 years. Aside from his attorney, Salameh could communicate only with his parents and siblings. He could

make one phone call each month and send one three-page, double-sided letter each week. The FBI monitored everything. He was barred from TV and radio news, and reading material had to be individually approved. The BOP "should call them punishment or torture, not 'special administrative measures' like it's something nice," Salameh said with a chuckle. "They are really devastating." The men convicted alongside Salameh went on hunger strike right away to demand that their SAMs be lifted. He was more cautious and thought it through….

16.   Because the SAMs were imposed on inmate Salameh in response to his "proclivity for violence and … continuing espousal of jihadist views," Exh. H, including his improper use of the mails to communicate with other international terrorists, and because by his own admission the sole purpose of his hunger strikes was to achieve the lifting of the SAMs, it is logical to assume that inmate Salameh's motive in engaging in hunger strikes was to resume communicating with other international terrorists and individuals capable of undermining national security. These are hardly "peaceful" hunger strikes, therefore, and instead demonstrate the significant security and law enforcement considerations that inmate Salameh's strikes implicated. The disruption to the institution as a result of these hunger strikes, as well as the risks associated with them, were extremely significant.

17.   In a declaration dated February 3, 2020, which Plaintiff submitted with her summary judgment papers, inmate Salameh claims that he never resisted a cell extraction, involuntary feeding, or involuntary rehydration procedure. This is both incorrect and irrelevant. As detailed in my previous declaration, I closely watched the use of force videos at issue in this case. Inmate Salameh clearly refused to submit to hand restraints and be removed from his cell voluntarily during the November 4, 2015, use of force. And on the second occasion, November 11, 2015, inmate Salameh is seen attempting to resist or reject efforts to subject him to involuntary nutrition by deliberately regurgitating or vomiting the supplement provided to him – behavior consistent with what Plaintiff herself describes

when she states in her article, in connection with an incident on March 20, 2006, that "as the Novasource, the nutritional supplement, trickled into his body, [Salameh] tightened his stomach and intentionally caused himself to vomit." During both uses of force he refused to voluntarily accept medical treatment and was repeatedly verbally disrespectful to both medical and correctional staff. Although inmate Salameh was not physically assaultive during these calculated uses of force, his actions constituted noncompliance and active resistance, and they could have, at any moment, escalated to physical violence, especially given Salameh's proclivity and past history. As I elaborate below, the potential for danger in use of force situations is the very reason BOP developed and utilizes the use of force techniques that are depicted in the videos.

The Law Enforcement Purpose of Calculated Uses of Force in Response to Inmate Hunger Strikes

18.     Plaintiff argues that there is no law enforcement purpose underlying the videos in question because involuntary hydration or nutrition in response to a hunger strike is a medical procedure rather than a law enforcement procedure. Plaintiff is incorrect.

19.     As explained in my initial declaration, this case implicates two distinct BOP Program Statements, each with a different focus. The focus of Program Statement PS 5562.05, *Hunger Strikes* (Exh. A to my initial declaration), is the preservation and protection of inmates' lives in a humane and appropriate manner, in accordance with BOP's statutory obligation of safekeeping. *See* 18 U.S.C. § 4042. The focus of BOP's use of force policy, on the other hand, is gaining and maintaining control of noncompliant inmates so as to protect and ensure the safety of inmates, staff, and others, to prevent serious damage to property, and to ensure institution security and good order. *See* BOP Program Statement 5566.06, *Use of Force* (Exh. B to my initial declaration). These two policies interact when

inmates engage in hunger strikes for such an extended period of time that a physician determines involuntary treatment is necessary to prevent death or permanent damage to an inmate's health.

20. The decision to treat a hunger striking inmate *is* a medical decision, which the facility physician makes if he determines, after staff makes reasonable but unsuccessful efforts to convince the inmate to accept treatment voluntarily, that a medical necessity exists for immediate treatment of a life or permanent-health threatening situation. *See* ¶ 14 of my initial declaration. However, the *involuntary* nature of the treatment provided requires that it be administered in accordance with BOP's calculated use of force protocols, which involve techniques and procedures for fulfilling BOP's fundamental law enforcement and security objectives to safely manage noncompliant inmates.

