UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                         :

AVIVA STAHL,                         :     **MEMORANDUM DECISION**

                   Plaintiff,     :     **AND ORDER**

                                             :

          - against -                :     19-cv-4142 (BMC)

                                           :

DEPARTMENT OF JUSTICE and     :
FEDERAL BUREAU OF PRISONS,     :
                                             :

                     Defendants.     :
                                             :
--------------------------------------------------------- X

**COGAN**, District Judge.

       Convicted for his role in the 1993 terrorist attacks on the World Trade Center, Mohammad Salameh was incarcerated at the United States Penitentiary, Administrative Maximum Facility in Florence, Colorado ("Florence ADX"). During his time there, Salameh went on several hunger strikes. The last one ended in procedures whereby Salameh received food and rehydration through intravenous therapy and a nasogastric tube. An investigative journalist, plaintiff Aviva Stahl, now seeks access to those videos under the Freedom of Information Act. She has sued the Bureau of Prisons and the Department of Justice, and before me are the parties' cross-motions for summary judgment.

       I conclude that certain segments of the videos fall within FOIA exemptions. As to these segments, defendants' motion is granted and plaintiff's motion is denied. For the remainder of the videos, however, the record lacks sufficient information to show whether the exempt information is reasonably segregable from the non-exempt information. As to these segments, I reserve judgment on the parties' motions. The parties shall submit supplemental memoranda and evidence addressing the remaining portion of the videos as set forth below.

# BACKGROUND

## I.    The Hunger Strikes

In 2015, Salameh began a hunger strike that would last thirty-four days.  By early November, his health had deteriorated to such a state that the BOP determined that he required immediate medical attention.  In two separate episodes, the BOP performed what it calls "involuntary medical treatment" and a "calculated use of force."  Plaintiff calls it "force-feeding."[1]

In the first episode, on November 4, BOP staff donned protective gear and went to Salameh's cell.  Defendants claim that Salameh refused to leave his cell.  Salameh denies this, claiming that he was too weak to come to his cell door.  In any event, the staff placed Salameh in handcuffs and leg irons, extracted him from the cell, placed him in a wheelchair, and ferried him to another room.

There, medical staff conducted a physical examination.  Observing signs of severe dehydration, they determined that Salameh needed immediate liquid intake.  He refused.  An emergency medical technician ordered that Salameh undergo involuntary rehydration.  Medical staff placed him on his back, adjusted his restraints, and inserted an IV into his arm.  Once satisfied with his liquid intake, the BOP staff returned him to his cell.

---

[1] In recapping events, I will not indulge defendants' request to "ignore" plaintiff's evidence and accept their version of events instead.  Citing no authority, defendants argue that "efforts to contradict [BOP] declarations" are "inappropriate."  In particular, they focus on a declaration from Salameh, saying it "should be flatly rejected" because it asks the Court to "take the word of a convicted terrorist over the statements of BOP personnel with relevant expertise and knowledge."  There are obvious reasons not to trust the account of a convicted terrorist.  But convicted criminals are no strangers to FOIA litigation, and even in these instances, courts do not assess credibility at summary judgment.  See, e.g., Barouch v. Dep't of Just., 87 F. Supp. 3d 10, 20 (D.D.C. 2015) (setting forth the general standard).  Additionally, none of the disputed facts affect the disputed legal issues.  The parties largely debate the appropriate terminology, the ethics of hunger strikes and the BOP's response, Salameh's prison record, and other background facts.  To the extent these facts are relevant and in dispute, I will note them below.

The next week, on November 11, the BOP again determined that Salameh required immediate attention.  Staff went to his cell, and this time, Salameh agreed to come to the door and submit to hand restraints.  The staff brought him to another room.  Medical staff weighed Salameh, took his vital signs, and conducted another physical examination.  Then, they placed Salameh in what the BOP calls "a specialized chair allowing an inmate to remain restrained while sitting upright."  Salameh refused to drink a liquid nutritional supplement, and a physician assistant determined that Salameh would receive the supplement without his consent.  While medical staff held Salameh's head, the physician assistant inserted a nasogastric tube through Salameh's nose and into his stomach.  Defendants report that Salameh resisted these efforts by "deliberately regurgitating and vomiting the supplement."  Salameh maintains that the vomiting was involuntary.  Once he received the nutritional supplement, the BOP staff returned him to his cell.

## II.    The FOIA Requests

Several years after these events, plaintiff submitted a FOIA request, seeking Salameh's medical records as well as "videotapes of any involuntary medical treatment."  The BOP provided redacted versions of Salameh's medical records, and it withheld the videos.  This suit followed.

