RKH:KMA; 2019V02252

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

AVIVA STAHL,

                                Plaintiff,

       -against-

FEDERAL BUREAU OF PRISONS and
U.S. DEPARTMENT OF JUSTICE,

                               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Civil Action No. 19-CV-04142

(Cogan, J.)


# SUPPLEMENTAL MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF
## DEENDANTS' MOTION FOR SUMMARY JUDGMENT


MARK J. LESKO
Acting United States Attorney
Eastern District of New York
217-A Cadman Plaza East, 7th Flr.
Brooklyn, New York 11201

May 13, 2021


Kathleen A. Mahoney
Assistant U.S. Attorney
     (Of Counsel)

<u>**PRELIMINARY STATEMENT**</u>

In accordance with the Memorandum Decision and Order dated March 26, 2021 (Dkt. #29) ("Order"), Defendants Federal Bureau of Prisons ("BOP") and U.S. Department of Justice respectfully submit this supplemental memorandum of law in further support of their motion for summary judgment in this action brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"),

Defendants renew their request for summary judgment dismissing this action in its entirety. Plaintiff's FOIA request sought copies of the BOP's medical records and "videotapes of any involuntary medical treatment" for inmate Mohammad Salameh.[1] Declaration of Erika Fenstermaker dated December 19, 2019 (Dkt. #17-5) ("Fenstermaker Declaration") ¶ 11 and Ex. B (Dkt. #17-7 at 2). As is relevant here, in responding to Plaintiff's FOIA request, the BOP withheld thirteen videos of two involuntary treatments administered to Salameh during his hunger strike in 2015, while he was an inmate at the Administrative Maximum (ADMAX) United States Penitentiary in Florence, Colorado.[2] *Id.* ¶¶ 17 and Ex. D (Dkt. #17-9 at 2-3, 4-5); *see also* Declaration of James Phelps dated December 18, 2019 (Dkt. #17-2) ("First Phelps Declaration") ¶ 3. Six of the videos are of the administration of intravenous ("IV") hydration on November 4, 2015, and the other seven videos are of the administration of liquid nutrition through a nasogastric tube on November 11, 2015; both sets comprise videos taken with two cameras at different angles. *See* First Phelps Decl. ¶¶ 4, 22-23, 36-37; *see also* Fenstermaker Decl. ¶¶ 19-21. The BOP asserted FOIA Exemptions 6, 7(C), 7(E), and 7(F), 5 U.S.C. §§ 552(b)((6), (7)(C), (7)(E), (7)(F) to

---

[1] The FOIA request included Salameh's written authorization to release his records to Plaintiff. *See* Fenstermaker Decl. ¶ 14 and Ex. B (Dkt. #17-7 at 4-5).

[2] The BOP released copies of Salameh's medical records with some redactions, which are not at issue. *See* Fenstermaker Decl. ¶ 16 and Ex. D (Dkt. #17-9 at 2-3); *see also* Dkt.#16 ¶¶ 2-3.

withhold the thirteen videos in their entireties. *See* Fenstermaker Decl. ¶ 17 and Ex. E (Dkt. #17-10 at 4-6); *see also id*. Ex. D (#17-9 at 2-3, 4-5).

This Court granted in part Defendant's motion for summary judgment and denied in part Plaintiff's cross-motion. Order;[3] *see* Dkt. #17, #19, #22, #23. Based on the descriptions in the BOP's supporting declarations, the Court concluded that the following portions of the videos were exempt from disclosure: the first segments in which the BOP staff identify themselves and detail their responsibilities; the portions of the middle segments that show the staff traveling to Salameh's cell, placing him in restraints, and bringing him to another room; and the final segments in which the staff again identify themselves and debrief the events. Order at 10, 21. The Court found that FOIA Exemption 7(F) applied to the BOP's procedures and security measures for removing prisoners from their cells during a calculated used of force (including the protective gear worn, the security equipment, and how that equipment is used) and staff's names, titles and responsibilities. *Id.* at 9-10. The Court also found that the BOP staff's names and identifying information were protected from disclosure by Exemption 7(C). *Id.* at 13-15. As to the portions of the videos that did not fall within Exemption 7(F), the Court concluded that the record lacked sufficient information to show whether the exempt information is reasonably segregable from non-exempt information (the conducting of the medical examination and the ordering and implementation of the involuntary medical treatment), and reserved judgment and directed the parties to submit supplemental memoranda and evidence. *Id*. at 1, 10-11, 20, 21-22.

