UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVIVA STAHL, | |
| Plaintiff, | |
| v. | No. 19-CV-4142 (BMC) |
| FEDERAL BUREAU OF PRISONS, and DEPARTMENT OF JUSTICE, | DECLARATION OF JOHN BAUMCHEN |
| Defendants. | |

DECLARATION OF JOHN BAUMCHEN

I, John Baumchen, do hereby declare and state as follows:

1. I am employed by the United States Department of Justice ["DOJ"], Federal Bureau of Prisons ["BOP"], as an Audio-Visual Production Specialist at the Management & Specialty Training Center ["MSTC"] in Aurora, Colorado. I have been employed in this capacity since December 25, 2005. In my capacity as Audio-Visual Production Specialist, I am responsible for producing audio and video materials for training staff within the BOP. I make the statements herein based on my personal knowledge and experience and my review of the official files and records of the BOP to which I have authorized access.

2. I have been informed that litigation is currently ongoing pertaining to BOP's withholding of videotapes that record calculated use of force incidents involving federal inmate Mohammad Salameh, Reg. No. 34338-054, during the time he was incarcerated at the Administrative Maximum facility in Florence, Colorado ["ADX Florence"]. Specifically, in response to a request made pursuant to the Freedom of Information Act ["FOIA"], the BOP withheld thirteen (13) videotapes related to two (2) calculated use of force incidents in which inmate Salameh was provided involuntary hydration and nutrition. It is my

1

understanding that the Court has ordered BOP to determine whether it has the ability to edit a portion of the videotapes in such a manner that will obscure the identities of BOP staff and other protected information. I have been informed that the specific portion of the videos at issue begin when inmate Salameh arrives in the room for medical examination and ends when he leaves the room.

3. Due to my experience as an Audio-Video Production Specialist, and my access to specialized video editing software, I was asked to assist with the task of determining whether the videos could be edited in the manner prescribed by the Court's Order. An integral part of producing a video for BOP training purposes is editing, in order to ensure that the final product is a visually pleasing video. Typically, editing of these videos involves selecting appropriate clips, making cuts as needed, adding voice over, special effects, and text as required. In the normal course of my duties, and particularly when creating videos, I do not edit for the purpose of blacking out or blurring content of the video, or obscuring the identity of individuals participating in the video. However, because the software I use in my capacity as Audio-Visual Production Specialist does have the ability to make these types of edits, I was asked to attempt to edit the calculated use-of-force videos at issue in a manner consistent with the Court's Order.

4. Initially, I was provided one video, titled "Camera 1 (C) part 3_WMV V9." The format of this video was Windows Media Audio/Video, and it was clear that the video was filmed using a hand held video recorder. Based on my experience, I could tell the quality of the video was poor, which in general, makes editing more difficult and time consuming. I was told this video was part 3 of a 4-part video documenting a calculated use-of-force that occurred on November 11, 2015. This particular video was 30 minutes and 19 seconds

2

long. However, I was asked to edit just a portion of this video (approximately 1 minute and 12 seconds) in order to determine whether it could be edited in the manner described by the Court's Order.

5. The software BOP uses to produce BOP training videos is called Adobe Creative Cloud – PremierePro and AfterEffects. Adobe AfterEffects software has the ability to apply what is called a "mask" to blur an area of video, such as a person's face. With a high quality video, the mask is able to track the movement of the individual and can follow the individual's face throughout the entirety of the video. However, the video at issue here is of poor quality, and the staff members move often. The staff members also move in and out of the video frame, making the automatic tracking nearly impossible to use, as the software loses track of an individual's face when half of the face or the whole face disappears from the frame. Therefore, the mask had to be applied to individual frames throughout the video, making the process of editing it very difficult and time consuming.

6. I first used a broad stroke mask, which had the effect of applying a partial blur to the staff member's faces. However, upon closer review, it was determined that the identities of the staff involved, including the clothing they were wearing, the staff members' skin color and other personal features such as accessories or assistive devices, as well as the protective gear worn by the correctional staff, were visible through the mask. As such, I was asked to attempt a second edit of the video that would better obscure the identifying features of the staff members seen in the video.

7. For my second attempt to edit the video, I applied a mask over the entire video frame, with the exception of the inmate. This had the effect of blurring out most of the video, with the exception of a misshapen circle around the inmate's seated body. While the blurring in this

3

attempt obscured the staff member's faces, it did not obscure certain other personal features, including the skin color of the medical professional or clothing and accessories worn by the individual. In addition, the mask did not blur the correctional staffs' hand placement on the inmate, the straps of the restraint chair he is sitting in, or the protective equipment worn on the hands of the correctional staff.

