UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVIVA STAHL,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL BUREAU OF PRISONS, and DEPARTMENT OF JUSTICE,<br><br>    Defendants. | No. 19-CV-4142 (BMC)<br><br>DECLARATION OF J. RELVAS |

DECLARATION OF J. RELVAS

I, J. Relvas, do hereby declare and state as follows:

1. I am employed by the United States Department of Justice ["DOJ"], Federal Bureau of Prisons ["Bureau"], as the Correctional Services Administrator for the North Central Regional Office in Kansas City, Kansas. I have been employed in this capacity since March 2020. I began my career with the Bureau in 2001, and have held various positions of increasing responsibility throughout the agency. In my current position as Correctional Services Administrator, I provide guidance and support to Correctional Services and Executive staff in 20 federal prisons located within the Bureau's North Central Region. I make the statements herein based on my personal knowledge and experience and my review of the official files and records of the Bureau to which I have authorized access.

2. I am aware of current ongoing litigation pertaining to the Bureau's withholding of videotapes that record calculated use-of-force incidents involving federal inmate Mohammad Salameh, Reg. No. 34338-054. It is my understanding that a request for the videotapes was made pursuant to the Freedom of Information Act (FOIA) and the Bureau withheld a total of thirteen (13) videotapes that documented two (2) separate calculated use

of force incidents involving inmate Salameh while he was incarcerated at the United States Penitentiary, Administrative Maximum, in Florence, Colorado ["ADX Florence"]. The first set of videos documented a calculated use of force incident on November 4, 2015, when inmate Salameh was provided involuntary hydration. The second set of videos documented a calculated use of force incident on November 11, 2015, when inmate Salameh was provided involuntary nutrition.

3. It is my understanding that the Court has ordered the Bureau to determine whether it has the ability to edit a portion of these videotapes in such a manner that will obscure the identities of Bureau staff. I have been informed that the specific portion of the videos at issue begins when inmate Salameh arrives in the room for medical examination and ends when he leaves the room. I have reviewed the relevant portion of each of the videotapes, and I have also reviewed the declaration and supplemental declaration executed by my predecessor, James Phelps, in regards to this case. Mr. Phelps's declarations discussed the Bureau's hunger strike and use of force policies in detail, and also described the content of each use of force video in great detail. While I agree with, and incorporate herein, the information contained in the declaration and supplemental declaration executed by Mr. Phelps, I am offering this declaration to clarify a few points and further justify the Bureau's withholding of the videos at issue.

<u>Content of the Videos</u>

4. Because Mr. Phelps's declaration details the content of each use of force video, I will not exhaustively detail my observations of the videos in this declaration. However, I want to clarify a few things about the portions of the videos that the Bureau has been ordered to attempt to edit, specifically from the time inmate Salameh arrives in the room for medical

2

examination and throughout the time the medical procedure occurs, ending when he leaves the room to be transported back to his cell.

5. In the November 4, 2015, video, inmate Salameh is escorted from his cell by several staff who make up the use of force team. As Mr. Phelps described, the team members are dressed in protective equipment, which is clearly visible in the video. The use of force team members are seen surrounding inmate Salameh, even when they arrive in the other area of the institution where his medical evaluation begins. When the medical professional appears in the video to initiate inmate Salameh's medical evaluation, the use of force team members do not leave the area, and in fact, remain surrounding inmate Salameh. The use of force team members are positioned in such a manner as to allow the medical examination to be conducted, but also to react quickly if the need to restrain inmate Salameh arose.

6. Although the description of this portion of the video might seem that it merely documents a routine medical assessment, it is actually much more complex than that. First, any interaction with an inmate in a prison setting, and especially under circumstances where an inmate is subject to involuntary procedures, must be treated with caution. In these situations, and particularly in situations where a calculated use of force is required, the Bureau mandates that universal use of force procedures must be utilized. As explained by Mr. Phelps, regardless of the nature of an inmate's noncompliance, whether it be an inmate refusing medical treatment or an inmate physically resisting staff, use of force techniques and procedures are employed in a consistent manner. Further, the very act of an inmate refusing to follow the rules of a prison or directives given by authorities demonstrates the unpredictability of noncompliant inmates. As such, staff who participate in use of force procedures must be ready at a moment's notice to react appropriately, regardless of the situation or circumstances. Consequently, a procedure to involuntarily hydrate or provide

3

nutrition to an inmate can only be accomplished during a calculated use of force, and the use of force procedures remain ongoing, even throughout the medical procedure.

7. The portions of the videos at issue here, therefore, show much more than a simple medical examination of inmate Salameh. For starters, the restraints applied to inmate Salameh are visible throughout the video. In addition, the staff members comprising the use of force team, each of whom is dressed in protective clothing and donning protective equipment, are visible throughout the video. The video shows the use of force team members' positioning and readiness, which includes their particular position around the inmate, the placement of their hands either on or near the inmate, and the manner in which they control the inmate when he moves or when it is necessary for the team members to move him. It also shows the use of force team member's reactions and controlling techniques employed when the medical professional approaches and makes contact with the inmate. Further, as the video progresses, it shows the use of force team accessing security devices and restraint keys, as well as the actual adjustment of the inmate's restraints. Allowing public access to this type of information could allow an inmate and other viewers to study the protective clothing and equipment worn by use of force team members, as well as specific controlling and restraint techniques employed by the team. Because the clothing, equipment, reactive and protective positioning, and controlling and restraint techniques are universal in all use of force situations, a perceptive inmate could learn to identify the weaknesses in those measures, and possibly defeat them, thereby placing use of force staff at risk of injury.

