```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
   AVIVA STAHL,                                             :
                                                            :   MEMORANDUM DECISION
                                        Plaintiff,          :   AND ORDER
                                                            :
              - against -                                   :   19-cv-4142 (BMC)
                                                            :
   DEPARTMENT OF JUSTICE and                                :
     FEDERAL BUREAU OF PRISONS,                             :
                                                            :
                                        Defendants.         :
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

The Court's previously issued partial summary judgment order prevented plaintiff, investigative journalist Aviva Stahl, from obtaining certain sections of thirteen videos taken at the Bureau of Prisons' ("BOP") Administrative Maximum-Security Facility in Florence, Colorado ("Florence ADX"). These videos show the non-consensual nasogastric tube feeding and intravenous rehydration of Mohammad Salameh – a man convicted for his role in the 1993 terrorist attacks on the World Trade Center. Stahl sought the full, unedited videos via a Freedom of Information Act ("FOIA") request to the BOP.

The Court prevented the release of the videos' "first segments," depicting BOP staff identifying themselves, describing their responsibilities, and transporting Salameh to the examination room, and "third segments," where the staff returns Salameh to his cell, identifies themselves again, and discusses the events. The Court reserved judgment and requested additional briefing as to whether the videos' "second segments," displaying Salameh's examination and the medical procedures, could be given to Stahl.

The briefing makes it clear that the government misunderstood the Court's first ruling. As a result, it only used one video editing feature at its disposal (of which there were likely many) and attempted to redact far too much material. The government needs to redetermine, using the relevant technical capabilities at its disposal, whether preventing the release of the BOP staffs' identities is unduly burdensome or inextricably intertwined with the unexempt material in the videos.

## BACKGROUND

### I. The Hunger Strikes

In 2015, Salameh began a hunger strike that would last thirty-four days. By early November, his health had deteriorated to such a state that the BOP determined that he required immediate medical attention. In two separate episodes, the BOP performed what it calls "involuntary medical treatment" and a "calculated use of force." Plaintiff calls it "force-feeding."

In the first episode, on November 4, BOP, staff donned protective gear and went to Salameh's cell. Defendants claim that Salameh refused to leave his cell. Salameh denies this, claiming that he was too weak to come to his cell door. In any event, the staff placed Salameh in handcuffs and leg irons, extracted him from the cell, placed him in a wheelchair, and ferried him to another room.

There, medical staff conducted a physical examination. Observing signs of severe dehydration, they determined that Salameh needed immediate liquid intake. He refused. An emergency medical technician ordered that Salameh undergo involuntary rehydration. Medical staff placed him on his back, adjusted his restraints, and inserted an IV into his arm. Once satisfied with his liquid intake, the BOP staff returned him to his cell.

2

The next week, on November 11, the BOP again determined that Salameh required immediate attention. Staff went to his cell, and this time, Salameh agreed to come to the door and submit to hand restraints. The staff brought him to another room. Medical staff weighed Salameh, took his vital signs, and conducted another physical examination. Then, they placed Salameh in what the BOP calls "a specialized chair allowing an inmate to remain restrained while sitting upright." Salameh refused to drink a liquid nutritional supplement, and a physician assistant determined that Salameh would receive the supplement without his consent. While medical staff held Salameh's head, the physician assistant inserted a nasogastric tube through Salameh's nose and into his stomach. Defendants report that Salameh resisted these efforts by "deliberately regurgitating and vomiting the supplement." Salameh maintains that the vomiting was involuntary. Once he received the nutritional supplement, the BOP staff returned him to his cell.

## II. The FOIA Requests

Several years after these events, plaintiff submitted a FOIA request, seeking Salameh's medical records as well as "videotapes of any involuntary medical treatment." The BOP provided redacted versions of Salameh's medical records, and it withheld the videos. This suit followed.