21. Regardless of the nature of the noncompliance, whether it be an inmate refusing to accept food or medical treatment or an inmate physically resisting staff, BOP utilizes the same basic approach to calculated use of force within an institution. As with other calculated uses of force, there is no way to predict how a hunger striking inmate will react when confronted with an action to which he does not consent or with which he does not agree. Inmates such as Salameh, with a proclivity for violence and a long history of discipline for insubordination, insolence, destruction of property, assault, and threatening bodily harm, can be especially unpredictable, and must be handled with particular care.

22. In order to be prepared for any range of reactions, BOP uses security staff specifically trained in conflict avoidance and use of force techniques; BOP also ensures that they don protective clothing and equipment and are assigned specific yet coordinated duties to achieve immediate control of an inmate. *See* PS 5566.06, p. 5.  In the event an inmate reacts negatively, by resisting or by attempting to assault staff (which, in my correctional

experience, occurs on a frequent basis), the use of force techniques help to mitigate any harm to the inmate himself, to the staff involved, and to other inmates in the area. These techniques and procedures also serve to prevent further disruption that could affect the security and order of the institution.

23.     For these reasons, any calculated use of force within an institution, including in response to a hunger strike, is fundamentally a law enforcement procedure, in fulfillment of BOP's paramount mission of protecting the public by detaining, instructing, and disciplining all persons charged with or convicted of offenses against the United States.


The Law Enforcement Purpose of the Use of Force Videotapes

24.     As discussed in my previous declaration, BOP policy requires calculated uses of force to be videotaped. The reason for the videotaping in the hunger strike context has nothing to do with the fact that an inmate is being given medical treatment to save his life and everything to do with the fact that it is a calculated use of force. Videotaping a calculated use of force serves several law enforcement and security purposes.

25.     First, the original videotapes of a calculated use of force are maintained and secured as evidence in the appropriate Special Investigative Service ["SIS"] office. If the inmate commits a prohibited or criminal act during the calculated use of force, or during the incident that prompted the use of force, SIS may use the videos to investigate or pursue disciplinary actions or criminal prosecutions against inmates. In each institution, SIS is responsible for conducting inmate and staff investigations (including assisting in the investigation of criminal acts), gathering intelligence through monitoring of inmate

communications,[4] training staff on intelligence-gathering methods and issues, advising executive staff on security matters, and setting security policy. For inmates subject to SAMs, SIS is responsible for coordinating with the FBI to ensure that the restrictions in the SAMs are complied with. As part of this ongoing responsibility, SIS would take great interest in BOP's response to an inmate subject to SAMs who engages in a hunger strike specifically to protest the SAMs, and would treat the video of any calculated use of force in response to such a hunger strike as part of its intelligence gathering as to that inmate.

26.     Second, the videos can be used to protect staff against unfounded allegations of excessive force, but they also help to ensure that staff involved only use the amount of force necessary and appropriate to gain or maintain control of the situation. The videos are routinely reviewed by Executive staff at the institution and in the Regional Office, to ensure compliance with the use of force policy and the laws concerning use of force. If staff's actions do not conform with BOP policy or with the laws concerning use of force, the videos may be used to pursue internal discipline or possible criminal prosecution of staff.

27.     All of these purposes for videotaping the calculated use of force are related to BOP's ultimate goal of maintaining safe, secure, and humane correctional environments, while ensuring the safety of staff and the protection of the public.


The Techniques and Procedures Depicted in the Videos are Not in the Public Domain

28.     Plaintiff states that the techniques and procedures depicted in the videos and described in my previous declaration have already been publicly disclosed. Again, this is incorrect.

---

[4] To monitor inmate communications, SIS offices develop mail and telephone monitoring lists. The names of high-risk, terrorist, and other inmates who are suspected of criminal or suspicious activity within the institution are placed on the lists, and SIS monitors all of their mail and telephone communications.

29.     As discussed extensively in my previous declaration, BOP has made its program statement concerning use of force publicly available, consistent with its obligations of transparency and accountability. While the general rules and procedures for using force have been disclosed, however, the operational details of how particular institutions use force to gain and maintain control of noncompliant inmates in specific situations have not.