The parties resolved any objections to the adequacy of the BOP's search and its redactions to the medical records, leaving one remaining issue: whether FOIA requires defendants to produce the videos.  Defendants have identified thirteen videos in total.  Six document the events of November 4, and seven document the events of November 11.  To explain their contents, defendants submitted declarations from two administrators at the BOP regional office that oversees Florence ADX.  The declarations explain that the videos generally follow the same format.  They come from two different cameras, which filmed the events from

two different angles.  They document roughly an hour and fifteen minutes of each event.  And generally speaking, the videos contain three different segments.[2]

The first segment is an introduction.  A BOP lieutenant and the two cameramen identify themselves by name and title.  According to the declarations, the lieutenant "describes the situation and the need for the calculated use of force."  He outlines "the specific procedures that will be taking place during the calculated use of force, including the order in which specific security measures will be conducted."  Then, the staff members who perform the "calculated use of force" identify themselves.  They detail their job titles and their specific responsibilities, including what part of Salameh's body they have the responsibility to restrain.  The staff members state that they are "willing participant[s] in the calculated use of force."  Further, the medical staff "discuss [Salameh's] medical condition, explain the need for involuntary treatment, and describe the procedures they intend to use."  The videos show their faces as well as their protective gear.  The videos also reveal "specific security equipment" and "how some of the security equipment works."

In the next segment, the videos document the events at issue.  The staff travel to Salameh's cell, perform the "calculated use of force," and place Salameh in restraints.  They bring Salameh to another room, and the medical staff conduct the procedure.  Finally, the staff return Salameh to his cell.

The final segment is a debrief.  From Salameh's cell, the staff travel to another location, where they again introduce themselves and outline their specific duties.  The lieutenant "describes the calculated use of force, including the specific actions that were taken by the staff

---

[2] In discussing "segments," I refer not to the actual splicing of the videos, but to the three general subject areas that the videos sequentially cover.

to restrain [Salameh] in preparation for the medical treatment." Each individual involved in the extraction describes "the specific duties he was assigned," "how he carried out those duties," and "whether he had any injuries following the incident." Then, the medical staff describe "the treatment they administered and [Salameh's] medical condition." With that, the videos conclude.

## DISCUSSION

### I.    Legal Framework

"The Freedom of Information Act sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to the functioning of a democratic society." FBI v. Abramson, 456 U.S. 615, 621 (1982) (quotation omitted). "FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." Milner v. Dep't of Navy, 562 U.S. 562, 565 (2011); see also 5 U.S.C. § 552(b). "These exemptions are explicitly made exclusive," and they "must be narrowly construed." Milner, 562 U.S. at 565 (cleaned up).

When an agency claims an exemption at summary judgment, the agency bears the burden of showing that the withheld records or information fall within the exemption. See, e.g., Carney v. Dept. of Just., 19 F.3d 807, 812 (2d Cir. 1994). The agency can satisfy this burden through affidavits or declarations that "giv[e] reasonably detailed explanations why any withheld documents fall within an exemption." Id. These documents "are accorded a presumption of good faith." Ctr. for Const. Rts. v. CIA, 765 F.3d 161, 166 (2d Cir. 2014) (quotation omitted).

Once an agency shows that an exemption applies, FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). A district court "must make specific findings of segregability regarding the documents to be withheld." Spadaro v. Customs &

Border Prot., 978 F.3d 34, 41 n.2 (2d Cir. 2020).  Although a court may rely on agency submissions in making those findings, they "will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping."  Evans v. Fed. Bureau of Prisons, 951 F.3d 578, 586 (D.C. Cir. 2020) (quotation omitted).

In this case, defendants cite Exemptions 6 and 7.  See 5 U.S.C. § 552(b)(6)–(7). Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  § 552(b)(6).  Exemption 7 covers several categories of "records or information compiled for law enforcement purposes." § 552(b)(7).  Three categories are relevant here.  First, Exemption 7(C) covers information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C).  Next, Exemption 7(E) shields information that "would disclose techniques and procedures for law enforcement investigations or prosecutions."  § 552(b)(7)(E).  And last, Exemption 7(F) reaches information that "could reasonably be expected to endanger the life or physical safety of any individual."  § 552(b)(7)(F).  Defendants maintain that these exemptions cover every segment of the videos.

## II.      The Applicable Exemptions

### A.      The Exemption 7 Threshold Analysis

To establish that records fall within Exemption 7, an agency must first show that the records were "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7); see also John Doe Agency v. John Doe Corp., 493 U.S. 146, 153 (1989).  No one disputes that the videos were "compiled."  See generally Milner, 562 U.S. at 584 (Alito, J., concurring).  The question is whether they were compiled for "law enforcement purposes."  The circuits are split as to the

proper standard, see Jordan v. Dep't of Just., 668 F.3d 1188, 1193–94 (10th Cir. 2011), and the Second Circuit does not seem to have spoken on the issue.[3]

In the absence of guidance, other courts in this circuit have advocated for a "commonsense understanding" of "law enforcement purposes." Hum. Rts. Watch, 2015 WL 5459713, at *5. This approach recognizes that "law enforcement" goes beyond "the investigation and prosecution of offenses that have already been committed." Milner, 562 U.S. at 582 (Alito, J., concurring). On the front end, it includes "proactive steps designed to prevent criminal activity and to maintain security," id., such as "plans to prevent attacks" or "settings in which the police are on the beat," Hum. Rts. Watch, 2015 WL 5459713, at *5 (cleaned up). And on the back end, "law enforcement" includes "the execution of sentences in criminal cases." Duffin v. Carlson, 636 F.2d 709, 713 (D.C. Cir. 1980).