In concluding that the record did not establish that Defendants could not redact the non-exempt portions of the videos because they are inextricably intertwined with exempt material, the Court posited that Defendants could blur the faces of the medical staff, crop the videos or isolate

---

[3] reported at 2021 WL 1163154.

2

screen shots. Dkt. #29 at 11. The Court rejected the BOP's assertion that it did not have the technical capacity to edit or redact exempt information. *Id*. at 12.

As shown below and in the supporting declarations that are being filed simultaneously with this memorandum of law,[4] the BOP has not been successful in its efforts to segregate any non-exempt information in the videos.

## ARGUMENT

### THE BOP CANNOT REASONABLY SEGREGATE NON-EXEMPT INFORMATION IN THE VIDEOS

The FOIA requires disclosure of "[a]ny reasonably segregable portion" of a responsive record after deletion of the exempt portions. 5 U.S.C. § 552(b) (text following exemptions). However, an agency need not disclose non-exempt portions of records that "are inextricably intertwined with exempt portions." *See Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve System*, 463 F.2d 239, 249 n.10 (2d Cir. 2006); *Mead Data Central, Inc. v. U.S. Department of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

Here, after the Order made clear which information is exempt from disclosure,[5] the BOP attempted to edit small portions of the videos to segregate the exempt information from the non-exempt information. However, the exempt information – identifying information of the BOP use of force team and the medical professional, the protective gear worn by the team, the security equipment and use of that equipment – is pervasive throughout the videos. The BOP's attempts to

---

[4] Declaration of John Baumchen dated May 7, 2021 ("Baumchen Declaration") and Declaration of J. Relvas dated May 7, 2021 ("Relvas Declaration").

[5] In its motion for summary judgment, the BOP maintained that everything in the videos was exempt from disclosure.

edit the small samples of the videos, non-exempt information demonstrate that it is not reasonably segregable.

**1. <u>The Videos at Issue</u>**

The medical procedures were videotaped because the provisions of hydration and nutrition were involuntary (*i.e.*, Salameh would not agree), and had to be administered by employing a calculated use of force. Relvas Decl. ¶ 15. BOP policy requires that any calculated use of force incident be videotaped. *Id.* Relvas, the BOP Correctional Services Administrator for the North Central Regional Office, who has watched the videos, observed that use of force techniques and procedures are employed throughout their entireties, including during the administration of medical treatment. *Id.* ¶¶ 13, 15; *see id.* ¶¶ 1, 3. The BOP employs use of force techniques and procedures in a consistent manner regardless of the nature of an inmate's noncompliance, whether it be an inmate refusing medical treatment or physically resisting staff. *Id*. ¶ 6. A procedure to involuntarily hydrate or provide nutrition to an inmate can only be accomplished during a calculated use of force, and the use of force procedures remain ongoing, even throughout the medical procedure. *Id.*

During the relevant portion of the November 4, 2015 video (from Salameh's arrival in the room for medical examination until he leaves to be transported back to his cell after administration of IV hydration), Salameh is escorted by several BOP staff who make up the use of force team. Relvas Decl. ¶¶ 4, 5. The team members are dressed in protective clothing and equipment that are clearly visible throughout the video. *Id.* ¶¶ 5, 7. The use of force team members are seen surrounding Salameh when they arrive in the area of the institution where his medical evaluation begins and during the medical evaluation. *Id*. ¶¶ 5, 7; *see id.* ¶ 6. The video shows how the use of force team members are positioned for readiness throughout the medical examination and

4

treatment should the need to restrain Salameh arise, as well as the placement of their hands on or near Salameh and the manner in which they control him when he moves or when it is necessary for the team members to move him. *Id*. ¶¶ 5, 7. The restraints applied to Salameh also are visible throughout the video. *Id.* ¶ 7. The video also shows the use of force team members' reactions and controlling techniques employed when the medical professional approaches and makes contact with Salameh, as well as the team's accessing of security devices and restraint keys. *Id.* ¶ 7. In other words, protected information is seen throughout the video.