8. I believe I can make the mask cover a larger area of the video, and in turn narrow the view of the video closer to the inmate, but this type of editing would require me to create a new mask layer, which would be applied to the entire video. I would then have to edit the new layer frame-by-frame to try to remove the concerning content. This would take a considerable amount of effort and time, and the results would still not fully obscure the concerning content, such as the medical professional's skin color or accessories, or the correctional officers' hand placement on the inmate's head. In addition, I am aware that the portion of the single video I edited is a very small clip from the entire medical procedure at issue in this case. I was asked to edit this small portion of the video in order to determine whether it was even possible to achieve a product that would comply with the Court's Order. This very small portion is not representative of what a final edited version of the video will look like. This small clip is unique, because the inmate and the staff remain fairly still and are positioned in such a way that a majority of their bodies and features could be blurred from the video frame. The remainder of the video, however, is similar to the video documenting the November 4, 2015, use of force incident, where the staff move often and remain in close proximity to the inmate and the medical professional. As discussed in more detail below, editing of that video was much more difficult and less successful that the very small clip I edited from the November 11, 2015, video.

9. The second video I received for test editing was titled, "Camera D part 1_WVM V9." Similar to the video documenting the November 11, 2015, use-of-force, this video was in Windows Media Audio/Video format, and was of poor quality. As I understand, this video was part 1 of a 3-part video documenting a calculated use-of-force that occurred on November 4, 2015. This particular video was 30 minutes and 25 seconds long. However, similar to the November 11, 2015, video, I was asked to edit just a portion of this video in order to determine whether it could be edited in the manner described by the Court's Order.

10. The November 4, 2015, video differed significantly from the clip of the November 11, 2015, video. First, in accordance with the Court's Order, I blurred approximately 9 minutes of content before any medical examination of the inmate began.[1] When the medical examination began, the inmate was seated in a transportation wheelchair and was surrounded by correctional staff who were fully outfitted with protective gear and equipment. As part of the medical examination, the correctional officers assisted the inmate to a standing position, but remained surrounding the inmate. I attempted to apply a mask that would obscure the identities of staff seen on the video, but the results were not consistent due to the frequency of individuals' movements. In some frames, the faces of staff could still be seen, and in others, the entire screen was blurred. Even in the frames where I was successful in blurring out staff faces, the skin or hair color of staff, accessories and protective equipment worn by staff, and the correctional officers' hand placement on the inmate could not be obscured. After the initial medical evaluation, the inmate was then moved to a bed and he remained in a lying position for most of the remainder of the medical

---

[1] For purposes of test editing, I blurred this portion of the video. If full editing of the videos is required, I will cut this portion of the video, rather than blurring the image.

5

procedure, with the exception of a few brief portions where he sat up or was helped into a higher position. I also attempted to apply a mask to this portion of the video, but I was unable to obscure a large portion of the correctional officers' bodies, which shows the protective equipment they wore and their hand placement on the inmate. I was also unable to obscure the restraints that were on the inmate, and the skin color and accessories worn by the medical staff are visible in some screens as well. Finally, staff faces are also quite clear in some frames, especially when the inmate sits up and is being medically examined.

11. The difficulties in editing the November 4, 2015, video will also be present in any attempt to further edit the November 11, 2015, video. In the remaining portions of that video, both before and after the clip that I edited, staff move often and are in close proximity to the inmate and the medical professional at all times. I will be unable to fully obscure the staff faces and their identifying features, and I will be unable to fully obscure the correctional staff's protective equipment and hand placement on the inmate. In sum, despite my best efforts to edit these video consistent with the Court's Order, the location of each staff member in the video, their movements, and the close proximity of the staff to the inmate, made effective editing impossible. I do not believe that, even with additional time and effort, I can edit these videos in a manner consistent with the Court's Order.

12. In addition to the difficulties described above, editing these videos in a manner most consistent with the Court's Order will take a significant amount of time and effort. Based on my professional experience, I estimate it will take approximately 8 hours to edit each 30-minute segment of video. As I understand it, there are approximately 194 minutes encompassed within the 13 videos at issue in this case. Therefore, I estimate it would take me approximately 80 hours to edit the videos in a manner consistent with the Court's Order.

In addition, the sound on each video would also require editing, in order to fully obscure the identity of staff participating in the use-of-force incident. An additional 2 to 4 hours of editing per 30-minute segment of video would be required to edit the sound, as I would need to identify each voice segment belonging to staff and edit that segment. That would add an additional 40 hours of editing to the process. This approximate figure (120 hours) does not include any time needed for review or additional modifications needed to produce a final product. Further, because this work is not encompassed within my customary duties, and would be in addition to my daily assigned tasks and normal workload, I anticipate it would take several months to complete a final, edited version of the videos. However, as stated above, even with careful and painstaking editing, the concerning information described above will not be fully obscured.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __7__ day of __MAY__ 2021.

_John Baumchen_
John Baumchen
Audio-Visual Production Specialist
Management and Specialty Training Center
Aurora, Colorado