8. The content of the November 11, 2015, videos is similar to the November 4, 2015, videos. First, inmate Salameh is escorted from his cell by the use of force team members, and again, the staff are dressed in protective clothing and equipment, which is clearly visible in the video. The use of force team members are seen surrounding inmate Salameh when

4

his medical evaluation begins. Again, the use of force team members do not leave the area, and remain surrounding inmate Salameh. They assist inmate Salaeh's movements when necessary for the purpose of the medical examination and maintain control of him throughout the examination. The video also shows the use of force team moving inmate Salameh into the specialized restraint chair utilized for the administration of involuntary nutrition. This portion of the video continues to show the use of force staff, their protective clothing equipment, and the positioning and controlling techniques utilized, as well as the manner in which the specialized restraints are applied to inmate Salameh. When the involuntary administration of nutrition is initiated, and throughout the completion of the procedure, the use of force team remains in position and continues to control inmate Salameh using the specialized use of force procedures required in a calculated use of force situation. When the provision of involuntary nutrition is completed, the video shows the use of force team removing the specialized restraints from inmate Salameh and moving him out of the specialized restraint chair onto a medical examination bed where his vitals are taken. Again, this portion of the video continues to show the use of force staff, their protective clothing equipment, the positioning and controlling techniques utilized, and the functioning of the specialized restraints. As with the November 4, 2015, video, during the entirety of the medical procedure, inmate Salameh's restraints are clearly visible, as are the use of force team members' protective clothing and equipment, their positioning around the inmate, the placement of their hands either on or near the inmate, and the manner in which they control the inmate. It also shows the use of force team member's reactions and controlling techniques employed when the medical professional approaches and makes contact with the inmate. Again, allowing public access to this type of information could place use of force staff at risk of injury.

5

Edited Videos

9. I understand that an attempt to edit the concerning information from a small portion of the use of force videos was made, and I had the opportunity to review the video clips after Bureau staff attempted to edit them. However, despite the efforts to edit the videos, the concerning information, which could place Bureau staff at risk of danger or injury, remained. I first reviewed a portion of the November 4, 2015, video, in which inmate Salameh was provided involuntary hydration. The restraints applied to inmate Salameh were visible throughout the edited video. In addition, I could see several areas of the edited video in which staff faces and nametags were not or could not be fully blurred. At times, even if the face of staff was blurred, their skin or hair color, or overall body makeup was visible, making identification of the individual employee easier. I could also clearly see the protective clothing and equipment worn by the use of force team members, and I could clearly make out their protective and reactive positioning, as well the controlling techniques employed throughout the use of force. Although the use of force team members appropriately allowed the medical professional access to the inmate, they remained close to the inmate and in most cases maintained direct physical contact with him. As such, editing the faces and protective clothing and equipment of the use of force staff, while maintaining a visual of the inmate and the medical evaluation and/or procedures he received, was not successful. Throughout the portion of the video that documented the medical evaluation and subsequent involuntary hydration, the use of force team continued to employ correctional readiness techniques and positioning, as well as controlling and restraint application techniques. These techniques can clearly be seen on the video, with the exception of the frames that were completely blurred and nothing can be seen.

10. In the November 11, 2015, video, much of the same concerns remain, even after Bureau staff attempted to edit the video. First, the edited portion of this video only encompassed a very short (less than 2:00 minutes) clip of the entire medical procedure. Specifically, the editing began after inmate Salameh had already been restrained in the specialized chair, and continued through a short period during which the medical professional prepared the liquid nutrition for the involuntary feeding. It did not encompass the beginning of the medical examination or the movement of inmate Salameh into and out of the restraint chair. As such, the same concerns I described in paragraph 9 above exist regarding any attempt to edit this video. Specifically, the faces and identifying features of the medical professional and use of force team members would be visible, as would the protective clothing and equipment worn by the use of force team members, and the positioning, restraining, and controlling techniques employed throughout the use of force.

11. In addition, although the editing of this very short clip was more successful in obscuring the identities of staff involved in the use of force (most likely because there was very little movement during this small portion of the video), some concerning information remained. First, I could clearly see the skin color of the medical professional, and given the limited number of medical professionals employed at ADX Florence, it would not be difficult to identify who the medical professional seen in the video is. Second, the edited video still reveals protective equipment worn by the use of force team members, as well as their protective and reactive positioning around the inmate, and the controlling techniques employed by the use of force team members. Again, public access to this type of information could allow perceptive inmates to learn the weaknesses in these measures, and possibly to defeat them in future use of force situations, thereby placing use of force staff

7

at risk of injury. Identification of individuals involved in the use of force could also place the individual staff member at risk of injury or subject them to retaliation.