The parties resolved any objections to the adequacy of the BOP's search and its redactions to the medical records, leaving one remaining issue: whether FOIA requires defendants to produce the videos. Defendants have identified thirteen videos in total. Six document the events of November 4, and seven document the events of November 11. To explain their contents, defendants submitted declarations from two administrators at the BOP regional office that oversees Florence ADX. The declarations explain that the videos generally follow the same format. They come from two different cameras, which filmed the events from

3

two different angles.  They document roughly an hour and fifteen minutes of each event.  And generally speaking, the videos contain three different segments.[1]

The first segment is an introduction.  A BOP lieutenant and the two cameramen identify themselves by name and title.  According to the declarations, the lieutenant "describes the situation and the need for the calculated use of force."  He outlines "the specific procedures that will be taking place during the calculated use of force, including the order in which specific security measures will be conducted."  Then, the staff members who perform the "calculated use of force" identify themselves. They detail their job titles and their specific responsibilities, including what part of Salameh's body they have the responsibility to restrain.  The staff members state that they are "willing participant[s] in the calculated use of force."  Further, the medical staff "discuss [Salameh's] medical condition, explain the need for involuntary treatment, and describe the procedures they intend to use."  The videos show their faces as well as their protective gear.  The videos also reveal "specific security equipment" and "how some of the security equipment works."

In the next segment, the videos document the events at issue.  The staff travel to Salameh's cell, perform the "calculated use of force," and place Salameh in restraints.  They bring Salameh to another room, and the medical staff conduct the procedure.  Finally, the staff return Salameh to his cell.

The final segment is a debrief.  From Salameh's cell, the staff travel to another location, where they again introduce themselves and outline their specific duties.  The lieutenant "describes the calculated use of force, including the specific actions that were taken by the staff

---

[1] In discussing "segments," I refer not to the actual splicing of the videos, but to the three general subject areas that the videos sequentially cover.

to restrain [Salameh] in preparation for the medical treatment." Each individual involved in the extraction describes "the specific duties he was assigned," "how he carried out those duties," and "whether he had any injuries following the incident." Then, the medical staff describe "the treatment they administered and [Salameh's] medical condition." With that, the videos conclude.

### III.    The Prior Order

On March 21, 2021, the Court found that FIOA Exemption 7(F), 5 U.S.C. § 552(b)(7)(F), covered the portions of the videos which displayed BOP's procedures for removing prisoners from their cells as well as the staff's names, titles, and responsibilities. Specifically, the Court's prior order found that the portions of the videos showing "protective gear," "security equipment," and how the staff use that equipment to restrain Salameh, remove him from a cell, and move him to another part of the prison, could facilitate inmate attempts to circumvent the procedures, threatening the BOP's ability to perform them safely. See Zander v. Dep't of Just., 885 F. Supp. 2d 1, 7 (D. D.C. 2012). Relatedly, the Court concluded that it could not ignore that Salameh has connections to international terrorist organizations and releasing the names and titles of the staff in the videos could reasonably be expected to expose them to retaliation or reprisals.

Turning to the remaining middle section of the videos, the Court held that disclosing how the BOP performs a physical examination, orders that an inmate undergo involuntary medical treatment, and implements that treatment could not "reasonably be expected to endanger the life or physical safety of any individual" in the same way as disclosing the procedures for a cell extraction. However, the Court acknowledged that the videos' "second segments" still contained some exempt information and this issue was not adequately briefed. Consequently, the Court accepted further briefing on the issue of whether the exempt information was "reasonably

5

segregable" from the non-exempt material. 5 U.S.C. § 552(b).[2] The Court specified that the parties should consider the remaining portion of the videos to begin when Salameh arrives at the room for the medical examination and ends when he leaves that room.

## DISCUSSION

### I. Legal Framework

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing Bigwood v. U.S. Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

In FOIA litigation, the government also bears the burden of demonstrating why it withheld records or that the requested information falls within an exemption. See Carney v. Dept. of Just., 19 F.3d 807, 812 (2d Cir. 1994). The government can satisfy this burden through affidavits or declarations that "giv[e] reasonably detailed explanations why any withheld documents fall within an exemption." Id. The government's evidence and witnesses "are accorded a presumption of good faith." Ctr. for Const. Rts. v. CIA, 765 F.3d 161, 166 (2d Cir. 2014) (quotation omitted).

Once the government shows that an exemption applies, FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record

---

[2] The Court also gave defendants the option to submit the videos for *in camera* review. See 5 U.S.C. § 552(a)(4)(B). But it also recognized that *in camera* review "is a matter entrusted to the district court's discretion," it is "the exception, not the rule." Loc. 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB, 845 F.2d 1177, 1180 (2d Cir. 1988).

6

after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  A district court "must make specific findings of segregability regarding the documents to be withheld." Spadaro v. Customs & Border Prot., 978 F.3d 34, 41 n.2 (2d Cir. 2020).  Although a court may rely on the government's submissions in making those findings, they "will not suffice if the [submissions] are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." Evans v. Fed. Bureau of Prisons, 951 F.3d 578, 586 (D.C. Cir. 2020) (quotation omitted).