30.     For example, PS 5566.06 refers to a list of protective gear that may be equipped during a use of force, if the circumstances warrant it. *See* PS 5566.06 at 9. But that list, which cross-references 29 C.F.R. Part 2910, only pertains to equipment meant to protect staff from occupational health exposures such as to blood or infectious materials. The policy statement does not contain an exhaustive list of all equipment used by BOP staff in uses of force across the system, nor does the referenced list pertain to security equipment utilized in a correctional setting.

31.     In addition, the publicly available policy statement does not detail the extensive training staff receive in order to participate in a calculated use of force; it does not describe in detail the duties and responsibilities to which each staff member is assigned in order to most effectively and efficiently gain and maintain control of a noncompliant inmate; and it does not specify or describe in detail the precise manner in which restraints are applied, or the specific manner in which inmates are extracted from their cells. Nor does it describe where or in what manner security equipment, such as restraints, keys, or other equipment, are to be secured or utilized during a use of force. None of this information is or should be in the public domain. In fact, Plaintiff agrees that certain aspects of a use of force, such as the location where keys are secured, are not, and should not be made, generally known to the public. *See* p. 15 of Plaintiff's response.

32.     As I exhaustively explained in my previous declaration, BOP has a legitimate and significant concern about the security risks resulting from inmates or the public learning of these specific details relating to uses of force. For example, inmates could utilize such information to discover potential weaknesses or shortcomings in the equipment BOP uses, leaving staff vulnerable to attacks in those areas, or they could use the information to develop countermeasures to remove the equipment or render it useless or less effective.

33.     In addition, by seeing the precise types and locations of security equipment, including keys to restraints, inmate cells, and other secure areas, inmates could target those locations to gain access to such equipment, allowing them to evade use of force procedures, injure staff, tamper with prison security measures, or otherwise threaten the security of the institution. Inmates may also utilize such information to develop methods to avoid the proper application of restraints, or to anticipate and counteract staff's actions, thereby circumventing staff's efforts to secure, restrain, and/or maintain control of the inmate during such incidents.

34.     Further, inmates could utilize such information to study BOP's limitations or challenges in carrying out calculated uses of force or in responding to emergencies, including space constraints and vulnerabilities of security or medical equipment, which could then be used to take advantage of such limitations or to plan affirmative attacks on or undermine the BOP's response efforts.

35.     Contrary to Plaintiff's suppositions, the physical layout of the specific areas within the secure confines of Florence ADX that are depicted in the videos are not available in any public forum. While I do not dispute that some photos or videos of a couple of discrete areas within Florence ADX may have been disclosed in the past, I can assert, without any doubt, that no videos or still images of areas within any correctional facility would be

released for public viewing unless an assessment has been made by trained and experienced staff that such limited disclosure would not adversely affect the security of the institution and the agency as a whole. This is consistent with BOP taking very seriously its obligation to protect the safety and security of its inmates, its staff, and the general public, as well as the orderly operation of its institutions. I can assert with equal confidence that no such assessment has ever been made with respect to the areas within Florence ADX depicted in the videos at issue here.

36.     To the contrary, any review of the videos by trained correctional personnel would conclude (as my own review did) that disclosure of these videos would significantly compromise the security of the institution and the agency as a whole. I reiterate my statements from my previous declaration that release of this information could permit inmates to circumvent BOP security procedures by allowing them to learn how to navigate through or secure themselves within these areas undetected by staff, and/or to gain access to critical medical supplies or security equipment.

37.     For this reason, the specific areas of Florence ADX and the security and medical equipment seen on the use of force videos at issue in this case have never been previously released in any public forum. Nor should they be.


Risk of Harm to BOP Staff

38.     Lastly, I renew and elaborate the concerns stated in my previous declaration pertaining to the risk of harm to which BOP staff would be exposed were the videos at issue to be released. In any correctional environment, staff are at risk of being threatened, assaulted, embarrassed, or otherwise harassed by inmates. The possible reasons for such behavior are endless, and may include retaliation for some perceived wrong carried out by staff as well

15

as efforts by inmates to upset the power dynamic within their institution. In addition, these actions by inmates take many forms, including not only physical assault and even murder[5] but also attempts to harass or embarrass staff through false or unfounded allegations.