This final category encompasses the videos. They relate to an integral part of the execution of sentences, namely, the BOP's statutory obligation to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2). Salameh's hunger strikes threatened the BOP's ability to fulfill those obligations. The BOP responded with the "involuntary medical treatment" and "calculated use of force," and it compiled the videos to document those actions and to guard against allegations of impropriety. Under a commonsense understanding, therefore, the videos were "compiled for law enforcement purposes" within the

---

[3] Although the Tenth Circuit has concluded that Williams v. FBI, 730 F.2d 882 (2d Cir. 1984), creates a *per se* rule that any document compiled by a "law enforcement agency" is "compiled for law enforcement purposes," see Jordan, 668 F.3d at 1196, I agree with other judges in this circuit that Williams does not mandate such an approach, see Hum. Rts. Watch v. Dep't of Just. Fed. Bureau of Prisons, No. 13-cv-7360, 2015 WL 5459713, at *5 (S.D.N.Y. Sept. 16, 2015). Rather, it stands for the proposition that Exemption 7 protects records or information "whether or not the reviewing judicial tribunal believes there was a sound law enforcement basis for the particular investigation." Williams, 730 F.2d at 883; see also Halpern v. FBI, 181 F.3d 279, 296 (2d Cir. 1999) (suggesting that Williams creates this narrower rule). Defendants seem to agree, for they have disclaimed any reliance on a *per se* rule.

meaning of Exemption 7.  Cf. Associated Press v. Dep't of Def., 554 F.3d 274, 286 (2d Cir. 2009) (noting the "undisputed" conclusion that records were "compiled for law enforcement purposes" when they "were compiled to document allegations of abuse and to impose disciplinary sanctions against military personnel and detainees where appropriate"); Pinson v. Dep't of Just., 313 F. Supp. 3d 88, 114 (D.D.C. 2018) (collecting cases to show that, under the D.C. Circuit's "rational nexus" approach, district courts have concluded that "records generated as part of BOP's law enforcement mission of protecting inmates, staff, and the community, were compiled for law enforcement purposes").[4]

Although defendants have made this threshold showing, the analysis does not end here. Exemption 7 applies only to the extent that a disclosure would result in one of six enumerated harms.  See 5 U.S.C. § 552(b)(7)(A)–(F).  Defendants cite three such harms, and I address each in turn.

### B.      Exemption 7(F): Safety

This exemption shields records or information that "could reasonably be expected to endanger the life or physical safety of any individual."  § 552(b)(7)(F).  To invoke it, "an agency must identify at least one individual with reasonable specificity and establish that disclosure of the documents could reasonably be expected to endanger that individual."  Am. C.L. Union v. Dep't of Def., 543 F.3d 59, 71 (2d Cir. 2008), vacated on other grounds, 558 U.S. 1042 (2009); see also Gonzalez v. U.S. Citizenship & Immigr. Servs., 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020) (applying this standard).  When it comes to showing danger, the agency's burden "is a low one."  N.Y. Times Co. v. Secret Serv., No. 17-cv-1885, 2018 WL 722420, at *10 (S.D.N.Y. Feb.

---

[4] Several courts in this Circuit have adopted the "rational nexus" approach.  See, e.g., Brennan Ctr. for Just. at N.Y. Univ. Sch. of L. v. Dep't of Homeland Sec., 331 F. Supp. 3d 74, 97 (S.D.N.Y. 2018) (citing Pratt v. Webster, 673 F.2d 408, 419–21 (D.C. Cir. 1982)).  Even under that approach, I would conclude that the records were compiled for "law enforcement purposes" for the reasons set forth above.

5, 2018). And as defendants repeatedly stress, a court "should within limits, defer to the agency's assessment of danger." Garcia v. Dep't of Just., 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (quotation omitted).

Under these standards, Exemption 7(F) covers several segments of the videos. First, it applies to the extent that the videos reveal the BOP's procedures for removing prisoners from their cells. According to defendants' declarations, the videos describe "the specific procedures that will be taking place during the calculated use of force, including the order in which specific security measures will be conducted." The videos also show "protective gear," "security equipment," and how the staff use that equipment to restrain an inmate, remove him from a cell, and move him to another part of the prison. Disclosing this information would enable inmates to circumvent the procedures, threatening the BOP's ability to perform them safely. Thus, to the extent the videos show these procedures described above, the videos fall within Exemption 7(F). See Zander v. Dep't of Just., 885 F. Supp. 2d 1, 7 (D.D.C. 2012) (holding that the exemption covered a video of a prisoner being forcibly removed from his cell).