The contents of the videos of the involuntary treatment administered on November 11, 2015 are similar to those from November 4, 2015. Relvas Decl. ¶ 8. The use of force team members and their protective clothing, equipment, positioning, hand placement, and controlling techniques are clearly visible throughout the video. *Id.* ¶¶ 8, 10. The use of force team members are seen surrounding inmate Salameh when his medical evaluation begins, and remain surrounding him throughout the examination. *Id.* ¶ 8. The video also shows the use of force team moving Salameh into the specialized restraint chair utilized for the administration of involuntary nutrition, removing the specialized restraints and moving Salameh out of the specialized restraint chair onto a medical examination bed where his vitals are taken after completion of the provision of involuntary nutrition. *Id.* ¶ 8. During the entirety of the medical procedure, Salameh's restraints are clearly visible. *Id.* ¶ 8.

The use of force team members are present throughout the videos of both procedures; they move constantly, and their identities, personal features, protective clothing and equipment, protective and reactive positioning, and controlling and restraint techniques are clearly depicted. *See* Relvas Decl. ¶ 12. From start to finish, the videos are of a calculated use of force encompassing law enforcement techniques and procedures that are not publicly known. *Id.* ¶¶ 13-14. Revealing

5

the identities and identifying features of those involved, which are inextricably intertwined with releasable information, would place the staff involved at risk of danger. *Id.* ¶ 17.

**2. BOP Efforts to Edit/Redact the Videos**

Following entry of the Order, the BOP tasked John Baumchen, an Audio-Visual Production Specialist at the BOP's Management & Specialty Training Center in Aurora, Colorado, with determining whether the videos could be edited to obscure the BOP staff's identities and the other protected information. Baumchen Decl. ¶¶ 1-2. Baumchen is experienced with using and has access to specialized video editing software. *Id.* ¶ 3.

Baumchen initially attempted to edit a small segment (approximately 1:12 minutes) of the Camera C Part 3 video from November 11, 2015. Baumchen Decl. ¶ 4. Baumchen used Adobe Creative Cloud – PremierePro and AfterEffects, the software that the BOP uses to produce training videos, to attempt to blur the individuals' faces by applying a "mask." *Id*. ¶ 5. Baumchen was unable to use automatic tracking due to the poor quality of the video and because the staff members move frequently and go in and out of the video frame. *Id.* As a result, the mask had to be applied to individual frames throughout the video, making the process of editing it very difficult and time consuming. *Id*. ¶ 5. To edit the individual frames, Baumchen tried using a broad stroke mask, but the staff member's faces, clothing, skin color, other personal features (such as accessories or assistive devices) and protective gear were still visible through the mask. *Id.* ¶ 6. Baumchen then attempted to edit the video by applying a mask over the entire video frame, with the exception of Salameh. *Id.* ¶ 7. Although this mask obscured the staff member's faces, it did not obscure certain other personal features, including the medical professional's skin color, clothing and accessories, the use of force team members' hand placement on Salameh, the straps of the restraint chair, or the protective equipment on the team's hands. *Id.* ¶ 7; *see also* Relvas Decl. ¶ 11 (observing that,

6

in this very short clip, the skin color of the medical professional and the use of force team members' protective equipment, positioning and controlling techniques are visible).

Baumchen also attempted to edit a portion of the Camera D Part 1 video from November 4, 2015. Baumchen Decl. ¶ 9. Baumchen was not successful in his attempt to apply a mask to obscure the identifies of the BOP staff in the portion of the video starting when the medical examination began due to the frequency of the individuals' movements. *Id.* ¶ 10. In some frames, the staff's faces could still be seen, and in others, the entire screen was blurred. *Id.* ¶ 10; *see also* Relvas Decl. ¶ 9 (observing that in this edited clip the staff faces and nametags were not or could not be blurred).[6] In the frames where staff faces were blurred, their skin or hair color and accessories and the correctional officers' hand placement could not be obscured. Baumchen Decl. ¶ 10; *see also* Relvas Decl. ¶ 9 (noting that the use of force team members remained close to Salameh and mostly maintained direct contact with him).