12. In my professional opinion, due to the constant movement of staff throughout the videos, and the close proximity of use of force staff to the inmate and the medical professional, the identities of staff, their personal features, including skin and hair color or body type, the protective clothing worn and protective equipment donned by staff, as well as the use of force techniques employed by the staff, such as protective and reactive positioning, and controlling and restraint techniques, cannot be edited from either video in a manner that would protect the safety of staff involved in either use of force incident, or any Bureau staff involved in other use of force situations. The information that could place Bureau staff at risk of danger or injury is simply too intertwined with any information that could possibly be released to make editing of these videos successful.

## Law Enforcement Techniques/Procedures

13. It is my understanding that the Court has determined the portion of the videos showing inmate Salameh receiving medical evaluations and treatment is not protected by the FOIA's law enforcement techniques and procedures exemption. Although I am not intimately familiar with the FOIA exemptions, I believe that a use of force video, from start to finish, encompasses law enforcement techniques and procedures. First, although the portion of the videos at issue document medical procedures, the videos themselves are not recordings of the medical procedures. Rather, the videos were made to document the use of force procedure, which in this particular case, happened to involve the involuntary administration of medical hydration and nutrition. While in a particular instance, it may be easy to distinguish between a use of force and a medical procedure for involuntary procedures outside a correctional environment, as the calculated use of force procedures

8

are continuously used throughout the medical procedures, the involuntary feeding or involuntary hydration of a particular inmate are all part of one use of force incident. It is simply impossible to separate the medical procedures from the use of force procedures, or in the alternative, to remove the use of force techniques and procedures from the portion of the video that captures the medical procedures.

14. The use of force by staff, on any level, is an action that has significant possible consequences for all involved. For this reason, the Bureau authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed. See BOP Program Statement 5560.06, at p. 1. When time and circumstances allow, a calculated use of force is preferred. Special techniques are taught to those who participate on a use of force team, and Bureau policy dictates that those techniques must be used to exert control over a noncompliant inmate. Id. at pp. 4-5. These special techniques are not published in publically available Bureau policies, and access to this information is restricted to only those who are actively involved in use of force procedures. Further, the techniques are universally employed in any calculated use of force procedure, regardless of the nature of the inmate's noncompliance or the circumstances requiring the use of force in the first place. Revealing these techniques to the public, even just a small portion or glimpse of the process, creates a significant risk of danger for Bureau employees who participate in any calculated use of force. Editing the videos at issue here is simply insufficient to protect against that danger.

15. Bureau policy also requires that any calculated use of force incident be videotaped. The videos that exist in the context of this case are unique in only one sense. Generally speaking, the provision of medical treatment to inmates is not routinely recorded on video. In this case, the only reason the medical procedures were videotaped was because the

9

provision of hydration and nutrition was involuntary, and had to be administered by employing a calculated use of force. If inmate Salameh had voluntarily agreed to consume either hydration or nutrition, no video would exist. It is not, therefore, inmate Salameh's medical treatment that encompasses the law enforcement techniques and procedures the Bureau seeks to protect. Rather, the Bureau seeks to protect release of the use of force techniques and procedures that are employed throughout the entirety of the use of force, including during the administration of medical treatment.

16. Use of force videos in general serve a multitude of law enforcement purposes. First, the very fact that a calculated use of force is initiated is evidence of the inmate's noncompliance and failure to follow Bureau rules and regulations. A use of force video, although I am uncertain whether they were in this particular case, can be used as evidence of the inmate's violation of Bureau rules and regulations, and depending on the circumstances of the inmate's noncompliance, could be used as evidence of the inmate's violation of the law. For example, a common scenario in which a calculated use of force is initiated occurs when an inmate engages in the destruction of government property, an act that is punishable under federal law. As another example, the necessity of using force can be evidence to support an investigation or prosecution of an inmate who has assaulted or threatened staff, which is also a common cause for using force in a prison setting. On the other hand, video evidence showing Bureau staff using force could possibly be used in connection with investigations or prosecutions of staff accused of using excessive force. In my professional opinion, and based on my experience, a video documenting a use of force, whether it includes a medical component or not, documents law enforcement techniques and procedures that can absolutely be used, and have been used in the past, in connection with investigations and prosecutions.

17. All of the above-described justifications for withholding the videos, as well as those discussed in Mr. Phelps's declaration and supplemental declaration, are necessary in order for BOP to carry out its mission of protecting the public, its staff, and inmates from harm. Protecting staff, the Bureau's security measures, and institutional order at ADX Florence, which houses some of the most violent and dangerous inmates, is of the utmost importance. Revealing the identities, or even identifying features, of those involved in a use of force scenario places those staff at risk of danger, and revealing the Bureau's use of force techniques could have detrimental effects for its staff, inmates, and the general public. Editing the videos in an attempt to obscure this information is simply insufficient to quell these concerns, because the protected information is too intricately intertwined with releaseable information throughout the entirety of each video.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7 day of MAY 2021.

J. Keevas
Correctional Services Administrator
North Central Regional Office
Kansas City, Kansas

11