II.     The Videos' Remaining Sections

The government's supplemental briefing argues that the BOP staffs' identities and the techniques they used to administer the involuntary treatment are exempt from FOIA.  To support this conclusion, defendants point to FOIA's safety exemption, 5 U.S.C. § 552(b)(7)(F), and the Court's March 26, 2022 opinion.  Based on this reading, defendants argue that protected information exists throughout the videos and is not "reasonably segregable."

This interpretation is too broad.  The Court's prior opinion demonstrates that the only remaining issue is whether the government's video editing capabilities allow it to efficiently and thoroughly redact the identities of BOP staff.  The government must attempt to redact the videos based on a proper reading of the Court's prior opinion and re-brief this issue if it still believes it cannot reasonably segregate the exempted material.

A.      Methods for Administering Involuntary Medical Treatment

When it exempted the first and third segments of the videos in its March 26, 2021 opinion, the Court distinguished the protective gear, security equipment and methods used to restrain, remove, and transport an inmate from how the BOP performs a physical examination, orders that an inmate undergo involuntary medical treatment, and implements that treatment.  It reasoned that disclosing the latter procedures "could not reasonably be expected to endanger the

7

life or physical safety of any individual in the same way" because the inmate was weak and restrained. Moreover, the procedures used for "involuntary medical treatment [account for the fact that it] is a last resort, reserved for instances in which an inmate's health has deteriorated to such an extent that the inmate needs immediate medical attention" and, "in such a state, an inmate could not reasonably be expected to have the strength to resist."

Despite this holding, the government's brief concludes that exempt information encompasses "the protective gear worn by the team, the security equipment and [the] use of that equipment." From this conclusion, the government reasons that editing the remaining sections of the videos would be nearly impossible because where prison personnel stand and what they are wearing is pervasive and inseparable. This approach ignores the prior opinion's critical distinction that the protective gear and security equipment alone are not exempt. Such equipment and how it is used is widely known. See, e.g., U.S. Gov't Accountability Off., GAO-11-410, Bureau of Prisons: Evaluating the Impact of Protective Equipment Could Help Enhance Officer Safety (2011). Rather, it is that equipment's use in the context of standard prisoner cell extraction and transfer procedures, which are also publicly available, that allows this section of the videos to fall within § 552(b)(7)(F)'s security exception.[3] Disclosing *this* information would enable otherwise healthy and capable inmates to circumvent the standard procedures, threatening the BOP's ability to perform them safely.

Once the prisoner extraction and transport were complete, Salameh was fully within the power of BOP personnel. The procedures that followed, consisting of a medical evaluation and

---

[3] See, e.g., Department of Justice National Institute of Corrections, Cell Extraction Handout, https://nicic.gov/cell-extractions-student-handout; CorrectionOne Academy, Cell Extraction Techniques, https://www.corrections1.com/corrections-products/videos/correctionone-academy-cell-extraction-techniques-kWR5gzTL0Em5aQx9/; id., Three Man Cell Extraction, https://www.corrections1.com/archive/videos/three-man-cell-extraction-4NQ5jnEf5rS1AgA4/.

the forced implementation of treatment, would never be used on a healthy inmate. Although standard use-of-force techniques and procedures are employed throughout these videos, these methods would be irrelevant to any similarly situated inmate seeking to resist BOP personnel during the forced administration of medical aid.

Salameh was a long way into his hunger strike and, even by the government's account, was surrounded and carefully restrained. Weak, encircled, and completely controlled, anyone in Salameh's position could not reasonably pose a danger to BOP staff – regardless of what he might know. Thus, the government has, again, not met its burden of demonstrating why BOP staff and inmate safety would be endangered by disclosing the methods and equipment displayed in the remaining sections of these videos.

### B.  Obscuring Staff Identity

At this point, the Court cannot accept the government's position that it could not reasonably segregate the exempted and unexempted information. The government's argument along with the submitted sworn statements of John Baumchen, the government's video editor, and J. Relvas, a Correctional Services Administrator, demonstrate inadequate attempts to redact.

Baumchen states that he attempted to edit a portion of the videos by blurring everything except the inmate. The government's argument suggests he did this because the government believed that Salameh's restraints, BOP equipment, and the techniques of BOP personnel all constituted exempted information. Given this overly broad task, Baumchen assessed that it would take him approximately 120 hours to edit the entire video. The Court cannot rely on this assessment because it was based on the previously described faulty premise.