39.    BOP staff all across the nation are constantly exposed to such threats of harm, retaliatory actions, and even physical abuse from inmates. There is no way to completely prevent such exposure, nor is there is any way to predict whether or when such threats, harm, or abuse will happen, or what will trigger it. The best BOP can do is to attempt to minimize such exposure, and doing so is among BOP's highest priorities.

40.    Disclosing videos such as those Plaintiff seeks here would not be consistent with such a priority. To the contrary, such disclosure would *maximize* the risk of harm to staff: by specifically disclosing which staff members were involved in a calculated use of force, and by showing the specific actions each member undertook during that use of force (actions the inmate opposed), one would essentially be putting a target on the back of each such staff member, inviting retaliation from an inmate intent on harming that staff member. This is not acceptable.

41.    These concerns are particularly significant given that the videos at issue involve inmate Salameh, who not only has a documented proclivity for violence as well as a long history of insolence, disobedience, and even assault toward BOP staff, but who has also repeatedly

---

[5] For example, in December 2018, five individuals entered pleas of guilty for their role in murdering a BOP correctional officer. The individuals admitted that they conspired to murder the staff member specifically in retaliation for his actions in seizing contraband from them, and that they recruited the assistance of hitmen from outside the facility to do the job. *See* DOJ Press Release, April 30, 2019, https://www.atf.gov/news/pr/five-men-sentenced-their-role-conspiracy-murder-federal-bureau-prisons-correctional-officer. In another case, an inmate in Pennsylvania stabbed a correctional officer at USP Canaan 200 times with two shanks and mutilated his body because of what he told prison officials was "a disrespect issue." *See* DOJ Press Release, July 11, 2017, https://www.justice.gov/opa/pr/federal-jury-returns-sentence-life-imprisonment-murder-federal-correctional-officer; "Stunning Video, Testimony in Prison Murder Trial," https://www.wnep.com/article/news/local/bradford-county/opening-statements-complete-in-prison-murder-trial/523-4c9f43ed-ba87-4a45-b02a-815b404fe9c1 (last visited Feb. 19, 2020). While murders of BOP staff members are thankfully rare, these cases highlights the many risks of harm a BOP staff member faces as a result of carrying out their official duties.

abused (or attempted to abuse) his communication privileges to connect with confederates, fellow terrorists, and other violent extremists both inside and outside the institution. The risk that terrorists or others who sympathize with Salameh could attempt to retaliate against BOP personnel depicted in the videos is real. Indeed, as mentioned in his 2015 SAM extension notification, Salameh is "viewed as [a] hero[] by other Islamic extremists in their war against the United States" and is "a violent jihadist, committed … to inspire others who share [his] views." Exh. H.

42.   Moreover, even inmates unconnected and unknown to Salameh who have themselves been subjected to involuntary treatment in response to their own hunger strikes, or their family members or confederates, may, upon viewing the videos, attempt to take action against the staff depicted in the videos, in retaliation for what they claim happened to them.

43.   As stated in my previous declaration, all of the above-described justifications for withholding the videos are necessary for BOP to carry out its core law enforcement mission of protecting the public, its staff, and inmates from harm. While these protection concerns are vital to BOP throughout its system, they are especially important at the Florence ADX, which is the institution where BOP houses its most dangerous convicts, often with histories of assaulting staff or other inmates, or criminal convictions resulting from terrorist acts against the United States, such as inmate Salameh.[6] Maintaining security and ensuring institutional order at Florence ADX is of paramount importance, and revealing BOP's techniques and procedures for doing so could have detrimental effects for BOP staff, the inmates, and the general public.

---

[6] Inmates such as Joaquin "El Chapo" Guzman with histories of significant violence as well as of attempted escape from custody with the assistance of outside confederates are also housed at Florence ADX.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of FEBRUARY 2020.

James Phelps
Associate Warden
United States Penitentiary - Coleman II
Coleman, Florida

18