Second, the exemption prevents disclosure of the staff's names, titles, and responsibilities. "Courts have upheld an agency's invocation of Exemption 7(F) to withhold identifying information of federal employees." Gonzalez, 475 F. Supp. 3d at 352 (collecting cases). To determine whether that disclosure would expose employees to harm, a court may consider the requester's "criminal history and propensity for retaliation." Garcia, 181 F. Supp. 2d at 378. Although Salameh was not the requester in this case, his criminal history still cautions against identifying the staff in the videos. The Court cannot ignore that Salameh helped orchestrate a terrorist attack that killed six people and sought to kill thousands more. He also has connections to international terrorist organizations. Releasing the names and titles of the staff in

9

the video could reasonably be expected to expose them to retaliation or reprisals.  To the extent the videos reveal this information, they fall under Exemption 7(F).  See id.

I therefore hold that Exemption 7(F) covers the following segments: (1) the entire first segment, when the BOP staff identify themselves and detail their responsibilities; (2) the entire final segment, when the staff again identify themselves and debrief the events; and (3) the portion of the middle segment that shows the staff traveling to Salameh's cell, placing Salameh in restraints, and bringing him to another room.  I further conclude that, for these segments, any non-exempt information is not "reasonably segregable" from the exempt information.  See 5 U.S.C. § 552(b).  Without the information regarding the procedures or the staff members' identities and responsibilities, these segments "will be of little or no value."  Zander, 885 F. Supp. 2d at 8.  For these segments, therefore, defendants have met their burden under FOIA.

Yet the fact that *segments* of the videos fall within an exemption does not mean that the entirety does so as well.  Defendants must provide "[a]ny reasonably segregable portion."  5 U.S.C. § 552(b).  And there is another, reasonably segregable portion that Exemption 7(F) does not reach: the segment that shows medical staff conducting the physical examination, ordering that Salameh undergo involuntary medical treatment, and implementing that treatment ("the remaining portion").

The remaining portion does not raise the concerns that justify withholding the other portions of the video under Exemption 7(F).  First, disclosing how the BOP performs a physical examination, orders that an inmate undergo involuntary medical treatment, and implements that treatment could not "reasonably be expected to endanger the life or physical safety of any individual" in the same way as disclosing the procedures for a cell extraction.  By defendants' own account, the "involuntary medical treatment" is a last resort, reserved for instances in which

10

an inmate's health has deteriorated to such an extent that the inmate needs immediate medical attention.  Defendants have not shown that, in such a state, an inmate could reasonably be expected to have the strength to resist in a way that would endanger BOP staff.  Additionally, much of the remaining portion shows the events that unfold after an inmate is restrained.

Second, to the extent the remaining portion reveals the staff's identities, that information is "reasonably segregable" from non-exempt information.  5 U.S.C. § 552(b).  An agency may withhold an entire record only if it shows that "the exempt and nonexempt information are 'inextricably intertwined,' such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value."  Mays v. Drug Enf't Admin., 234 F.3d 1324, 1327 (D.C. Cir. 2000) (quotation omitted).  In this regard, a video must "meet the same sort of segregability standards typically applied to printed material."  Evans, 951 F.3d at 587.  And just as defendants could redact an individual's name from a document, they could blur the faces of the medical staff, crop the videos, or even isolate screenshots.  See id.

Defendants fail to overcome this commonsense conclusion.  Although defendants bear the burden of establishing segregability, their opening memorandum does not even discuss it.  To the extent the declarations address the issue, they are wholly conclusory.  "Although different portions of the videos contained different levels or categories of exempt information," one explains, "each second of the video that I reviewed and assessed for release contained exempt information."  Another declaration merely states that "[e]very effort was made to provide [p]laintiff with all reasonably segregable nonexempt information."  Finally, the Vaughn index[5]

---

[5] "A Vaughn index typically lists the titles and descriptions of the responsive documents that the Government contends are exempt from disclosure."  N.Y. Times Co. v. Dep't of Just., 758 F.3d 436, 438–39 (2d Cir. 2014); see also Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973).

simply lists the applicable exemptions and states, "The images/depiction of the BOP staff are not segregable."  These statements are not enough.  See, e.g., Evans, 951 F.3d at 587.[6]

That conclusion does not change simply because segregating non-exempt information will require some video editing.  Although defendants insist that "the BOP does not have the technical capacity to edit or redact exempt information," other courts have roundly rejected this argument – and for good reason.  See, e.g., id.  At all levels of government, video technology has become commonplace, seen everywhere from the officer's bodycam to the prison's security camera.  Video-editing software has necessarily followed suit.  Because editing is routine and inexpensive, an agency cannot credibly claim that it lacks access to this technology.  And if acquiring this software could stand in the way of complying FOIA, no video would ever be disclosed.