### 3. **The Non-Exempt Information in the Videos is Not Reasonably Segregable**

As demonstrated by Baumchen's efforts described above, segregation of non-protected information from the protected information in the thirteen videos is not likely to be feasible. The videos were filmed with handheld video recorders and are of poor quality, which makes editing difficult and time-consuming. Baumchen Decl. ¶¶ 4, 9. Editing these poor quality videos filmed with handheld recorders is not as simple an undertaking as with the videos in the cases cited in the Order at 12-13, which involved videos of different types and quality and necessitated only blurring of faces (and not other protected information), or simply required cutting the video. *See Evans v. Federal Bureau of Prisons*, 951 F.3d 579 (D.C. Cir. 2020) (surveillance camera footage); *Tunnell v. Department of Defense*, No. 14-CV-00269-SLC, 2016 WL 5724431 (N.D. Ind. Sept. 30, 2016)

---

[6] Relvas also viewed the "redacted" portions of the videos. Relvas Decl. ¶¶ 9-10.

(training videos the agency agreed to release in redacted form to blur or disguise the names and identities of the military personnel depicted in them);[7] *Schwartz v. United States Drug Enforcement Administration*, No. 13-CV-5004 (CBA) (RML), 2016 WL 154089, at *16, *20 (E.D.N.Y. Jan 12, 2016) (the only editing required was removal of on-screen data from the perimeter of the video frames); *Sampson v. City of El Centro*, No. 14-cv-1807 (DHB), 2015 WL 11658713 at *7 (S.D. Cal. Aug. 31, 2015) (only faces needed to redacted from photographs and videos); *Stevens v. United States Department of Homeland Security*, No. 13 C 03382, 2014 WL 5796429, at *10 (N.D. Ill. Nov. 4, 2014) (DVD video footage from a security surveillance camera);[8] *Womack v. Smith*, No. 06-CV-2348, 2012 WL 1245752, at *6-*7 (M.D. Pa. Apr. 13, 2012) (ruling on motion *in limine* in a *Bivens* action that only clips from the videos can be introduced at trial due to their length); *Prison Legal News v. Executive Office for United States Attorneys*, No. 08-cv-01055-MSK-KLM, 2009 WL 2982841, at *4-*5 (D. Col. Sept. 16, 2009) (only the initial audio portion of the video was not exempt from disclosure).

Here, Baumchen's attempts to edit small clips from the videos demonstrate that segregation is not feasible. As Baumchen explains, applying multiple masks frame-by-frame to each video to try to remove the protected information would take a considerable amount of effort and time, and still would not fully obscure all of the protected content. Baumchen Decl. ¶¶ 8, 11. In addition, editing would be effectively impossible due to the use of force team members' frequent

---

[7] The videos at issue here are not BOP training videos. If they were, Baumchen, who is responsible for producing audio and video material for training staff within the BOP, would be able to edit them. *See* Baumchen Decl. ¶ 1.

[8]   In that case, the court held the plaintiff failed to demonstrate that the agency had the technology to segregate the DVD, even though "[a] larger federal agency government agency such as ICE should have sufficient technological expertise and equipment to segregate data from its video files."

movements and close proximity to Salameh and the medical professional. *Id.* ¶¶ 8, 11. It would take a significant amount of time and effort to edit the videos and to produce final, edited versions that do not fully obscure the protected information.[9] *Id.* ¶ 12.

**4. *In Camera* Review**

       Although *in camera* review is the exception, not the rule in FOIA actions,[10] the Court may deem it may appropriate here. Viewing of the videos, as well as the redaction attempts, would further support the BOP's declarations, which explain the difficulty, if not impossibility, of editing out the ever-present exempt information.

---

[9] Baumchen estimated that it would take several months to produce inadequately redacted versions of the videos. Baumchen Decl. ¶ 12.

[10] *See Local 3, International Brotherhood of Electrical Workers v. National Labor Relations Board*, 845 F.2d 1177, 1180 (2d Cir. 1988).

## <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in Defendants' prior submissions in support of their motion for summary judgment, Defendants' motion should be granted in its entirety, Plaintiff's cross-motion should be denied, and this action should be dismissed.

Dated: Brooklyn, New York
         May 13, 2021

MARK J. LESKO
Acting United States Attorney
Eastern District of New York
*Attorney for Defendants*
217-A Cadman Plaza East, 7th Flr.
Brooklyn, New York 11201

By:      *Kathleen A. Mahoney*
         Kathleen A. Mahoney
         Assistant United States Attorney
         (718) 254-6026
         kathleen.mahoney@usdoj.gov

10