Additionally, Baumchen originally stated that the video editing software he used, but was unfamiliar with for the purposes of redaction, could both black out and blur images, yet he

9

and Relvas only discussed the effects of the blur function.  Presumably placing a black box or circle around BOP staff would be a far easier and more complete way to obscure their identity as opposed to merely blurring out portions of a frame.  One could envision blacking out everything around an oval of Salameh and then placing a black box over any BOP staff member's hand or body part that entered the remaining frame.

It cannot be overstated that disclosing the identity of the BOP staff involved in this forced medical treatment of a convicted international terrorist risks exposing them to reprisals and retaliation outside the walls of Florence ADX.  See Manna v. Dep't of Just., 51 F.3d 1158, 1166 (3d Cir. 1995); Maroscia v. Levi, 569 F.2d 1000, 1002 (7th Cir. 1977); Garcia v. Dep't of Just., 181 F. Supp. 2d 356, 373–74 (S.D.N.Y. 2002).  Defendants have therefore established a safety interest that weighs against disclosure.

But the Court's analysis does not end there.  The government still must demonstrate why it cannot "reasonably segregate" or redact any portion of those videos.  5 U.S.C. § 552(b).  As this Court previously observed, other courts have required the government to edit videos to obscure identifying information in order to comply with FOIA.  See Schwartz v. Drug Enf't Admin., No. 13-cv-5004, 2016 WL 154089, at *20 (E.D.N.Y. Jan. 12, 2016) (cleaned up), aff'd, 692 F. App'x 73 (2d Cir. 2017); Prison Legal News v. Exec. Off. for U.S. Att'ys, No. 08-cv-1055, 2009 WL 2982841, at *5 (D. Colo. Sept. 16, 2009, aff'd in part, appeal dismissed in part, 628 F.3d 1243 (10th Cir. 2011); see also Tunnell v. Dep't of Def., No. 1:14-cv-269, 2016 WL 5724431, at *3 (N.D. Ind. Sept. 30, 2016); Stevens v. Dep't of Homeland Sec., No. 13-cv-3382, 2014 WL 5796429, at *10 (N.D. Ill. Nov. 4, 2014).

More broadly, video editing has become commonplace in litigation.  See Womack v. Smith, No. 1:06-cv-2348, 2012 WL 1245752, at *7 (M.D. Pa. Apr. 13, 2012) (ordering BOP

officials in a Bivens action to edit video evidence "to exclude excessive nudity"); see also Sampson v. City of El Centro, No. 14-cv-1807, 2015 WL 11658713, at *7 (S.D. Cal. Aug. 31, 2015).

In other FOIA cases concerning the BOP's video records, courts have already held that the government has a duty under FOIA to release footage if it can successfully segregate sections of videos to redact exempt material.  See generally Kubik v. U.S. Fed. Bureau of Prisons, No. 10-6078, 2011 WL 2619538 (D. Or. July 1, 2011).  Most recently, the D.C. Circuit in Evans v. Fed. Bureau of Prisons, 951 F.3d 578, 587 (D.C. Cir. 2020), a case involving the redaction and release of BOP surveillance footage of a stabbing, observed "teenagers regularly send each other screenshots from all sorts of video media.  Presumably, most of these teenagers have fewer resources than the United States government.  It is not at all clear why the government could not at least isolate some [material and meet some] sort of segregability standard.".  Evans continues, "[i]t is not at all clear why the government could not at least isolate some screenshots that would meet the same sort of segregability standards typically applied to printed material." Id.

The government's arguments and evidence reveal that it incorrectly broadened the Court's earlier guidance and may not have fully explored the redaction options available in the software it used for this case.  Thus, the Court cannot presently make findings of fact concerning the exempt material's severability.  The government must narrow its scope and, again, attempt to redact information that could reasonably be used to identify BOP staff.  It also must not accept at face value just one feature in what clearly is very capable and technically advance video editing software.

11

## CONCLUSION

The Government is directed to conduct the additional video redaction efforts described above, plus any others of which a capable video expert might know, and submit the additional analysis within the next 30 days. Plaintiff may respond within 30 days thereafter.

**SO ORDERED.**

Digitally signed by Brian M. Cogan
_____
U.S.D.J.

Dated: Brooklyn, New York
       March 11, 2022