Indeed, courts regularly require agencies to edit videos to comply with FOIA.  See Schwartz, 2016 WL 154089, at *20 (ordering the DEA to provide a video with a "redaction"); Prison Legal News v. Exec. Off. for U.S. Att'ys, No. 08-cv-1055, 2009 WL 2982841, at *5 (D. Colo. Sept. 16, 2009) (ordering segregation of an audio track from a video track), aff'd in part, appeal dismissed in part, 628 F.3d 1243 (10th Cir. 2011); see also Tunnell v. Dep't of Def., No. 1:14-cv-269, 2016 WL 5724431, at *3 (N.D. Ind. Sept. 30, 2016) (noting that the DOD offered "to blur the names and faces and to alter the voices of individuals" appearing in videos); Stevens v. Dep't of Homeland Sec., No. 13-cv-3382, 2014 WL 5796429, at *10 (N.D. Ill. Nov. 4, 2014)

---

[6] Although defendants attempt to defend these statements in reply, their arguments conflate good faith with deference.  Because plaintiff has not put forth evidence of bad faith, defendants suggest, I must accept every assertion, no matter how conclusory.  That is wrong.  The "presumption of good faith does not . . . weight the scales in favor of withholding," and it "does not change the fact that the agency's decision that the information is exempt from disclosure receives no deference."  Schwartz v. Drug Enf't Admin., No. 13-cv-5004, 2016 WL 154089, at *9 (E.D.N.Y. Jan. 12, 2016) (cleaned up), aff'd, 692 F. App'x 73 (2d Cir. 2017).  "[T]he agency always bears the burden of establishing that any claimed exemption applies."  Id. (quotation omitted).

(reluctantly accepting ICE's professed inability to segregate certain video footage but ordering the agency to use its software to edit other footage, noting that it "would strain credulity" to believe that no employee within the agency could use that software).

As a more general matter, video editing has become commonplace in litigation.  See Womack v. Smith, No. 1:06-cv-2348, 2012 WL 1245752, at *7 (M.D. Pa. Apr. 13, 2012) (ordering BOP officials in a Bivens action to edit video evidence "to exclude excessive nudity"); see also Sampson v. City of El Centro, No. 14-cv-1807, 2015 WL 11658713, at *7 (S.D. Cal. Aug. 31, 2015) (allowing a defendant police department "to blur/redact the faces" in videos subject to a protective order).  These solutions could apply here.

Of course, acquiring technology can sometimes be infeasible or prohibitively expensive. In these instances, "excision of exempt information would impose significant costs," rendering the exempt and non-exempt information "inextricably intertwined."  Mays, 234 F.3d at 1327 (quotation omitted).  But defendants' conclusory assertions do not make that showing, so I cannot conclude that Exemption 7(F) covers the entirety of the videos.  If defendants wish to withhold the remaining portion, they must look to another exemption.

### C.      Exemptions 6 and 7(C): Privacy

Defendants next cite the two overlapping provisions in Exemptions 6 and 7(C). Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Exemption 7(C) shields records or information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  § 552(b)(7)(C).  Given this slightly different language, the two exemptions have slightly different requirements.  See generally SAI v. Transp. Sec. Admin., 315 F. Supp. 3d 218, 259–60 (D.D.C. 2018).  Because this case does not implicate those differences, I will analyze the exemptions together.

For both exemptions, a court must balance the individual interest in privacy against the public interest in disclosure. See Associated Press, 554 F.3d at 284 (Exemption 7(C)); Wood v. FBI, 432 F.3d 78, 87 (2d Cir. 2005) (Exemption 6). "The privacy side of the balancing test is broad and encompasses all interests involving the individual's control of information concerning his or her person." Wood, 432 F.3d at 88 (quotations omitted). Government employees have a privacy interest in their names and identifying information, see Garcia, 181 F. Supp. 2d at 371, and whether disclosure threatens that interest "depends on the consequences likely to ensue," Wood, 432 F.3d at 88. "[P]ossible harassment and embarrassment" is enough. Id. (discussing investigative personnel); see also Pinson, 313 F. Supp. 3d at 115–16 (applying that logic to BOP staff).

The staff here face more than harassment and embarrassment – they face reprisals and retaliation. See Garcia, 181 F. Supp. 2d at 371. Once again, I cannot ignore the gravity of Salameh's crimes or his ties to international terrorism. See Manna v. Dep't of Just., 51 F.3d 1158, 1166 (3d Cir. 1995) (stating that the plaintiff's "position in the hierarchy of a particularly influential and violent La Cosa Nostra family [was] highly material to the protection of individual privacy interests"); Garcia, 181 F. Supp. 2d at 373–74 (considering the requester's criminal history). Defendants have therefore established a privacy interest that weighs against disclosure.[7]

As for the public interest, a plaintiff must show that "the public interest sought to be advanced is a significant one" and that "the information is likely to advance that interest." Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004). "[T]he Supreme Court has made

---

[7] Although plaintiff stresses that defendants disclosed the names of the medical staff who participated in the procedures when defendants released Salameh's medical records, I conclude that the staff still have a privacy interest in the visual depictions of them performing the procedures.

clear that there is only one relevant interest, namely, 'to open agency action to the light of public scrutiny.'" Associated Press, 554 F.3d at 285 (quoting Dep't of Just. v. Reps. Comm. for Freedom of Press, 489 U.S. 749, 772 (1989)).  That interest "focuses on the citizens' right to be informed about what their government is up to." Dep't of State v. Ray, 502 U.S. 164, 177 (1991) (quotation omitted).  Thus, a plaintiff must show how the withheld information "would shed any additional light on the Government's conduct." Associated Press, 554 F.3d at 285 (quoting Ray, 502 U.S. at 178).

For segments of the video, plaintiff cannot make that showing.  In large part, plaintiff addresses whether the public has a right to be informed about *what* actions the government takes. But it does not always follow that the public has a right to be informed of *who in the government* takes those actions. See Garcia, 181 F. Supp. 2d at 374.  The government employees here are career officials, not publicly accountable policymakers or elected officials.  Therefore, plaintiff has failed to show that the public interest outweighs the privacy interests at stake.

Specifically, I hold that the identifying information in the remaining portion falls under only Exemption 7(C).  That exemption "is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." SAI, 315 F. Supp. 3d at 260 (quotations omitted).  Neither plaintiff nor defendants have offered any reason why the remaining portion would fall under Exemption 6 but not Exemption 7(C).  Therefore, I need not address Exemption 6 at this stage.

At this point, however, defendants are no better off than under Exemption 7(F). Defendants have not explained why they cannot edit the video to obscure the identities of BOP staff, just as they could redact a written document. See Evans, 951 F.3d at 587.  If defendants wish to withhold the remainder of the video, they once again must look elsewhere.

D.      **Exemption 7(E): Techniques and Procedures**

Finally, defendants turn to Exemption 7(E), which shields records or information that

"would disclose techniques and procedures for law enforcement investigations or prosecutions."

5 U.S.C. § 552(b)(7)(E).  If a document falls within this exemption, it "is categorically exempt

from FOIA disclosure, without need for demonstration of harm."  Iraqi Refugee Assistance

Project v. Dep't of Homeland Sec., No. 12-cv-3461, 2017 WL 1155898, at *5 (S.D.N.Y. March

27, 2017) (quotation omitted).[8]

Defendants seem to assume that this exemption covers *all* law enforcement techniques

and procedures.  The plain text says otherwise.  The techniques and procedures must also

concern "investigations or prosecutions."  5 U.S.C. § 552(b)(7)(E).  A "prosecution" generally

refers to "[a] criminal proceeding in which an accused person is tried."  Prosecution, Black's

Law Dictionary (11th ed 2019).  And an "investigation" is "[t]he activity of trying to find out the

truth about something, such as a crime, accident, or historical issue."  Investigation, Black's Law

Dictionary (11th ed 2019).  In short, Exemption 7(E) concerns "how law enforcement officials

go about investigating a crime."  Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of

Homeland Sec., 626 F.3d 678, 682 (2d Cir. 2010).  Therefore, to show that the remaining portion

falls within this exemption, defendants must establish that it reveals techniques and procedures

for law enforcement "investigations or prosecutions."

Of course, the prison setting often requires investigations and prosecutions.  The

exemption thus reaches "techniques for investigating criminal activity within a prison facility."

Pinson, 313 F. Supp. 3d at 118.  For instance, the BOP may investigate the sale of controlled

---

[8] Although Exemption 7(E) also protects records or information that "would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E), defendants do not argue that the videos fall within this provision.

substances.  See, e.g., Duffin, 636 F.2d at 713 & n.3.  Exemption 7(E) therefore covers records and information that would reveal "who might be interviewed or the types of data reviewed for a particular investigation" or "how the data was collected and organized within [a] database, how staff searched the database, and how the information can be reported."  Pinson, 313 F. Supp. 3d at 118.

Yet defendants have not explained, even at the most general level, what the BOP could have been "investigating" or "prosecuting" while recording the remaining portion.  Nor have they explained why disclosure would compromise their ability to perform investigations or prosecutions.  See Am. C.L. Union, 973 F. Supp. 2d at 319.  Instead, they insist that they can withhold the videos because they have classified them as "evidence."  But evidence of what?  Defendants have no answer to this fundamental question.[9]

Defendants' own declarations dispel the notion that the videos concern investigations.  Acknowledging that the BOP's mission "is not classically investigatory in nature," defendants tie the procedures to the BOP's statutory obligation to provide for an inmate's safekeeping, care, and subsistence.  To that end, they repeatedly characterize the procedures as "medical treatment."  But here, as in most cases, medical treatment does not relate to "investigations."  See id. at 318–19 (holding that a detainee's medical history did not contain techniques or procedures for law enforcement investigations or prosecutions).

In their final efforts to circumvent the statutory text, defendants take increasingly broad positions.  They first argue that disclosure would "undermine the security of the institution."  But disclosure can undermine security without revealing techniques and procedures for

---

[9] For other issues, defendants emphasize that they have stored the videos as "evidence" at the office for the BOP's Special Investigative Services, but defendants do not argue that this action connects the videos to "investigations" under Exemption 7(E).

"investigations" or "prosecutions" – that is why Congress provided a separate exemption for information that "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).

Defendants next argue that disclosure would impede the BOP's "ability to fulfill its mission as a law enforcement agency."  As we have seen, however, "law enforcement" goes beyond "the investigation and prosecution of offenses," Milner, 562 U.S. at 582 (Alito, J., concurring), and also reaches "the execution of sentences in criminal cases," Duffin, 636 F.2d at 713.  The remaining portion arose in that second context, not the first.  Defendants cannot avail themselves of this distinction at the threshold analysis, only to abandon it later on.[10]

Finally, defendants resort to policy arguments.  They inveigh against plaintiff's motives, asking me to reject her FOIA request as "misguided" and "naïve."  But courts do not construe FOIA exemptions by reference to the requester's beliefs, nor do they carve out unwritten exemptions based on ad-hoc policy concerns.  Courts "have no license to give statutory exemptions anything but a fair reading."  Food Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2366 (2019) (alteration adopted) (quotation omitted).  And just as I "cannot arbitrarily constrict [an exemption] . . . by adding limitations found nowhere in its terms," I "cannot properly expand [the exemption] beyond what its terms permit."  Id. (addressing a different FOIA exemption).  I therefore hold that, on the evidence defendants have submitted, Exemption 7(E) does not apply to the remaining portion of the videos.[11]

---

[10] Defendants also stress that these procedures are not generally known to the public.  Although that is another requirement of Exemption 7(E), see, e.g., Schwartz, 2016 WL 154089, at *11, I need not address it here because defendants have not shown that the remaining portion meets the exemption's other requirements.

[11] In so holding, I recognize that the District Court for the District of Columbia has reached the opposite conclusion in nearly identical circumstances.  Specifically, Rosenberg v. Department of Defense, 342 F. Supp. 3d 62, 93 (D.D.C. 2018), held that the DOD properly withheld a memorandum that "describe[d] in minute detail the procedures to be followed by guard personnel to confirm if a detainee is on hunger strike, and, if so, the steps that need to be taken, including the specific techniques used for enteral feeding" for detainees at Guantánamo Bay.

In holding that defendants have not shown that the remaining portion falls under a FOIA exemption, I recognize that "disclosure is not always in the public interest." CIA v. Sims, 471 U.S. 159, 167 (1985). The inherently fact-specific nature of FOIA requests ensures that, in some instances, disclosures will harm America's interests and reputation in ways that Congress could not have foreseen. See, e.g., Am. C.L. Union v. Dep't of Def., 901 F.3d 125, 127 (2d Cir. 2018) (noting "a plea from the Prime Minister of Iraq" that disclosing photos of detainees at military detention facilities "would fuel insurrection and make it impossible to have a functioning government"). Perhaps this is one of those cases. After all, a hunger strike weaponizes the government's commitment to an inmate's wellbeing, forcing it into an impossible choice. As other courts have observed:

> [O]fficials faced with a hunger-striking inmate whose behavior is life-threatening would, absent force-feeding, face two choices: (1) give in to the inmate's demands, which would lead other inmates to "copy the same tactic, manipulating the system to get a change in conditions"; or (2) let the inmate die, which is a harm in its own right, and would often "evoke a strong reaction from the other inmates and create serious safety and security concerns."

---

I respectfully disagree with the court's analysis. Citing cases addressing the FBI, Rosenberg stated:

> Exemption 7(E) has not been limited to "techniques and procedures" or "guidelines" that directly relate to a particular investigation, prosecution, or crime. Instead, courts have widely approved of agency's invocations of Exemption 7(E) to shield from disclosure law enforcement techniques, procedures, or guidelines that, if disclosed, would raise security concerns or render the withheld law enforcement techniques or guidelines ineffective.

342 F. Supp. 3d at 94 (citing Jimenez v. FBI, 938 F. Supp. 21, 30 (D.D.C. 1996)). Applied to this case, this statement is too broad. Just because techniques and procedures need not relate to a *particular* investigation does not mean that they need not relate to an investigation *at all*.

Interpreting Exemption 7(E) to reach all "law enforcement techniques and procedures" would rewrite the statute. As a textual matter, it would all but erase "investigations or prosecutions," and I must construe FOIA "to avoid surplusage." Am. C.L. Union, 543 F.3d at 70. It would also yield an expansive exemption. Almost any document compiled by a law enforcement agency will reveal "law enforcement techniques and procedures," and if all such documents were exempt, Exemption 7(E) would create "a hole one can drive a truck through." John Doe Agency, 493 U.S. at 164 (Scalia, J., dissenting) (rejecting a similarly broad construction of Exemption 7). That reading is at odds with the Supreme Court's repeated command that exemptions "must be narrowly construed." Milner, 562 U.S. at 565 (quoting Abramson, 456 U.S. at 630). Because that statement is not just "a formula to be recited" but "a principle to be followed," I will follow it here. John Doe Agency, 493 U.S. at 161 (Scalia, J., dissenting).

Aamer v. Obama, 742 F.3d 1023, 1040 (D.C. Cir. 2014) (alterations adopted) (quoting Matter of

Bezio v. Dorsey, 21 N.Y.3d 93, 106, 967 N.Y.S.2d 660, 669 (2013)).  These choices spawn legal

and ethical issues that can seem intractable.  There are no simple solutions, and we can easily

lose sight of that fact if we focus on a single document or video.

        For better or worse, however, Congress has not entrusted the courts with carving out ad-

hoc exemptions to FOIA.  It has reserved that job for itself – and in some instances, it has proven

up to the task.  See, e.g., Am. C.L. Union, 901 F.3d at 128 (discussing the Protected National

Security Documents Act of 2009, Pub. L. No. 111-83, § 565, 123 Stat. 2142, 2184 (2009)).

Defendants seem to believe that this case deserves similar treatment.  Regardless of what I think

of the merits of this position, that is not for me to decide.

## III.    Summary Judgment and Segregability

        As the foregoing analysis shows, defendants have demonstrated that the remaining

portion contains *some* exempt information, but their submissions leave open questions as to

whether that information is "reasonably segregable" from non-exempt information.  5 U.S.C.

§ 552(b).  In these circumstances, I cannot make the segregability findings that would allow me

to grant summary judgment in favor of plaintiff or defendants.  I will therefore reserve judgment

on the parties' motions to the extent they concern the remaining portion of the videos.  The

parties are directed to submit supplemental memoranda, with sufficiently detailed evidence,

addressing only the remaining portion.  See, e.g., Hum. Rts. Watch, 2015 WL 5459713, at *8

(reserving judgment as to one portion of a document and directing the government to provide a

"detailed, line-by-line segregability analysis").

        I will also give defendants the option to submit the videos for *in camera* review.  See 5

U.S.C. § 552(a)(4)(B).  Although *in camera* review "is a matter entrusted to the district court's

discretion," it is "the exception, not the rule."  Loc. 3, Int'l Bhd. of Elec. Workers, AFL-CIO v.

NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988); see also Halpern, 181 F.3d at 295. "[A] court should only order an *in camera* review of the contested documents when the court is unable to assess the validity of the exemptions claimed upon its review of the indexes and affidavits provided by the government agency." Garcia, 181 F. Supp. 2d at 370 (citing Halpern, 181 F.3d at 295). Still, videos present unique segregability problems that often warrant *in camera* review. See, e.g., Evans, 951 F.3d at 588. If defendants' supplemental memorandum and evidence do not adequately address the segregability issues in this case, *in camera* review of the remaining portion may become necessary. See, e.g., Int'l Couns. Bureau v. Dep't of Def., 864 F. Supp. 2d 101, 107 (D.D.C. 2012) (ordering *in camera* review to determine segregability for a video).

## CONCLUSION

Defendants' motion for summary judgment [17] is granted in part, and plaintiff's motion for summary judgment [19] is denied in part. Specifically, defendants' motion is granted as it pertains to (1) the entire first segment, when the BOP staff identify themselves and detail their responsibilities; (2) the entire final segment, when the staff again identify themselves and debrief the events; and (3) the portion of the middle segment that shows the staff traveling to Salameh's cell, placing Salameh in restraints, and bringing him to another room. However, I reserve judgment on the motions as they pertain to the remaining portion. The parties should consider the remaining portion to begin when Salameh arrives at the room for the medical examination and to end when he leaves the room. The parties shall submit supplemental memoranda and

evidence addressing only that remaining portion.  The parties shall agree on a reasonably prompt schedule for these submissions and submit it for approval.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
      March 26, 2021

22